IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 ) |
| Hawthorne Race Course, Inc., *et al.*,[1] | ) Case No. 26-03505 ) |
| Debtors. | ) Joint Administration Requested ) ) |

### DECLARATION OF TIMOTHY SEAN CAREY IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Timothy Sean Carey, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. I am the President and CEO of above-captioned debtors and debtors in possession (collectively, the "**Debtors**").

2. I graduated from Eastern Illinois University in 1986 with a Bachelor of Arts in Economics and attended the University of Arizona Race Track Management Program.

3. I have been the President and CEO of the Debtors since 2005. The Debtors operate the Hawthorne racetrack at 3501 S. Laramie Ave., Cicero, Illinois, approximately ten (10) miles from downtown Chicago. I was asked to run the racetrack in 2005 by an uncle who recognized the need for a fourth-generation member of the family to step in and take the business in a new direction. At the time, we were having difficulties with our business partner and I felt an obligation to help the family where I could. Prior to my positions at the Debtors, I was the founder and managing partner of Dagwood's Sandwich Factor ("**Dagwood's**"). Prior to Dagwood's, I was

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hawthorne Race Course, Inc., (2284); Carey Heirs Properties, LLC, (2654); Suburban Downs, Inc., (2457); and Post Time Catering, Inc., (3590). The Debtors' mailing address is 3501 S. Laramie Ave, Stickney, IL 60804.

President and founder of Chicago Trolley Co. ("**Chicago Trolley**") which was sold to Coach USA in May of 2000. Prior to Chicago Trolley, I had six years of executive leadership in start-up ventures within the hospitality and entertainment industry, where I was Senior Corporate Director for Inter-Track Partners, LLC, an off-track pari-mutuel wagering and hospitality and entertainment company that had annual revenues of $285 million.

4.      I submit this declaration (the "**Declaration**") in support of the First Day Motions (as defined below) and to provide information to the Court and parties in interest regarding the Debtors. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management or the Debtors' professionals, discussions with other employees of the Debtors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions and the industry in which the Debtors operate. If called as a witness, I could and would competently testify to the matters set forth in this Declaration.

5.      On February 27, 2026 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), as well as certain motions and other applications (the "**First Day Motions**"), with the Court, thereby commencing these related chapter 11 cases.

6.      I submit this Declaration in support of the First Day Motions.

### Overview of the Debtors' Business and Financial Affairs

7.      Thomas Carey, a Chicago alderman and entrepreneur, purchased the dormant Hawthorne racetrack in 1909, and in fits and starts, began re-establishing horse racing in the Chicago area. Hawthorne, the oldest gaming institution in the State of Illinois, is also the oldest

continually run, family owned and operated racetrack in North America serving the gambling public, cooperating in good faith with industry stakeholders, and upholding its civic responsibilities.

8. In 2016 with the closing of the Balmoral and Maywood harness facilities, Hawthorne reaffirmed its commitment to horse racing and saved hundreds of harness horsemen businesses and thousands of harness horsemen jobs thus becoming the country's only dual breed racetrack, running both thoroughbred and harness racing on the same track by converting the surface of the track prior to the commencement of a respective race meeting. Since 2022 and the closing of Arlington Racecourse, we undertook the sole responsibility of underwriting the Illinois horseracing industry in northern Illinois and are the last racetrack operating in Northern Illinois bearing the increased burden of greater purses and regulatory expenses.

9. The racetrack employs over 250 people with its longest tenured employee spending 52 years at the track. Backside residence on the racetrack property consisting of licensed employees of horsemen and their families varies depending on any racing season but will vary from a low of approximately 290 up to 500 or more. There have been years when over 900 people lived on the backside. The families live rent free and receive medical and dental care funded almost entirely by Hawthorne. These families are part of the community, supporting local businesses, attending church and sending their kids to local schools. Currently there are approximately 100 children, age 18 or under, living on the premises. There is a gentleman who is 84 years old and has been working at the racetrack and living on the backside for 72 years, arriving when he was 12 years old.

