IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: <br><br> Hawthorne Race Course, Inc., *et al.*,[1] <br><br> Debtors. | ) Chapter 11 <br> ) <br> ) Case No. 26-03505 <br> ) <br> ) Joint Administration Requested <br> ) <br> ) |

### DECLARATION OF BILLY CONDON IN
### SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Billy Condon, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. Since February 2023, I have been with Getzler Henrich and Associates, LLC ("**Getzler Henrich**"), where I currently serve as a Director. Getzler Henrich is a restructuring advisory services firm that specializes in providing operational and financial services to businesses and their stakeholders.

2. Since November 2025, Getzler Henrich has been retained by the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") as their financial advisor. I have worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' financing and restructuring efforts. I have independently reviewed, have become familiar with, and have personal knowledge regarding the Debtors' day-to-day operations, businesses, financial affairs, and books and records, and I am well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hawthorne Race Course, Inc., (2284); Carey Heirs Properties, LLC, (2654); Suburban Downs, Inc., (2457); and Post Time Catering, Inc., (3590). The Debtors' mailing address is 3501 S. Laramie Ave, Stickney, IL 60804.

57353495.1

3. I have over seven (7) years of experience with in- and out-of-court restructurings, recapitalizations, mergers and acquisitions, and divestiture transactions. I have worked with companies, private equity firms, commercial banks, and direct lenders, providing financial analysis as well as operational and strategic advisory services. Prior to joining Getzler Henrich, I was a Consultant at Focus Management Group, where I provided restructuring advisory services. I was also a Senior Consultant at Allstate, where I focused on corporate strategy and acquisitions.

4. I graduated from University of Chicago's Booth School of Business with a Master of Business Administration and from Marquette University with Bachelors of Arts in Mathematics.

5. I submit this declaration (the "**Declaration**") in support of the First Day Motions (as defined below) and to provide information to the Court and parties in interest regarding the Debtors. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management or the Debtors' professionals, discussions with other employees of the Debtors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions and the industry in which the Debtors operate. If called as a witness, I could and would competently testify to the matters set forth in this Declaration.

6. On February 27, 2026 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), as well as certain motions and other applications (the "**First Day Motions**"), with the Court, thereby commencing these related chapter 11 cases.

7. I submit this Declaration in support of the First Day Motions.

2

57353495.1

## Overview of the Debtors' Business and Financial Affairs

### A. Carey Heirs Properties, LLC.

8. Carey Heirs Properties, LLC, an Illinois limited liability company ("**CHP**"), owns the underlying real estate and certain improvements located at the Hawthorne Race Course, 3501 S. Laramie Ave., Cicero, Illinois. CHP leases the racetrack to Hawthorne Race Course, Inc., an Illinois corporation ("**HRC**") to conduct thoroughbred horse racing meetings and Suburban Downs, Inc., an Illinois corporation ("**SDI**") to conduct Standardbred (harness) horse racing meetings.

9. CHP is owned by seventy-seven (77) members many of whom, but not all, are shareholders HRC and/or SDI. Most of the members of CHP and the shareholders of HRC and SDI are descendants of Thomas Carey, who purchased the racetrack property in 1909 and ran a horse racing business through the years. Upon the death of Thomas Carey, the ownership and operation of the racetrack was passed in eight equal interests, one each to his seven children and one to his wife's family. Through the years and by design, the ownership and operation of the racetrack have remained in those original family groups and, because two of Thomas Carey's children were unmarried and did not have any children of their own at the time of death, through death and descendancy, ownership now consists of six family groups. The recent deaths of two (2) members will result in those shares being held for their descendants.

10. CHP is governed by a board of managers (the "**Board of Managers**") consisting of three managers.

### B. Hawthorne Race Course, Inc.

11. HRC conducts its business under the auspices of governing bodies of the State of Illinois, the Illinois Racing Board ("**IRB**") and the Illinois Gaming Board ("**IGB**"), and operates

3

(a) live pari-mutuel wagering on thoroughbred horse racing, (b) simulcasting wagering of horse racing programs from in-state and out-of-state locations, (c) food and beverage operations under its wholly-owned subsidiary, Post Time Catering, Inc., (d) sportsbook wagering, (e) advance deposit wagering from funded accounts, usually online, and (e) off-track betting facilities that accept pari-mutuel wagering on its thoroughbred horse racing as well as simulcast racing from other locations through its operating division, Hawthorne OTB ("**OTB**"). HRC currently operates 10 OTBs throughout Illinois (Joliet, Crestwood, Villa Park, Rockford, Oakbrook Terrace, Hoffman Estates, North Aurora, Evergreen Park, Lansing and McHenry) with Prospect Heights temporarily closed due to fire.