10. Currently, it is estimated that the racetrack supports over 10,000 direct/indirect jobs involved in the Illinois horse racing agri-business, including farming, breeding and training. In

57118473.2

determining the constitutionality of a certain horse racing statute in 2008, the Illinois Supreme Court commented on the importance of horse racing in Illinois stating that Illinois has a strong interest in preserving industries in the state which benefit the economy of the state as a whole.[2]

### A. Carey Heirs Properties, LLC.

11. Carey Heirs Properties, LLC, an Illinois limited liability company ("**CHP**"), owns the underlying real estate and certain improvements located at the racetrack. CHP leases the racetrack to Hawthorne Race Course, Inc., an Illinois corporation ("**HRC**") to conduct thoroughbred horse racing meetings and Suburban Downs, Inc., an Illinois corporation ("**SDI**") to conduct Standardbred (harness) horse racing meetings.

12. CHP is owned by seventy-seven (77) members many of whom, but not all are shareholders HRC and/or SDI. Most of the members of CHP and the shareholders of HRC and SDI are descendants of Thomas Carey, who purchased the racetrack property in 1909 and ran a horse racing business through the years. Upon the death of Thomas Carey, the ownership and operation of the racetrack was passed in eight equal interests, one each to his seven children and one to his wife's family. Through the years and by design, the ownership and operation of the racetrack have remained in those original family groups and, because two of Thomas Carey's children were unmarried and did not have any children of their own at the time of death, through death and descendancy, ownership now consists of six family groups.

13. CHP is governed by a board of managers (the "**Board of Managers**") consisting of three managers. The Board of Managers selected me as President for convenience in the transaction of the business and for the purpose of overseeing the day-to-day operations of CHP, as I have done since CHP's organization in 2012.

---

[2] *Empress Casino Joliet Corp.* v. *Giannoulias*, 231 Ill. 2d 62, 896 N.E. 2d 277 (2008)

4

57118473.2

### B. Hawthorne Race Course, Inc.

14. HRC conducts its business under the auspices of governing bodies of the State of Illinois, the Illinois Racing Board ("**IRB**") and the Illinois Gaming Board ("**IGB**"), and operates (a) live pari-mutuel wagering on thoroughbred horse racing, (b) simulcasting wagering of horse racing programs from in-state and out-of-state locations, (c) food and beverage operations under its wholly-owned subsidiary, Post Time Catering, Inc., (d) sportsbook wagering, (e) advance deposit wagering from funded accounts, usually online, and (e) off-track betting facilities that accept pari-mutuel wagering on its thoroughbred horse racing as well as simulcast racing from other locations through its operating division, Hawthorne OTB ("**OTB**"). HRC currently operates 10 OTBs throughout Illinois (Joliet, Crestwood, Villa Park, Rockford, Oakbrook Terrace, Hoffman Estates, North Aurora, Evergreen Park, Lansing and McHenry) with Prospect Heights temporarily closed due to a fire but expected to be back online at the end of the month. Hawthorne is allowed to operate up to 16 OTB's in the state.

15. HRC and its predecessors have been licensed by the IRB prior to the destruction of the racetrack in 1978 by fire, and continuously since its reconstruction. Prior to 1979, the year in which HRC was incorporated, the Estate of Thomas Carey, an Illinois general partnership, d/b/a Hawthorne Race Course owned and operated the racetrack.

16. HRC is also mostly owned by the descendants of Thomas Carey, and similarly to CHP and SDI, is owned in six family groups. The shareholders of HRC are comprised of fifty-eight (58) shareholders plus four trusts, each with a single beneficiary. The HRC shareholders are similar to, but not exactly the same in name or percentage as, the shareholders of SDI.

17. HRC is governed by a Board of Directors currently consisting of nine directors. The Board of Directors has named me as its President and CEO, a position I have held since 2005.

57118473.2

In October of 2019, in conjunction with the development of Illinois' first Racino entertainment complex (the "**Racino**") featuring both casino-style wagering and horseracing, Kevin Kline was named CEO of Gaming for the Hawthorne Casino and Race Course, a division of HRC.

18. On July 30th 2020, the IGB unanimously found HRC to be preliminarily suitable for an organizational gaming license. In July 2021, the IGB voted unanimously to find myself (as Shareholder, Board Member, President and CEO) and Kevin Kline (as CEO of Gaming), as well as the other HRC board members and HRC shareholders suitable as key persons of HRC. HRC's continued licensing suitability and respective sports wagering license renewal was approved by the IGB in September of 2024.