12. HRC and its predecessors have been licensed by the IRB prior to the destruction of the racetrack in 1978 by fire, and continuously since its reconstruction. Prior to 1979, the year in which HRC was incorporated, the Estate of Thomas Carey, an Illinois general partnership, d/b/a Hawthorne Race Course owned and operated the racetrack.

13. HRC is also mostly owned by the descendants of Thomas Carey, and similarly to CHP and SDI, is owned in six family groups. The shareholders of HRC are comprised of fifty-eight (58) shareholders plus four trusts, each with a single beneficiary. The recent deaths of two (2) shareholders will result in their shares being held for their descendants. The HRC shareholders are similar to, but not exactly the same in name or percentage as, the shareholders of SDI.

14. HRC is governed by a Board of Directors currently consisting of nine directors. In 2019, in conjunction with the development of Illinois' first Racino entertainment complex (the "**Racino**") featuring both casino-style wagering and horseracing, Kevin Kline was named CEO of Gaming for the Hawthorne Casino and Race Course, a division of HRC.

4

57353495.1

15. In July 2020, the IGB unanimously found HRC to be preliminarily suitable for an organizational gaming license. In July 2021, the IGB voted unanimously to find Timothy Carey (as Owner, Board Member, President and CEO) and Kevin Kline (as CEO of Gaming), as well as the eleven other HRC owners and board members suitable as key persons of HRC. The other HRC shareholders (both individuals and Trusts) have also been found suitable to hold an ownership interest in HRC.

16. HRC was also awarded retail, mobile, and online sportsbook wagering licenses. Such wagering was operated by PointsBet USA under a licensing agreement with HRC. During 2023, the shareholders of PointsBet USA agreed to the sale of its US operations to Fanatics, a subsidiary of Fanatics Holding Inc. and in May of 2023, HRC and Fanatics signed a letter of intent framework to enter into a definitive agreement based substantially on HRC's agreement with PointsBet. On January 26, 2026, Fanatics terminated the mobile and internet portion of the agreement with HRC but continued to provide retail services at the racetrack and the OTBs eligible to offer sports wagering.

C. **Suburban Downs, Inc.**

17. SDI conducts Standardbred (harness horse) race meetings, pari-mutuel betting and simulcast wagering at the racetrack and HRC's OTBs when HRC is not holding a thoroughbred meet. SDI has been granted a license to operate by the IRB since before 1998, from 2002 to 2008 and continuously from 2016 until January 26, 2026 when the IRB suspended SDI's license.

18. SDI is also mostly owned by the descendants of Thomas Carey, and similarly to CHP and HRC, ownership remains in six family groups. The shareholders of SDI are comprised of fifty-eight 58 shareholders, including five trusts. The recent deaths of two (2) shareholders will

5

57353495.1

result in those shares being held for their descendants. The SDI shareholders are similar to, but not exactly the same in name or percentage, as the shareholders of HRC.

**D.    Post Time Catering, Inc.**

19.    Post Time Catering, Inc., an Illinois corporation, is a wholly owned subsidiary of HRC and provides food and beverage services at the racetrack.

**E.    Hawthorne Race Course, Inc. et al. Organizational Structure**



**F.    The Debtors' Prepetition Debt Obligations**

20.    Signature Bank, N.A. ("**Signature Bank**") is the provider of the Debtors' senior secured credit facilities (the "**Signature Facilities**") and served as the central source of liquidity for both racing and Racino development activities. As of December 31, 2025, the Debtors had outstanding a revolving line of credit of approximately $15 million alongside a suite of term loans: Term Loans A, E, F, G, H (drawn in two tranches), I, and a $5 million Bridge Loan totaling $35.1 million in combined term debt and revolver exposure. These loans carry interest rates ranging from a fixed rate of 10% to floating structures tied to prime plus a spread, resulting in $1.0 million of interest accrued as of December 31, 2025. In addition to contractual interest, the Signature Facilities include substantial back-end financial obligations: $6.1 million in exit fees across Term Loans F, G, H, and I, which materially increase the effective cost of capital. When combining

6

57353495.1

principal, accrued interest, and exit fees, the Debtors' estimated total obligations to Signature Bank were approximately $51.6 million as of February 24, 2026. In December 2025 and January 2026, Signature Bank froze all of the Debtors' accounts.

21. In 2025, Latto Capital LLC provided a $5.0 million term loan secured by the Debtors' real estate. This loan is secured by a second-priority lien on the Debtors' real estate, subordinate to Signature Bank's liens.