19. HRC was also awarded retail, mobile, and online sportsbook wagering licenses. Such wagering was operated by PointsBet USA under a licensing agreement with HRC. During 2023, the shareholders of PointsBet USA agreed to the sale of its US operations to Fanatics, a subsidiary of Fanatics Holding Inc. and in May of 2023, HRC and Fanatics signed a letter of intent framework to enter into a definitive agreement based substantially on HRC's agreement with PointsBet. On January 26, 2026, Fanatics terminated the mobile and internet portion of the agreement with HRC but continues to provide retail services at the racetrack and the OTBs eligible to offer sports wagering.

C. **Suburban Downs, Inc.**

20. SDI conducts Standardbred (harness horse) race meetings, pari-mutuel betting and simulcast wagering at the racetrack and HRC's OTBs when HRC is not holding a thoroughbred meet. SDI has been granted a license to operate by the IRB since before 1998, from 2002 to 2008 and continuously from 2016 until January 26, 2026 when the IRB suspended SDI's license.

21. SDI is also mostly owned by the descendants of Thomas Carey, and similarly to CHP and HRC, ownership remains in six family groups. The shareholders of SDI are comprised of fifty-eight 58 shareholders, including five trusts. The SDI shareholders are similar to, but not exactly the same in name or percentage, as the shareholders of HRC.

22. SDI is governed by a Board of Directors currently consisting of ten directors. The Board of Directors has named me as its President and CEO, a position I have held since 2005.

### D. Post Time Catering, Inc.

23. Post Time Catering, Inc., an Illinois corporation, is a wholly owned subsidiary of HRC and provides food and beverage services at the racetrack.

### E. Hawthorne Race Course, Inc. et al. Organizational Structure



### F. The Debtors' Prepetition Debt Obligations

24. Signature Bank, N.A. ("**Signature Bank**") is the provider of the Debtors' senior secured credit facilities (the "**Signature Facilities**") and serves as the central source of liquidity for both racing and Racino development activities. As of December 31, 2025, the Debtors had outstanding a revolving line of credit of approximately $15 million alongside a suite of term loans: Term Loans A, E, F, G, H (drawn in two tranches), I, and a $5 million Bridge Loan totaling $35.1 million in combined term debt and revolver exposure. These loans carry interest rates ranging

from a fixed rate of 10% to floating structures tied to prime plus a spread, resulting in $1.0 million of interest accrued as of December 31, 2025. In addition to contractual interest, the Signature Facilities include substantial back-end financial obligations: $6.1 million in exit fees across Term Loans F, G, H, and I, which materially increase the effective cost of capital. When combining principal, accrued interest, and exit fees, the Debtors' estimated total obligations to Signature Bank were approximately $51.6 million as of February 24, 2026. In December 2025 and January 2026, Signature Bank froze all of the Debtors' accounts.

25. In 2025, Latto Capital LLC provided a $5.0 million term loan secured by the Debtors' real estate. This loan is secured by a second-priority lien on the Debtors' real estate, subordinate to Signature Bank's liens.

26. On or about February 20, 2026, the Marital Trust of Robert F. Carey Jr. UAD November 15, 1987 (the "Carey Trust") made a loan to Hawthorne in the principal amount of $300,000. To secure its repayment obligations, Hawthorne granted a junior mortgage to the Carey Trust on the Crestwood Property. The mortgage was recorded on February 24, 2026.

27. The Debtors also carry a layer of unsecured obligations, primarily consisting of subordinated related party notes and racing working capital borrowings that are not collateralized by the Debtors' assets. These instruments feature flexible or long dated maturities, and function as subordinated support capital used to fund racing operations, facility needs, and liquidity gaps.

## Events Leading to Filing of the Chapter 11 Cases

28. The Debtors have faced substantial financial hardship in recent years, driven by challenges affecting the horse racing industry in Illinois, initially due to the expansion of casino gaming and later compounded by an increasingly competitive sports betting market, as well as other industry-wide issues, including rising costs and increased regulatory fees related to

simultaneously running a troubled business and building a new business. This hardship has been further exacerbated by the recent suspension of SDI's organizational license and the termination of its harness racing meet; the termination of internet and mobile sports wagering by HRC's sports wagering partner; and the discontinuation of certain simulcast wagering arrangements by other horse racing tracks throughout the United States, resulting in litigation and monetary judgments against the Debtors.