22. On or about February 20, 2026, the Marital Trust of Robert F. Carey Jr. UAD November 15, 1987 (the "Carey Trust") made a loan to Hawthorne in the principal amount of $300,000. To secure its repayment obligations, Hawthorne granted a junior mortgage to the Carey Trust on the Crestwood Property. The mortgage was recorded on February 24, 2026.

23. The Debtors also carry a layer of unsecured obligations, primarily consisting of subordinated related party notes and racing working capital borrowings that are not collateralized by the Debtors' assets. These instruments feature flexible or long dated maturities, and function as subordinated support capital used to fund racing operations, facility needs, and liquidity gaps.

### Events Leading to Filing of the Chapter 11 Cases

24. The Debtors have faced substantial financial hardship in recent years, driven by challenges affecting the horse racing industry in Illinois, initially due to the expansion of casino gaming and later compounded by an increasingly competitive sports betting market, as well as other industry-wide issues, including rising costs and increased regulatory fees. This hardship has been further exacerbated by the recent suspension of SDI's organizational license and the termination of its harness racing meet; the termination of internet and mobile sports wagering by HRC's sports wagering partner; and the discontinuation of certain simulcast wagering

7

57353495.1

arrangements by other horse racing tracks throughout the United States, resulting in litigation and monetary judgments against the Debtors.

25. The Debtors have been unable, outside a bankruptcy process, to attract capital, due to the economic stress created by its tepid relationship with its lender Signature Bank among other reasons. The Debtors, due to a citation to discover assets issued by Churchill Downs Incorporated, a judgment creditor with a judgment in the amount of $1,546,266, have not been able to utilize their revenue stream and Signature Bank has been unwilling to advance funds to pay payroll and employee benefits, track changeover to thoroughbred racing season, amounts due to the horsemen community for services and racing provided, utilities, insurance, professionals, tax and regulatory fees, and other miscellaneous obligations.

26. To assist the Debtors, Signature Bank provided the Debtors with its land-only appraisal (not valuing the improvements, off track betting parlors and other assets) which reflects a value of approximately $95 million as of August 7, 2025.

27. The Debtors believe that their value significantly exceeds the $95 million reflected in the appraisal and have received numerous expressions of interest from third parties regarding a potential recapitalization of its business. These parties have indicated that, in light of the circumstances described above and other considerations, they are willing to proceed only within the context of a bankruptcy process. Prior to the Petition Date, many of these interested parties executed non-disclosure agreements and reviewed extensive documentation and other material information made available by the Debtors' financial advisors through a data room and other means.

### The Debtors' DIP Financing Efforts

57353495.1

28. Following Signature Bank's freeze of the Debtors' accounts, management determined that an infusion of outside capital was necessary. The Debtors sought to obtain a priming credit facility sufficient to fund operations through a sale process. This effort was led by Getzler Henrich, as the Debtors' financial advisor, which commenced an outreach process in early January 2026. Getzler Henrich contacted thirty-five (35) potential lenders, fourteen (14) of which expressed interest, and five (5) of which executed non-disclosure agreements. The process ultimately resulted in the Debtors receiving three (3) term sheets.

29. After evaluating proposals from the three prospective DIP lenders, the Debtors selected a proposed priming debtor-in-possession financing facility (the "**DIP**") from JDI Loans LLC. The proposed facility provides up to $16 million in financing with a 120-day term. The DIP offers the most cost-efficient structure while preserving liquidity. The projected interest and fees under the DIP are approximately $865,000 and $152,000 lower, respectively, than those proposed under the other two term sheets. In addition, Getzler Henrich successfully negotiated the removal of a $2.25 million interest reserve, thereby reducing the overall loan size and associated fees.

## The Debtors' Operational Assumptions

30. The Debtors' 2025–2026 harness racing season began on November 11, 2025 and was scheduled to run through February 15, 2026. On December 28, 2025, the Debtors cancelled the remaining fifteen (15) race dates due to liquidity constraints. The primary unpaid obligation related to horsemen's purses. Although purse checks had been issued prior to Signature Bank's freezing of the Debtors' accounts, they could not be deposited once the accounts were frozen. The Debtors' horsemen declined to continue racing until they were made whole. Signature Bank refused the Debtors' requests to advance funds to honor the outstanding checks.

31. The Debtors' thoroughbred racing season is scheduled to begin on March 29, 2026. To conduct the meet, horsemen must be made whole, including payment of accrued purse balances and replacement of returned checks issued for unpaid purses. The Debtors' DIP budget allocates $3.91 million in week one of these chapter 11 cases to restore purse balances, which is critical to the ongoing viability of the Debtors' business.

32. Thoroughbred racing is critical to cash flow because it drives on-track wagering, OTB wagering, and intertrack and out-of-state wagering. The Debtors earn a share of wagering revenue when hosting races. OTB and intertrack earnings are reflected in the DIP budget under the line item "Out of State Earnings."