29.     The Debtors have been unable, outside a bankruptcy process, to attract capital, due to the economic stress created by its tepid relationship with its lender Signature Bank among other reasons. The Debtors, due to a citation to discover assets issued by Churchill Downs Incorporated, a judgment creditor with a judgment in the amount of $1,546,266, have not been able to utilize their revenue stream and Signature Bank has been unwilling to advance funds to pay payroll and employee benefits, track changeover to thoroughbred racing season, amounts due to the horsemen community for services and racing provided, utilities, insurance, professionals, tax and regulatory fees, and other miscellaneous obligations.

30.     To assist the Debtors, Signature Bank provided the Debtors with its land-only appraisal (not valuing the improvements, off track betting parlors and other assets) which reflects a value of approximately $95 million as of August 7, 2025.

31.     The Debtors believe that their value significantly exceeds the $95 million reflected in the appraisal and have received numerous expressions of interest from third parties regarding a potential recapitalization of its business. These parties have indicated that, in light of the circumstances described above and other considerations, they are willing to proceed only within the context of a bankruptcy process. Prior to the Petition Date, many of these interested parties executed non-disclosure agreements and reviewed extensive documentation and other material

9

57118473.2

information made available by the Debtors' financial advisors through a data room and other means.

32. After receiving proposals from three potential DIP lenders, the Debtors have agreed to a proposed priming DIP loan facility with JDI Loans LLC. The proposed facility provides for up to $16 million in financing with a 120-day term.

### The Debtors' Objectives

33. The Debtors filed for chapter 11 to complete a sale of substantially all of their assets free and clear of liabilities under section 363. The Debtors remain hopeful that they may find a suitable buyer interested in a going concern sale. A reorganization is a possible avenue to restart operations if the Debtors are able to come to an agreement with a party to recapitalize the Debtors as part of a plan process for resolving the Debtors' other liabilities. Nevertheless, the Debtors are focused on using the process afforded by section 363 of the Bankruptcy Code to maximize recovery to their creditors.

34. To help execute this strategy, the Debtors' financial advisor, Getzler Henrich & Associates LLC, will coordinate the sale with respect to all assets and particularly to evaluate potential going concern sales for some or all of the assets in addition, or in the alternative to, sales of the physical assets. With the aid of these experienced professionals, the Debtors will execute a comprehensive marketing strategy with respect to all of their material assets.

### First Day Motions

35. The following motions (the "First Day Motions") are being filed contemporaneously herewith:

   a. Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases

57118473.2

    b. Application of Debtors for Order Authorizing Retention and Employment of Omni Agent Solutions, Inc. as Claims and Noticing Agent to the Debtors, Effective as of the Petition Date, Pursuant to 28 U.S.C. § 156(c) and Local Rule 5003-1

    c. Debtors' Motion (A) for Authority to (I) Pay Certain Prepetition Employee Wages, Salaries and Other Compensation, (II) Pay and Honor Employee Medical and Other Benefits, and (III) Continue Employee Benefit Programs; (B) to Obtain Related Relief; and (C) for Shortened and Limited Notice Thereof

    d. Debtors' Motion for Authority to Pay Prepetition Taxes and Related Obligations

    e. Debtors' Motion to Authorize Payment of Deposits as Adequate Assurance of Payment for Utility Services

    f. Motion of Debtors in Possession for Authorization to Obtain Debtor in Possession Financing

36. Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue preserving the value of their assets. I have reviewed each of the First Day Motions, and I believe that the relief sought herein is necessary to permit an effective transition into chapter 11. The facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief with appropriate reliance on the Debtors' management and the Debtors' advisors, and I can attest to such facts. I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments, and otherwise continue their business operations as sought in the First Day Motions.

### The Debtors' Professionals

37. The Debtors have engaged and will be seeking the Court's approval of the employment of the following professionals as expenses of their estates:

    a. Saul Ewing LLP, as general bankruptcy counsel;

    b. Getzler Henrich & Associates LLC, as financial advisor;

57118473.2

  c. Carey White Boland Murnighan & Murray, LLC, as special corporate counsel; and

  d. Omni Agent Solutions, Inc., as claims agent and administrative agent.

## Conclusion

38. The goal of the Debtors in these cases is to maximize the value of their assets. Based on my business judgment, the recommendations of the Debtors' advisors, and my own extensive efforts in attempting to address the Debtors' liabilities, I believe that the path that the Debtors have selected through the chapter 11 process is the most clear and efficient to pursue this goal.

Dated: February 27, 2026

Respectfully submitted,

/s/ *[signature]*
Timothy Sean Carey

57118473.2