33. According to the Illinois Racing Board, failure to conduct the thoroughbred meet jeopardizes the Debtors' racing license. The Debtors' casino license is contingent upon maintaining that racing license. Based on discussions with potential buyers and recapitalization partners, the casino license is essential to maximizing enterprise value and achieving a successful reorganization.

34. The Debtors generate wagering receipts from live pari-mutuel wagering at HRC and at its off-track betting facilities. The Debtors fell behind on settlement payments to host tracks, resulting in the following disruptions: (i) simulcast partners terminated signal transmissions to the Debtors; (ii) the Debtors were unable to receive simulcast signals; (iii) the Debtors were unable to export their own signals; and (iv) Fanatics terminated the mobile and internet portions of its agreement with HRC (collectively, the "**Disruptions**").

35. Prior to the Disruptions, the Debtors received approximately $5 million per month in wagering deposits. As a result of the Disruptions, monthly wagering deposits have declined to well under $1 million. The DIP budget assumes that simulcast partnerships will be reactivated

57353495.1

over the first four weeks of these chapter 11 cases. Management has identified the highest-margin simulcast partners for priority reactivation. Certain simulcast partners may require partial payment of prepetition balances as a condition to reinstatement.

36. The DIP budget provides for $750,000 in critical vendor payments over a thirteen-week period. Reactivating simulcast signals could increase collections by approximately $4.0 million per month. These payments are expected to generate a significant return by restoring liquidity and wagering revenue streams.

### The Debtors' Objectives

37. The Debtors filed for chapter 11 to complete a sale of substantially all of their assets free and clear of liabilities under section 363. The Debtors remain hopeful that they may find a suitable buyer interested in a going concern sale. A reorganization is a possible avenue to restart operations if the Debtors are able to come to an agreement with a party to recapitalize the Debtors as part of a plan process for resolving the Debtors' other liabilities. Nevertheless, the Debtors are focused on using the process afforded by section 363 of the Bankruptcy Code to maximize recovery to their creditors.

38. To help execute this strategy, Getzler Henrich will coordinate the sale with respect to all assets and particularly to evaluate potential going concern sales for some or all of the assets in addition, or in the alternative to, sales of the physical assets. With the aid of these experienced professionals, the Debtors will execute a comprehensive marketing strategy with respect to all of their material assets.

### First Day Motions

39. The following motions (the "First Day Motions") are being filed contemporaneously herewith:

    a. Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases

    b. Application of Debtors for Order Authorizing Retention and Employment of Omni Agent Solutions, Inc. as Claims and Noticing Agent to the Debtors, Effective as of the Petition Date, Pursuant to 28 U.S.C. § 156(c) and Local Rule 5003-1

    c. Debtors' Motion (A) for Authority to (I) Pay Certain Prepetition Employee Wages, Salaries and Other Compensation, (II) Pay and Honor Employee Medical and Other Benefits, and (III) Continue Employee Benefit Programs; (B) to Obtain Related Relief; and (C) for Shortened and Limited Notice Thereof

    d. Debtors' Motion for Authority to Pay Prepetition Taxes and Related Obligations

    e. Debtors' Motion to Authorize Payment of Deposits as Adequate Assurance of Payment for Utility Services

    f. Motion of Debtors in Possession for Authorization to Obtain Debtor in Possession Financing

40. Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue preserving the value of their assets. I have reviewed each of the First Day Motions, and I believe that the relief sought herein is necessary to permit an effective transition into chapter 11. The facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief with appropriate reliance on the Debtors' management and the Debtors' advisors, and I can attest to such facts. I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments, and otherwise continue their business operations as sought in the First Day Motions.

### The Debtors' Professionals

41. The Debtors have engaged and will be seeking the Court's approval of the employment of the following professionals as expenses of their estates:

    a. Saul Ewing LLP, as general bankruptcy counsel;

    b.    Getzler Henrich & Associates LLC, as financial advisor;

    c.    Carey White Boland Murnighan & Murray, LLC, as special corporate counsel; and

    d.    Omni Agent Solutions, Inc., as claims agent and administrative agent.

## Conclusion

42.    The goal of the Debtors in these cases is to maximize the value of their assets. Based on the recommendations of the Debtors' advisors, and Getzler Henrich's own extensive efforts in attempting to address the Debtors' liabilities, I believe that the path that the Debtors have selected through the chapter 11 process is the most clear and efficient to pursue this goal.

Dated: February 27, 2026                                    Respectfully submitted,

                                                                       /s/ Billy Condon
                                                                       Billy Condon

57353495.1