**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| In re | Chapter 11 |
| **HAWTHORNE RACE COURSE, INC.**, an Illinois Corporation, *et al.*[1] | Case No. 26-03505 |
|  | Hon. Timothy A. Barnes |
| **Debtors.** | Jointly Administered |

**INITIAL INTERIM ORDER AUTHORIZING
DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING**

Upon the initial presentation of the motion (the "Motion")[2] of Hawthorne Race Course, Inc, an Illinois corporation, Post Time Catering, Inc., an Illinois corporation, Suburban Downs, Inc., an Illinois Corporation and Carey Heirs Properties, LLC, an Illinois limited liability company, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seeking entry of an order ("Initial Interim Order"), pursuant to sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 503(b), 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rules for the Northern District of Illinois, Eastern Division  (the "Local Rules"):

This Court, having considered the relief requested in the Motion, the exhibits attached

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Hawthorne Race Course, Inc. (2284); Carey Heirs Properties, LLC, (2654); Suburban Downs, Inc., (2457); and Post Time Catering, Inc, (3590). The Debtors' mailing address is 3501 S. Laramie Ave., Stickney, IL 60804.

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion or in the DIP Loan Agreement.

1

thereto, the First Day Declarations (defined in the Motion), the evidence submitted and arguments made at the interim hearing by all parties in interest held before this Court on March 4, 2026 (the "Initial Hearing"); and due and sufficient notice of the Initial Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; The Court finding that certain of the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, necessary to avoid immediate and irreparable harm to the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Loan Agreement, substantially in the form attached hereto as Exhibit A, and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefore,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND THE EVIDENCE SUBMITTED DURING THE HEARING:[3]**

      a.      **Petition Date.** On February 27, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court, commencing these Chapter 11 Cases.

      b.      **Debtors in Possession.** The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

c.  **Jurisdiction and Venue.** The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

d.  **Notice.** The Initial Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice of the Motion has been provided in a manner sufficient under the circumstances and no other or further notice of the Motion or the entry of this Initial Interim Order shall be required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the continued Interim Hearing.

e.  **Committee Formation.** As of the date hereof, the United States Trustee for the Northern District of Illinois, Eastern Division  (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

f.  **Good Faith.** Based on the papers filed and the proceedings of record in these Chapter 11 Cases, (i) the extension of credit and financial accommodations under the DIP Loan, as provided by the DIP Loan Agreement, are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Loan and the DIP Loan thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express reliance on the protections offered thereby and by order of the Court; (iii) the liens, claims, and other covenants and payments as set forth in the DIP Loan Agreement or this Initial Interim Order, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code are integral, critical,

57362429.5

and essential components of the DIP Loan provided by the DIP Lender to the Debtors; and (iv) the DIP Lender, the DIP Loan, the DIP Fees, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Initial Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

g.      **Good Cause.** Good cause has been shown for the entry of this Initial Interim Order, and the entry of this Initial Interim Order is in the best interests of the Debtors, their estates, their residents, their creditors, their employees, and other parties in interest.

h.      **Need for Postpetition Financing and Use of Cash Collateral.** The Debtors do not have sufficient and reliable sources of working capital to continue to operate their business in the ordinary course without access to the DIP Loan requested in the Motion. The financing provided pursuant to this Initial Interim Order, the DIP Loan Agreement, and other DIP Documents, as provided in week one in the Budget, and the authority to use Cash Collateral granted herein will permit the Debtors to, among other things, (i) maintain the orderly operation of their businesses; (ii) make payroll for their employees; (iii) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Cases, which are necessary to preserve enterprise value and benefit all Debtors; (iv) fund any obligations benefiting from the Carve Out; (v) maintain business relationships with vendors and suppliers; and (vi) satisfy other working capital and operational needs.

i.      **Willingness to Provide Financing.** The DIP Lender has committed to provide financing to the Debtors subject to: (i) entry of this Initial Interim Order; (ii) approval of the terms and conditions of the DIP Loan Agreement, and the other DIP Documents; (iii) satisfaction of the closing conditions set forth in the DIP Loan Agreement; (iv) findings and conclusions of law by this Court that the DIP Lender is extending credit to the Debtors pursuant to this Initial Interim

Order and the DIP Loan Agreement in good faith, and that the DIP Lender's claims, superpriority claims, security interests, liens, and other protections granted pursuant to this Initial Interim Order will have all the protections provided by section 364(e) of the Bankruptcy Code, and if any Chapter 11 Case is dismissed, the DIP Lender may enforce the DIP Documents against any such Debtor in any court of competent jurisdiction.

j.    **Approved Budget.** The Debtors have prepared and delivered to the DIP Lender an initial budget attached as **<u>Exhibit B</u>** (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Loan Agreement, the "<u>Initial DIP Budget</u>"). The Initial DIP Budget reflects, among other things, for the thirteen (13) week period commencing on or about the Petition Date, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each one-week period covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time, conditioned upon further approval of the Court, in accordance with the DIP Loan Agreement or the other DIP Documents, and such modified, amended, extended, or updated budget, once approved by the Debtors and the DIP Lender, shall modify, replace, supplement, or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Loan Agreement) shall constitute, without duplication, an "<u>Approved Budget</u>"). The Initial DIP Budget has been prepared by the Debtors, their management, and their advisors, and the Debtors believe that the Initial DIP Budget is reasonable under the circumstances. The DIP Lender is relying, in part, on the Debtors' agreement to comply with the Approved Budget (subject only to Permitted Variances) the terms of the DIP Loan Agreement, and this Initial Interim Order in

determining to enter into the DIP Loan and to consent to the use of their Cash Collateral provided for in this Initial Interim Order and the DIP Documents.

k.      **Use of Cash Collateral and Proceeds of DIP Loan.** As a condition to the Debtors' entry into the DIP Loan Agreement and the other DIP Documents and the extension of credit under the DIP Loan Agreement, including the use of Cash Collateral generated from and after the Petition Date, the Debtors have agreed that the proceeds of the DIP Loan and such Cash Collateral shall be used solely in accordance with the terms and conditions of this Initial Interim Order, the DIP Loan Agreement, and the Approved Budget (subject to Permitted Variances).

l.      **Section 506(c) and Marshaling.** Subject to entry of a Final Order, as material inducement to the DIP Lender's agreement that its liens and superpriority claims shall be subject to payment of the Carve Out, subject to entry of the Final Order, the DIP Lender is entitled to (i) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral.

m.      **Requisite Authority.** Subject to entry of this Initial Interim Order, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Loan Agreement and the other DIP Documents to which it is a party and to perform its obligations thereunder.

n.      **Immediate Entry.** Sufficient cause exists for immediate entry of this Initial Interim Order pursuant to Bankruptcy Rule 4001(c)(2). Absent granting the relief set forth in this Initial Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Loan and the permitted use of Prepetition Collateral in accordance with this Initial Interim Order and the DIP Loan Agreement are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based on the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1.    **Motion Granted.** The relief sought in the Motion is GRANTED on a limited interim basis as set forth herein. Entry into the DIP Loan Agreement and, as applicable, the other DIP Documents is authorized and approved, in each case, subject to the terms and conditions set forth in this Initial Interim Order and in the DIP Loan Agreement.

2.    **Authorization of the DIP Loan.** The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Loan Agreement, and the other DIP Documents (as applicable), and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Initial Interim Order and the DIP Loan Agreement, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents that may be required or necessary for their performance under the DIP Loan Agreement, and the creation and perfection of the DIP Liens described in and provided for by this Initial Interim Order and the DIP Loan Agreement. Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with this Initial Interim Order, the DIP Loan Agreement, or other DIP Documents.  Upon execution and delivery, the DIP Loan Agreement and, as applicable, the other DIP Documents shall represent legal, valid, and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms. Each officer of the Debtors acting individually is hereby authorized to execute and deliver the DIP Loan Agreement and the other DIP Documents.

3.      **DIP Obligations.** The DIP Documents and this Initial Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations. All DIP Obligations shall be enforceable against the Debtors, their respective estates, and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or the dismissal of any of the Chapter 11 Cases, or in any other proceeding superseding or related to any of the foregoing (the "Successor Case"), and their creditors and other parties-in-interest. Upon entry of this Initial Interim Order, the DIP Obligations shall include, but not be limited to, (i) the payment by the Debtors of (a) the unpaid principal amount of and interest on the DIP Loan, as and when due, whether at maturity, by acceleration, or otherwise, and (b) all fees and other monetary obligations of the Debtors to the DIP Lender under the DIP Loan Agreement and this Initial Interim Order, and (ii) the payment and performance of all covenants, duties, agreements, obligations, and liabilities of the Debtors to the DIP Lender under the DIP Loan Agreement and this Initial Interim Order. The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Loan Agreement and the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date or as otherwise set forth in the DIP Loan Agreement. No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Loan Agreement (including any DIP Obligation or DIP Liens) to the DIP Lender that is approved by this Initial Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation

by any person or entity for any reason.

4.      **Authorization to Enter into DIP Loan.**  The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Loan Agreement (and any other DIP Documents) and to take such other and further acts as may be necessary, appropriate, or desirable in connection therewith. Upon entry of this Initial Interim Order, the Debtors are authorized to borrow up to aggregate amount of the Interim Amount, and the Debtors are hereby authorized to provide a guaranty of payment and performance in respect of the DIP Obligations, in each case, in accordance with the DIP Loan Agreement, and the DIP Obligations are hereby approved (as and when such amounts become earned, due, and payable in accordance with the DIP Loan Agreement) without the need to seek further Court approval. The borrowing of DIP Loan under this Initial Interim Order and the DIP Loan Agreement shall permanently decrease the DIP Commitment and, once repaid, the DIP Loan incurred may not be re-borrowed.

5.      **DIP Collateral.** The term "DIP Collateral"[4] means, collectively, all rights, properties and assets of each DIP Borrower, including all personal property, real property (including without limitation all Real Property), and Fixtures, in each case, whether now owned or existing or hereafter acquired, created or arising, whether arising before or after the Petition Date, and wherever located, including, without limitation, the following: all General Intangibles, Payment Intangibles, Instruments, Accounts, Documents, Documents of Title, Goods, Inventory, Equipment, Fixtures, Chattel Paper, Electronic Chattel Paper, Letter of Credit Rights (whether or not the letter of credit is evidenced by a writing), post petition Money, Deposit Accounts, post

---

[4] As set forth in the DIP Loan Agreement, capitalized terms used in this paragraph that are not otherwise defined herein have the meaning ascribed to such term in the UCC.

petition cash, certificates of deposit, Investment Property, Securities, Securities Accounts, Securities Entitlements, Commodities Accounts, Supporting Obligations, Financial Assets,)and all monies therein, and any cash held therein, and any and all claims, rights and interests in, to or under any of the above, and all substitutions for, additions, attachments, accessories, Accessions and improvements to and replacements, products, Proceeds and insurance proceeds of any or all of the foregoing; all causes of actions (other than Borrowers' Avoidance Actions); all books and records relating to the foregoing, including all ledgers, records regarding the Borrowers' assets or liabilities, business operations or financial condition, and all computer programs or storage or any Equipment containing such information. The DIP Collateral also includes all Borrowers' real property (including the Real Property), leases, leasehold interests, and all rents, profits and Proceeds thereof, all contracts, contract rights, intercompany claims, rights to payment of money, arbitration awards, licenses, permits, and franchise rights, all capital stock, trust interests, all rights under insurance and proceeds thereof, all collateral support, tax or other refunds, mineral rights, and all Software, patents, copyrights, trademarks, trade names and other intellectual property (whether or not registered, and if registered, whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with the right to sue or otherwise  recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, and all Proceeds of any of the foregoing, including without limitation license fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto, any and all claims, rights and interests in, to or under any of the above, and all substitutions for, additions, attachments, accessories, Accessions and improvements to and replacements, products, Proceeds and insurance proceeds of any or all of the foregoing. Notwithstanding the foregoing, the DIP Collateral shall not include any DIP Borrower's

57362429.5

(a) Avoidance Actions or proceeds thereof, (b) pre-petition cash and prepetition receivables, or

(c) equity and/or beneficial interests issued by any Borrower.

6.     **Disposition of Collateral.** Notwithstanding anything otherwise provided herein, it

shall be deemed a DIP Termination Event if the Borrowers sell, transfer, or otherwise dispose of

any portion of the DIP Collateral, other than in the ordinary course of business or in connection

with the payments contemplated under this Initial Interim Order or the Approved Budget (subject

to the Permitted Variances), without the prior written consent of the DIP Lender, except as

permitted in the DIP Loan Agreement and this Initial Interim Order.

7.     **DIP Liens.** To secure the DIP Obligations, immediately upon and effective as of

entry of this Initial Interim Order, pursuant to Bankruptcy Code sections 364(c)(2) and 364(d)(1),

the DIP Lender is hereby granted, on an interim basis, continuing, valid, binding, enforceable,

nonavoidable, and automatically and properly perfected security interests in and liens on the DIP

Collateral of the Borrowers (collectively, the "DIP Liens") as follows:

    (i)    Lien on Any Unencumbered DIP Collateral.  Pursuant to section 364(c)(2)
of the Bankruptcy Code, a valid, perfected, binding, continuing, enforceable
and non-avoidable first-priority, lien on all DIP Collateral unencumbered as
of the Petition Date, which shall be junior and subordinated only to the
Carve Out.

    (ii)    Priming Lien on Any Encumbered DIP Collateral.  Pursuant to section
364(d)(1) of the Bankruptcy Code, a valid, perfected, binding, continuing,
enforceable and non-avoidable first-priority, senior priming lien on all DIP
Collateral that is subject to a lien as of the Petition Date, which shall be
junior and subordinated only to the Carve Out.

Other than as set forth herein or in the DIP Loan Agreement, and upon entry of the Final Order,

the DIP Liens shall not be (A)  subject to sections 506, 510, 549, 550, or 551 of the Bankruptcy Code,

and/or (B) made subject to *or pari passu* with any lien or security interest heretofore or hereinafter

granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against

any trustee appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any

of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Case.

8.　　**Perfection of DIP Liens.** This Initial Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens, without the necessity of execution, filing or recording any security agreement, control agreement, pledge agreement, financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit-account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or to entitle the DIP Lender to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender is authorized, but not required, to file, as it deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect or otherwise evidence the DIP Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. The DIP Lender may, in its sole discretion, file an electronic copy or photocopy of this Initial Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.

9.　　**DIP Superpriority Claims.** Subject only to the Carve Out, effective immediately upon entry of this Initial Interim Order, the Debtors granted to the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative-expense claims in the

Chapter 11 Cases and any Successor Case (collectively, the "DIP Superpriority Claims") for all

DIP Obligations with priority over any and all administrative expense claims and unsecured claims

against the Debtors or their estates in the Chapter 11 Cases and any Successor Case, including

administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections

105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b),

546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or

not such expenses or claims may become secured by a judgment lien or other non-consensual lien,

levy, or attachment. The DIP Superpriority Claims shall be payable have recourse and be payable

from all prepetition and postpetition property and assets of the Debtors and their estates and all

DIP Collateral and all proceeds thereof. The DIP Superpriority Claims shall, for purposes of section

1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section

503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall

be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof.

Except with respect to the Carve Out, no costs or expenses of administration, including professional

fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that

have been or may be incurred in these proceedings, or in any Successor Case, and no priority claims

are, or will be, senior to, prior to, or have parity with the DIP Superpriority Claims or the DIP

Obligations, or with any other claims of the DIP Lender arising under the DIP Loan Agreement

and/or this Initial Interim Order.

      10.    **No Obligation to Extend Credit.** The DIP Lender shall have no obligation to make

any loan or advance under the DIP Loan Agreement unless (i) all of the conditions precedent to

the closing of the DIP Loan and such loan or advance, and other terms under the DIP Loan

Agreement and this Initial Interim Order have been satisfied in full or waived by the DIP Lender

(in its sole discretion), and (ii) no Event of Default under the DIP Loan Agreement or the other

DIP Documents (including this Initial Interim Order) has occurred and is continuing.

      11.    **Use of DIP Loan Proceeds.** The Debtors shall be permitted to use DIP Loan under

the DIP Loan only for the purposes specifically set forth in this Initial Interim Order and the DIP

Loan Agreement.  The Opening Disbursement shall be used, *inter alia*, to pay the unpaid portion

of the Loan Fee, and Lender's other costs and expenses which are authorized to be paid under this

Initial Interim Order in connection with the DIP Loan.  Lender shall allow bi-weekly draws (each

a "**Draw**") with payment of interest.

      12.    **No Monitoring Obligation.** The DIP Lender shall not have any obligation or

responsibility to monitor any Debtor's use of the DIP Loan, and the DIP Lender may rely on each

Debtor's representation that the use of the DIP Loan at any time is in accordance with the

requirements of this Initial Interim Order and the DIP Loan Agreement, including the Approved

Budget (subject to the Permitted Variances).

      13.    **Authorization to Use Cash Collateral.** Subject to the terms and conditions of this

Initial Interim Order and the DIP Loan Agreement, and in accordance with the Approved Budget

(subject to Permitted Variances), the Debtors are authorized to use the DIP Lender's Cash

Collateral until the DIP Termination Declaration Date.  All cash receipts generated from pre-

petition receivables are cash collateral of Signature Bank.

      14.    **Modification of DIP Loan Agreement.** The Debtors and the DIP Lender are

hereby authorized to implement, in accordance with the terms of the DIP Loan Agreement, any

non-material modifications of the DIP Loan Agreement without further notice, motion, or

application to, order of, or hearing before, this Court. Any material modification or amendment to

the DIP Loan Agreement shall only be permitted pursuant to an order of this Court, after being

submitted to this Court on five (5) days' notice to the U.S. Trustee and the Prepetition Secured Parties; provided, however, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Loan Agreement, shall not require an order of this Court. In the event of any inconsistency between this Initial Interim Order and the DIP Loan Agreement, this Initial Interim Order shall control.

15.     **DIP Loan Reporting.** Except as otherwise provided herein or approved by the DIP Lender in its reasonable discretion, the proceeds from the DIP Loan shall be used only in compliance with the terms of the DIP Loan Agreement and in accordance with the Approved Budget subjected to Permitted Variances. The Debtors shall comply with the reporting requirements and obligations set forth in the DIP Loan Agreement and shall provide copies to the Prepetition Secured Parties.

16.     **Modification of Automatic Stay.** The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors, the DIP Lender, and, as applicable, the Prepetition Secured Parties to accomplish the transactions contemplated by this Initial Interim Order.

17.     **Proceeds of Subsequent Financing.** If any of the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Loan Agreement or otherwise at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Loan Agreement) and the termination of the DIP Lender's obligation to extend credit under the DIP Loan, then, after satisfaction of the

57362429.5

Carve Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Initial Interim Order and the DIP Loan Agreement until all DIP Obligations are satisfied in full.

18.    **Payments Held in Trust.** Except as expressly permitted in this Initial Interim Order including in the Approved Budget, the DIP Loan Agreement, or otherwise ordered by this Court, including in respect of the Carve Out, if any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Loan Agreement and termination of the DIP Loan in accordance with the DIP Loan Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust and shall immediately turn over such proceeds to the DIP Lender for application in accordance with this Initial Interim Order, the DIP Loan Agreement, or the applicable DIP Documents.

19.    **Maintenance of DIP Collateral.** Until the payment in full of the DIP Obligations, the Debtors shall, except as otherwise agreed to by the DIP Lender in writing (email being sufficient): (i) insure the DIP Collateral as required under the DIP Loan Agreement; and (ii) maintain the cash-management system consistent with the terms and conditions of any order(s) governing the Debtors' cash-management systems and the DIP Loan Agreement.

20.    **Right to Credit Bid.** Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its DIP Liens up to the amount of the DIP Obligations, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization

plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under

section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee

for any of the Debtors under section 725 of the Bankruptcy Code. In connection with any such

credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender,

provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or

more of the applicable DIP Lender's subagents or a newly formed acquisition vehicle.

21.    **DIP Termination Event; Exercise of Remedies.**

a.    **DIP Termination Event.**  For purposes of this Initial Interim Order, the

term "DIP Termination Event" shall mean:

(i)    the occurrence of the Maturity Date,

(ii)    the occurrence of any Event of Default under the DIP Loan
Agreement or this Initial Interim Order; or

(iii)    the acceleration of the DIP Obligations or termination of the
DIP Commitment in accordance with the terms of the DIP
Loan Agreement or the other DIP Documents.

b.    **Exercise of Remedies.** Upon the occurrence of a DIP Termination Event,

without further notice to, hearing of, application to, or order from this Court, the automatic

stay provisions of section 362 of the Bankruptcy Code shall be modified to the extent

necessary to permit the DIP Lender to take any of the following actions, at the same or

different time: (i) deliver a written notice (which may be via email) to counsel for the

Debtors, counsel for the Prepetition Secured Parties, the U.S. Trustee, and counsel for the

Creditors' Committee (if any) (the "Remedies Notice") declaring the occurrence of a DIP

Termination Event (such date, the "DIP Termination Declaration Date") and deliver a

Carve Out Trigger Notice; (ii) declare the termination, reduction or restriction of any

commitments under the DIP Loan (including the DIP Commitment) to the extent any such

commitment remains; (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction of the DIP Loan and the DIP Loan Agreement as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (v) charge default interest at the default rate set forth in the DIP Loan Agreement; and (vi) declare the termination, restriction, or revocation of the ability of the Debtors to use of the DIP Lender's Cash Collateral.

c.    **Waiting Period Procedures.** The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) business days following the DIP Termination Declaration Date (such period, the "Waiting Period"). If, however, the Debtor files a request for an emergency hearing during the Waiting Period and a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court. At any hearing regarding a Remedies Notice, the Court may only consider (i) whether a DIP Termination Event occurred or is continuing, and (ii) a request by the Debtors for non-consensual use of the DIP Lender's Cash Collateral. During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including Cash Collateral) only for payroll and other expenses critical to maintain the business of the Debtors' operating in accordance with the terms of this Initial Interim Order and the Approved Budget.

d.    **Rights and Remedies Following Termination Date.** Following a DIP Termination Declaration Date and the expiration of the Waiting Period, unless this Court

has entered an order prior to the expiration of the Waiting Period finding that a DIP Termination Event has not occurred or is not continuing, the DIP Lender is hereby granted relief from the automatic stay of Bankruptcy Code section 362, without further notice, hearing, motion, order or other action of any kind, to exercise all rights and remedies against the DIP Collateral in accordance with this Initial Interim Order, the DIP Loan Agreement, the other DIP Documents (if any), and applicable law.

22.    **No Waiver by Failure to Seek Relief.** The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Initial Interim Order, the DIP Loan Agreement, applicable law, or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Initial Interim Order, the DIP Loan Agreement, or applicable law shall not constitute a waiver of any of its respective rights. Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Initial Interim Order, the DIP Loan Agreement shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consents required hereunder by the DIP Lender shall be implied by any inaction or acquiescence by the DIP Lender.

23.    **Carve Out.**

a.    **Priority of Carve Out.** The DIP Lien and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out. The Carve Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in the DIP Orders. The Carve Out is a lien subordination agreement, not a limitation on the allowance or payment of Professional Fees.

b.      **Carve Out.** The term "Carve Out" shall mean the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and to the United States Trustee under 28 U.S.C. § 1930(a)(6), together with any interest thereon pursuant to 31 U.S.C. § 3717 ("Statutory Fees"), which shall not be subject to the Approved Budget; (ii) Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000, (iii) subject to the terms and conditions of this Initial Interim Order, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, the reasonable unpaid fees and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") or persons or firms retained by the Creditors' Committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals and PCO Professionals, the "Professional Persons") that are incurred at any time before or on the first calendar day following delivery by the DIP Lender of a Carve Out Trigger Notice, to the extent permitted by the Approved Budget and are allowed by the Court under sections 327, 330, or 363 of the Bankruptcy Code (whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice) and remain unpaid after application of any retainers being held by such Professional Persons (the "Pre-Trigger Date Fees"); and (iv) allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $100,000 incurred after the first calendar day following delivery by the DIP Lender of the Carve Out Trigger Notice (the "Trigger Date"), to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"); provided, however, that for the purposes of the

foregoing, any plan-success fee, financing fee, transaction fee, or other similar contingency fee shall not be included in the Pre-Trigger Date Fees or Post-Carve Out Trigger Notice Cap and shall be paid, to the extent allowed, pursuant to any confirmed plan in these Chapter 11 Cases. No amounts set forth in this subparagraph with respect to the Carve Out may be modified without the prior written consent of the DIP Lender. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the Prepetition Secured Parties, the Office of the U.S. Trustee, and counsel to the Creditors' Committee (if any), which notice may be delivered following the occurrence or during the continuation of a DIP Termination Event and acceleration of the DIP Loan under and as such terms are defined in the DIP Loan Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

c.        **Payment of Allowed Professional Fees Prior to the Trigger Date.** Any payment or reimbursement made prior to the occurrence of the Trigger Date in respect of any allowed Professional Fees shall not reduce the Carve Out.

d.        **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.**  The DIP Lender shall not be responsible for the direct or indirect payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Case under any chapter of the Bankruptcy Code. Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent

to the allowance of any fees or expenses of Professional Persons of any of the Debtors, the Creditors' Committee (if any), any other official or unofficial committee in these Chapter 11 Cases or any Successor Case, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses.

24.     **Approval of DIP Fees.**  In consideration for the DIP Loan, the Court hereby approves the Loan Fee and the Break-Up Fee, each of which is fully earned, non-refundable, payable in accordance with the terms of the DIP Loan Agreement (all such fees, together, the "<u>DIP Fees</u>"). The DIP Fees shall be part of the DIP Obligations and secured by the DIP Liens on DIP Collateral and all other security provided under the DIP Documents.  The Exit Fee and the Guaranteed Interest Payment remain subject to Court approval at the Continued Interim Hearing.  Notwithstanding anything herein to the contrary, upon entry of the Initial Interim Order, all reasonable and documented out-of-pocket fees and expenses of the DIP Lender in connection with the DIP Loan (the "<u>DIP Lender Expenses</u>") incurred prior to the Closing Date shall be paid on the Closing Date, without the need to first deliver a copy of its invoice or otherwise comply with paragraph 25.

25.     **DIP Lender's Professionals' Fees.**  The Debtors are obligated to pay all reasonable and documented out-of-pocket DIP Lender Expenses related to the DIP Loan, including the preparation, execution, delivery, administration, and exercise of any remedies related to the DIP Documents, this Initial Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Documents are consummated.  Professionals for the DIP Lender (Fox Rothschild  LLP, and such other professionals as the DIP Lender determines necessary, the "<u>DIP Lender's Professionals</u>"), shall

provide summary copies of any invoices (which shall not be required to contain time entries/narratives and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, the attorney work-product doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested by electronic mail to the Debtors, U.S. Trustee, and counsel to the Creditors' Committee (if appointed). The Debtors shall promptly pay in full all such invoiced fees and expenses at the conclusion of the Review Period (defined below) other than any Disputed Invoiced Fees (defined below). Any objections raised by the Debtors, the U.S. Trustee, or the Creditors' Committee with respect to such invoices shall be subject to the Complex Case Procedures, Section D, paragraph 14(c) regarding notice parties and reasonableness (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) days of the receipt of such invoice (the "Review Period"); provided, however, that any failure by such party to raise a Disputed Invoiced Fee during the applicable Review Period shall constitute a waiver of any rights of such party to object to the applicable invoice. Upon delivery of the Disputed Invoiced Fee, the DIP Lender's Professionals and the objecting party shall meet and confer in good faith to resolve the objection for a period of not less than five (5) days, to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) days' prior written notice by the submitting party of any hearing on

such motion or other pleading. No DIP Lender's Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court

26.    **Indemnification.** The DIP Lender (and its affiliates and respective officers, directors, employees, attorneys, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities, or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith, actual fraud, or willful misconduct of the relevant indemnified person (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (i) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Loan Agreement, or (ii) to the extent arising out of any loss, claim, damage, liability, or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee.

27.    **Use of DIP Proceeds.** Without in any way limiting the foregoing, no DIP Collateral, DIP Loan, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, any official committee appointed in the Chapter 11 Cases, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any Successor Case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (i) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Lender's enforcement or realization on any of the DIP Collateral, or Cash Collateral, following the occurrence and continuation of a DIP Termination Event; or (ii) to investigate (including by way

of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the DIP Lender, and each of its respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to the Interim DIP Order, the DIP Loan, the DIP Documents, the DIP Obligations, any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Liens, the DIP Documents.

28. **Releases.** Subject to entry of a Final Order, the Debtors, on their own behalf and on behalf of their estates, forever and irrevocably: (i) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such, from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender-liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Loan Agreement the other DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and

counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

29.   **Waivers.**

a.   **Limitation on Charging on Expenses.** Subject to entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

b.   **No Marshaling.** Subject to entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Initial Interim Order and the DIP Loan Agreement; provided, however, to the extent the DIP Lender exercises remedies after a DIP Termination Event and as practicable, the DIP Lender stipulates to using commercially reasonable efforts to collect from DIP Collateral commercial-tort claims before turning to such proceeds thereof; *provided*, for the avoidance of doubt, this limitation on DIP Lender's exercise of remedies shall not be deemed a modification of Section 2.3 of the DIP Loan Agreement.

30.   **No Lender Liability.** In determining to make any loan (whether under the DIP Loan Agreement or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtors or their respective creditors, stakeholders, or estate, and the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the

Debtors by virtue of making the DIP Loan or allowing use of their Cash Collateral. Furthermore, nothing in this Initial Interim Order shall impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

31.     **Limitation of Liability.** Nothing in this Initial Interim Order, the DIP Loan Agreement,  or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (i) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (ii) any fiduciary duties to the Debtors, their respective creditors, stakeholders, or estates. The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP  Collateral shall be borne by the Debtors.

32.     **No Third-Party Beneficiaries.** Except as explicitly provided for herein, this Initial Interim Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

33.     **Insurance Proceeds and Policies.** The DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

34.     **No Waivers or Modifications of Initial Interim Order.** The Debtors have agreed not to and shall not seek any modification or extension of this Initial Interim Order without the

57362429.5

prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender.

35.    **Binding Effect of this Initial Interim Order.** Immediately upon entry of this Initial Interim Order by this Court, the terms and provisions of this Initial Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, all other stakeholders of any of the Debtors, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of any of the Chapter 11 Cases or any Successor Case; provided, however, that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including DIP Cash Collateral) by or extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the Debtors' estates.

36.    **Discharge.** Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan.

37.    **Survival.** This Initial Interim Order, the terms of the DIP Documents, and any actions taken pursuant hereto shall survive entry of any order that may be entered: (i) confirming any chapter 11 plan in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing any of the Chapter 11 Cases or any Successor Case; or (iv) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Case. The terms and provisions of this Initial Interim Order and the DIP Documents, including the claims, liens, security interests and other protections granted to the DIP Lender

pursuant to this Initial Interim Order and the DIP Documents, pursuant to this Initial Interim Order, shall continue in the Chapter 11 Cases or any Successor Case including following dismissal of any of the Chapter 11 Cases or any Successor Case in any court of competent jurisdiction, and shall maintain their priority as provided by this Initial Interim Order until, in respect of the DIP Loan, all the DIP Obligations, pursuant to the DIP Documents and this Initial Interim Order, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Loan, which survive such discharge or dismissal by their terms). In the event of dismissal or conversion of the Chapter 11 Cases or any Successor Case, the terms of this Initial Interim Order including the indemnification of the DIP Lender shall survive and continue, and shall not be modified by Bankruptcy Code sections 348 or 349, or otherwise, until the indefeasible repayment of all DIP Obligations are satisfied in full, which remedies may be exercised in this Court or any other court of competent jurisdiction.

38.    **Necessary Actions.** The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Initial Interim Order and the DIP Loan Agreement.

39.    **Enforceability.** This Initial Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Initial Interim Order shall be immediately effective and enforceable, by this and any other court of competent jurisdiction, upon its entry, and there shall be no stay of execution or effectiveness of this Initial Interim Order.

40.    **Initial Interim Order Controls.** In the event of any conflict between or among the

terms or provisions of this Initial Interim Order and the DIP Loan Agreement, the terms and provisions of this Initial Interim Order shall govern and control.

41.    **Headings.** All paragraph headings used in this Initial Interim Order are for ease of reference only and shall not affect the construction or interpretation hereof.

42.    **Retention of Jurisdiction.** This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Loan Agreement or this Initial Interim Order, even if the Chapter 11 Cases are converted or dismissed.

43.    **Continued Interim Hearing.** The continued interim hearing (the "Continued Interim Hearing") on the Motion shall be held on Tuesday, March 10, 2026 at 10:00 a.m. (prevailing Central Time).

44.    The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested in the Motion is necessary to avoid immediate and irreparable harm.

45.    All time periods set forth in this Initial Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

46.    Notwithstanding anything to the contrary herein, the Debtors are only authorized to borrow funds under the DIP Loan as set forth in week one of the Budget.

ENTERED:

Dated: March 5, 2026

_____
Judge Timothy A. Barnes
United States Bankruptcy Court

# Exhibit A

**DEBTOR-IN-POSSESSION LOAN AGREEMENT**

among

**HAWTHORNE RACE COURSE, INC.**
**POST TIME CATERING, INC.**
**SUBURBAN DOWNS, INC.**
**CAREY HEIRS PROPERTIES, LLC**

and

**DERBY DIP LLC**

Executed as of March 4, 2026

## TABLE OF CONTENTS

**Page**

1.   DEFINITIONS.................................................................................................. 2

2.   LOAN. ........................................................................................................... 8

3.   DISBURSEMENT. ........................................................................................ 10

4.   INSURANCE.................................................................................................. 13

5.   GENERAL  REPRESENTATIONS AND WARRANTIES ............................. 14

6.   HAZARDOUS MATERIALS. ....................................................................... 17

7.   GENERAL COVENANTS, CONDITIONS AND AGREEMENTS............................. 20

8.   FINANCIAL STATEMENTS. ....................................................................... 23

9.   BORROWERS' DEFAULT. .......................................................................... 24

10.  MISCELLANEOUS. ..................................................................................... 29

**Exhibits**:

EXHIBIT A  LEGAL DESCRIPTION.................................................................... A-1

EXHIBIT B  BUDGET............................................................................................. B-1

EXHIBIT C  LOAN DOCUMENTS....................................................................... C-1

EXHIBIT D  BORROWER'S INSURANCE REQUIREMENTS............................ D-1

SCHEDULE 6  EXCEPTIONS TO REPRESENTATIONS AND WARRANTIES ...... Sched. 6-1

182749781.2

## DEBTOR-IN-POSSESSION LOAN AGREEMENT

THIS DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "**DIP Loan Agreement**") is dated as of March 4, 2026 and is made by and among (i) **HAWTHORNE RACE COURSE, INC.**, an Illinois corporation ("**Hawthorne Race Course Borrower**"); **POST TIME CATERING, INC.**, an Illinois corporation ("**Post Time Catering Borrower**"); **SUBURBAN DOWNS, INC.**, an Illinois corporation ("**Suburban Downs Borrower**"); **CAREY HEIRS PROPERTIES, LLC**, an Illinois limited liability company ("**Carey Heirs Properties Borrower**") (Hawthorne Race Course Borrower, Post Time Catering Borrower, Suburban Down Borrower, and Carey Heirs Properties Borrower are individually and collectively, as context may require, referred to herein as "**Borrower**" or "**Borrowers**"), and (ii) **DERBY DIP LLC**, an Illinois limited liability company ("**Lender**").

## RECITALS

A.     On February 27, 2026, Borrowers commenced the Chapter 11 Cases Nos.   26-03505 (Hawthorne Race Course Borrower), 26-03517 (Post Time Catering Borrower), 26-03515 (Suburban Down Borrower), and  26-03512 (Carey Heirs Properties Borrower), (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "**Bankruptcy Code**"), with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "**Bankruptcy Court**"). Borrowers continue to operate their businesses and manage their assets and liabilities as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Borrowers request a senior secured loan in the amount of $16,000,000 from Lender for the purpose of financing Borrowers' Chapter 11 bankruptcy cases.

B.     The Carey Heirs Properties Borrower is the owner of the Hawthorne Race Course real estate (the "**Track**") located at 3501 S. Laramie Ave. in Village of Stickney, IL including 107 acres of land and certain ancillary buildings totaling over 1.0 million SF ("**Carey Heirs Properties Borrower Property**").

C.     The Hawthorne Race Course Borrower is the owner of (i) certain ancillary buildings and personal property at the Track, (ii) the Crestwood OTB real estate located at 5065 Cal Sag Road a/k/a 13148 Rivercrest Drive, Crestwood, IL including 6 acres of land and all ancillary buildings totaling 20,400 SF, (iii) the sole right to develop a racino in the southern suburbs of Chicago, (iv) all operating licenses and permits necessary in order to operate thoroughbred horse racing at the Track and certain OTBs throughout Illinois, and (v) has been found suitable to develop a casino at the Track (collectively, the "**Hawthorne Race Course Borrower Property**").

D.     The Suburban Downs Borrower is the owner of all operating licenses and permits necessary in order to operate harness horse racing at the Track (the "**Suburban Downs Borrower Property**" and along with the Carey Heirs Properties Borrower Property and the Hawthorne Race Course Borrower Property, the **"Property"**).

E.     The Post Time Catering Borrower is a wholly owned subsidiary of the Hawthorne Race Course Borrower and provides food and beverage services at the Track (the "**Post Time**

182749781.2

**Catering Borrower Property**" and along with the Carey Heirs Properties Borrower Property and the Hawthorne Race Course Borrower Property, the **"Property")**.

F.    Borrowers have requested a loan from Lender for the purposes of paying costs and expenses solely pursuant to the Budget attached to this DIP Loan Agreement as **Exhibit B**.

G.    As a condition of making said loan, Lender requires that Borrowers execute and deliver this DIP Loan Agreement and the other Loan Documents (as hereinafter defined).

H.    On March 4, 2026, the Bankruptcy Court entered the *Interim Order (I) Authorizing Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Interim Financing Order**") [ECF No. [*]].

I.    The DIP Loan (as defined herein) will have priority in all respects to any and all liens, claims and encumbrances against the Property as of the Dip Approval Date (as hereinafter defined) and set forth in the Bankruptcy Plan (as defined herein).

J.    As a condition of making said loan, Lender requires that Borrowers execute and deliver this DIP Loan Agreement and the other Loan Documents (as hereinafter defined).

THEREFORE, in consideration of the mutual covenants, conditions and agreements herein contained, the parties hereto hereby agree as follows:

<u>**AGREEMENT**</u>

1.    **DEFINITIONS.**

    **1.1**    <u>**Defined Terms**</u>. The following capitalized terms generally used in this DIP Loan Agreement shall have the meanings defined or referenced below. Certain other capitalized terms used only in specific sections of this DIP Loan Agreement are defined in such sections.

"**Account Debtor**" means the Person who is obligated on or under an Account.

"**Accounts**" means collectively (a) any right to payment of a monetary obligation, arising from the delivery of goods or the provision of services, and/or the sale or lease of goods related to any of such services (whether such services are supplied by Borrowers or a third party), (b) without duplication, any "account" (as that term is defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), any "payment intangibles" (as that term is defined in the UCC) and all other rights to payment and/or reimbursement of every kind and description, in each case arising from the delivery of goods or the provision of services, (c) all accounts, general intangibles, intellectual property, rights, remedies, guarantees, supporting obligations, letter of credit rights and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under the Loan Documents in respect of the foregoing, (d) all information and data compiled or derived by Borrowers or to which Borrowers are entitled in respect of or related to the foregoing, and (e) all proceeds of any of the foregoing.

"**Affiliate**" or "**Affiliates**" shall mean an entity's partners, members, managers or parent

2

and subsidiary corporations, and any other entity or person directly or indirectly, controlling, controlled by or under common control with said entity, and their respective affiliates, shareholders, directors, officers, employees and agents.

"**Appraisal**" shall mean a written appraisal acceptable to Lender in its sole and absolute discretion.

"**Approved Leases**" shall mean Leases, if any, approved in writing by Lender as provided in this DIP Loan Agreement.

"**Assignee Lender**" shall have the meaning ascribed to such term in **Section 10.2**.

"**Avoidance Actions**" means avoidance actions under Chapter 5 of the Bankruptcy Code.

"**Bankruptcy Code**" has the meaning set forth in the recitals of this DIP Loan Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals of this DIP Loan Agreement.

"**Bankruptcy Law**s" means the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Court's Local Rules, and, to the extent applicable, the rules, regulations and requirements of the Office of the United States Trustee.

"**Bankruptcy Plan**" means that certain Chapter 11 reorganization and repayment plan proposed by Borrowers and approved by the Bankruptcy Court regarding the Chapter 11 Cases, which upon consummation will discharge the Chapter 11 Cases.

"**Bankruptcy Proceeding**" shall mean a voluntary filing by Borrowers under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "**Bankruptcy Court**").

"**Borrower**" and "**Borrowers**" shall have those meanings ascribed to it above.

"**Borrowers' Funds**" shall mean funds which are not proceeds from the DIP Loan, expended by Borrower.

"**Break-up Fee**" shall mean the fee equal to the sum of three percent (3.0%) of the outstanding amount of the DIP Loan, which shall be immediately payable if the Bankruptcy Court does not enter the final Financing Order, in addition to all Lender costs and expenses, including Lender legal costs and fees.

"**Business Day**" shall mean a day of the week (but not a Saturday, Sunday or holiday) on which banks located in the State of Illinois and the State of Nevada are open to the public for carrying on substantially all of their business functions. Unless specifically referenced in this DIP Loan Agreement as a Business Day, all references to "days" shall be to calendar days.

"**Chapter 11 Cases**" has the meaning set forth in the recitals of this DIP Loan Agreement.

3

"**Collateral**" shall mean, except for the Borrowers horse racing, sports wagering and casino licenses, permits and regulatory approvals, all property (including all personal, real, tangible and intangible property) in which the Collateral Documents grant (or purport to grant) Lender a lien or security interest, including, without limitation, a security interest in any proceeds from any sale of Borrowers business or assets whether or not any horse racing, sports wagering and casino licenses, permits and regulatory approvals (collectively, the "**Licenses**") are included in any such sale.

"**Collateral Documents**" shall mean the Financing Order, the DIP Loan Agreement and the Loan Documents, including any UCC financing statements relating to the foregoing, all as same may be amended, restated or modified.

"**Covenants**" shall mean reciprocal easement agreement, deed restriction, and the like (together with any amendments, restatements, or modifications thereto), if any, concerning the Property, whether executed by Borrower alone, or executed by and between Borrower and owners of adjacent property, if any.

"**Creditors Committee**" means, if and when appointed, the Official Committee of Unsecured Creditors.

"**Default Rate**" shall mean a rate per annum equal to twenty-two percent (22%).

"**DIP Approval Date**" means the date upon which the Interim Financing Order is entered by the Bankruptcy Court in form and substance satisfactory to Lender in its sole and absolute discretion.

"**DIP Lender**" shall mean Derby DIP LLC.

"**DIP Loan**" shall mean the loan described in **Section 2.1**.

"**DIP Motion**" means the motion filed pursuant to Sections 105, 361, 363, 364(c)(1), 364(c)(2), 364(d)(1), 364(e), 503, and 507 of the Bankruptcy Code seeking approval of the DIP Loan and entry of the Financing Order.

"**Environmental Report**" shall mean those certain four (4) reports provided to Lender.

"**Event of Default**" shall have the meaning ascribed to such term in **Section 9.1.1**.

"**Exit Fee**" shall mean the fee equal to the sum of two percent (2.0%) of the Loan Amount, which shall be fully earned, non-refundable, and allowed upon the entry of the Interim Financing Order and the occurrence of the Effective Date, and payable on the Maturity Date or the earlier acceleration of the DIP Loan, or such earlier date specified in the DIP Loan Agreement or the Financing Order.

"**Extension**" shall mean the Borrowers' right to extend the DIP Loan one (1) time for three (3) months subject to the following:  i) Borrowers shall not have been in default during the term of the DIP Loan; ii) the Property is under an active LOI with a new equity source to recapitalize the Property in an amount in excess of $35 million; iii) Borrowers shall provide notice of the extension to Lender at least 30 days prior to the Maturity Date (the "**Notice**"); and iv) Borrowers

shall pay Lender an extension fee of one (1%) percent of the Loan Amount, payable with the Notice, plus interest on the DIP Loan during the Extension period.

"**Extension Fee**" shall mean the fee paid by the Borrowers to the Lender in the amount of equal to one (1%) percent of the Loan Amount.

"**Financing Order**" shall mean the Interim Financing Order and a final order approving the DIP Loan.

"**First Funding Date**" shall have the meaning set forth in **Section 3.1** of this DIP Loan Agreement.

"**General Intangibles**" means "general intangibles" as defined in the UCC, including, without limitation, any and all general intangibles, choses in action, causes of action, rights to the payment of money (other than Accounts), and all other intangible personal property of Borrower of every kind and nature wherever located and whether currently owned or hereafter acquired by Borrower (other than Accounts), including, without limitation, corporate or other business records, inventions, designs, patents, patent applications, service marks, service mark applications, trademark applications, brand names, tradenames, trademarks and all goodwill symbolized thereby and relating thereto, tradestyles, trade secrets, registrations, domain names, websites, computer software, advertising materials, distributions on certificated and uncertificated securities, investment property, securities entitlements, goodwill, operational manuals, product formulas for industrial processes, blueprints, drawings, copyrights, copyright applications, rights and benefits under contracts, licenses, license agreements, permits, approvals, authorizations which are associated with the operation of Borrower's business and granted by any Person, franchises, customer lists, deposit accounts, tax refunds, tax refund claims, and any letters of credit, guarantee claims, security interests or other security held by or granted to Borrower to secure payment by an Account Debtor of any of Borrower's Accounts, and, to the maximum extent permitted by applicable law, any recoveries or amounts received in connection with any litigation or settlement of any litigation.

"**Guaranteed Interest Amount**" shall mean an amount equal to three (3) months of interest on the DIP Loan, but in no event less than $520,000.

"**Hazardous Materials**" shall have the meaning ascribed to such term in **Section 6.1.1**.

"**Hazardous Materials Claims**" shall have the meaning ascribed to such term in **Section 6.1.3.**

"**Hazardous Materials Laws**" shall have the meaning ascribed to such term in **Section 6.1.2.**

"**Interim DIP Approval**" shall mean entry of the Interim Financing Order by the Bankruptcy Court approving the DIP Loan as a priming super priority secured loan on an interim basis.

"**Improvements**" shall mean the buildings and other structures now or hereafter located on the Property, together with all necessary or required site improvements and all appurtenances

and fixtures and all tenant improvements.

"**Leases**" shall mean all leases, licenses or other agreements providing for the use or occupancy of any portion of the Property, including all amendments, extensions, renewals, supplements, modifications, sublets and assignments thereof and all separate letters or separate agreements relating thereto.

"**Lender**" shall have that meaning ascribed to it above.

"**Loan Amount**" shall mean Sixteen Million and No/100 Dollars ($16,000,000).

"**Loan Disbursement Statement**" shall mean the statement showing the disbursement of Loan proceeds in connection with the Opening Disbursement, which shall be prepared by Lender and executed by Borrower.

"**Loan Documents**" shall mean those documents, as hereafter amended, supplemented, replaced or modified from time to time, properly executed and in recordable form, if necessary, listed as Loan Documents in **Exhibit C**, and shall also include any other agreement executed by Borrowers (or any of them) in favor of or with Lender in connection with the transactions contemplated by this DIP Loan Agreement.

"**Loan Fee**" shall have the meaning ascribed to such term in **Section 2.3**.

"**Material Adverse Effect**" shall mean (a) a material adverse change in, or a material adverse effect upon, the assets, business, liabilities, properties, condition (financial or otherwise) or results of operations of Borrowers taken as a whole, (b) a material impairment of the ability of Borrowers to pay or otherwise perform any of the Obligations under any of the Loan Documents, or (c) a material adverse effect on (i) the Collateral, (ii) the legality, validity, binding effect or enforceability against Borrowers of any of the Loan Documents to which it, respectively, is a party, (iii) the perfection or priority of any lien or security interest granted to Lender under any Loan Document, or (iv) the rights or remedies of Lender under any Loan Document.

"**Milestone Non-Compliance Event**" shall mean that any Milestone has not been timely satisfied as provided in the definition of "Milestones".

"**Milestones**" shall mean the**:** (i) interim approval by the Bankruptcy Court of the DIP Facility within three (3) Business Days of the Petition Date; and (ii) entry of an order by the Bankruptcy Court approving the final DIP Facility within twenty-eight (28) days of the Petition Date.

"**Maturity Date**" shall mean the earlier of the effective date of the Bankruptcy Plan or one hundred twenty (120) days from approval of interim financing.

"**Municipality**" shall mean, as the case may be, the city, municipality, parish, or territory in which each Property is located.

"**Note**" shall mean that certain Term Note of even date herewith duly executed by Borrower to the order of Lender in the maximum principal amount of the Loan Amount, as same may be

6

amended, restated or modified.

"**Note Rate**" shall mean that rate of thirteen percent (13%) per annum.

"**Opening Disbursement**" shall have the meaning ascribed to such term in **Section 3.1**.

"**Obligations**" shall mean the DIP Loan, as evidenced by the Note, all interest accrued thereon (including interest which would be payable as post-petition interest in connection with any bankruptcy or similar proceeding, whether or not permitted as a claim thereunder), all fees due Lender hereunder (including, without limitation, the Loan Fee, the Exit Fee, any extension fee, and the Break-up Fee, if applicable), any costs or expenses incurred by Lender hereunder (including, without limitation, legal, search, appraisal, travel, consultant and other due diligence costs), reasonable attorneys' fees, indemnification payments and any and all other liabilities and obligations of Borrower to Lender under this DIP Loan Agreement and any other Loan Document, which are owed to Lender or any Affiliate of Lender, all in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, together with any and all renewals or extensions thereof.

"**Obligor**" shall mean Borrower and any other party liable with respect to the Obligations.

"**Organizational Documents**" shall mean, with respect to a (i) corporation, the articles or charter and bylaws; (ii) with respect to a partnership, the partnership agreement and certificate of limited partnership; (iii) with respect to a limited liability company, the operating agreement and certification of formation or organization; (iv) with respect to a trust, the trust agreement; and (v) with respect to an individual, none.

"**Permits**" means all governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals of a Person required under all applicable laws and required for such Person in order to develop, use, lease, or operate a business at any Property.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, limited liability company, unincorporated organization, association, corporation, institution, entity, party, or government (whether national, federal, state, provincial, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"**Petition Date**" means the date of filing of the Bankruptcy Proceedings, or February 27, 2026.

"**Potential Event of Default**" shall mean an event or circumstance that with the passage of time, the giving of notice or both, could become an Event of Default.

"**Project**" shall mean all of the Improvements now or at any time located on the land underlying the Property, together with any fixtures, fittings, apparatus, machinery, equipment and other personal property, and any replacements thereof or substitutes therefor, now or at any time hereafter owned by Borrower (or either of them) and located thereon or not located thereon but

182749781.2

used in any way in connection with the Property, the Improvements located thereon.

"**Property**" shall have the meaning ascribed to such term in **Exhibit A**.

"**RICO Related Law**" shall mean the Racketeer Influenced and Corrupt Organizations Act of 1970 or any other federal, state or local law for which forfeiture of assets is a potential penalty.

"**State**" shall mean the State of Illinois.

"**Transfer**" shall mean any conveyance, transfer, sale, swap, assignment, pledge, hypothecation, mortgage, encumbrance or other disposition of all or any portion of the Property or the Project or of any interest in Borrower, or the entering into of any agreement to do any of the foregoing, whether the same occurs directly, indirectly, by operation of law or otherwise.

"**UCC**" shall mean the Uniform Commercial Code as enacted in the states where the Collateral is located or the applicable party is organized.

    **1.2**   **Exhibits and Schedules Incorporated**. All exhibits and schedules attached hereto or referenced herein are hereby incorporated into this DIP Loan Agreement.

**2.**    **LOAN.**

    **2.1**   **The DIP Loan**. Borrower desires to borrow from Lender a loan (the "**DIP Loan**") in an amount equal to the Loan Amount, the proceeds of which shall be first used to pay closing costs, to pay delinquent and current real property taxes, to pay Lender's costs and expenses associated with the underwriting, documenting, funding, monitoring and enforcing of the DIP Loan (including, without limitation, legal, search, appraisal, travel, consultant and other due diligence costs), and to otherwise pay approved expenses solely  in accordance with the DIP Budget attached hereto as **Exhibit B**.

    **2.2**   **Use of Proceeds**. Borrowers agree to borrow the DIP Loan from Lender to the extent amounts are required by Borrowers in the DIP Budget attached hereto as **Exhibit B** (and for no other use or purpose), and to apply all proceeds of the DIP Loan for such purposes, and for no other purpose.

    **2.3**   **Loan Fee**. Borrowers shall pay Lender a loan fee for the DIP Loan in the amount of 2.0% of the Loan Amount.  A portion of the Loan Fee equal to Sixty Thousand and No/100 Dollars ($60,000) has already been paid by Borrowers to Lender, and the balance shall be due upon funding of the Opening Disbursement, these fees shall together be known as the "**Loan Fee.**" The Loan Fee shall be deemed earned by Lender at the time of payment and non-refundable.

    **2.4**   **Loan Documents**. Borrower shall deliver to Lender concurrently with this DIP Loan Agreement each of the Loan Documents, properly executed and, as applicable, in recordable form.

    **2.5**   **Agreement Date**. The Loan Documents shall become effective on the date of this DIP Loan Agreement.

**2.6    Maturity Date**. On the Maturity Date, all sums due and owing under this DIP Loan Agreement and the other Loan Documents shall be repaid in full.  All payments due under this DIP Loan Agreement shall be paid in immediately available funds.

**2.7    Note Rate**.

**2.7.1.    Interest Rate**. All disbursements of Loan proceeds shall bear interest at the Note Rate, subject to the default interest provisions contained herein.

**2.7.2.    Loan Payments**.

**2.7.2.1.**  Subject to **Section 2.7.3**, Borrowers shall pay the interest accrued on the outstanding amount of the DIP Loan with each Draw (as defined in **Section 3.1**).

**2.7.3.    Default Interest**.

**2.7.3.1.**  If any payment of interest required hereunder or under any other Loan Document is not received by Lender on or before the date such payment becomes due, Borrower shall pay to Lender a late charge equal to five percent (5%) of the amount of such unpaid payment to defray part of the increased cost of collecting late payments and the opportunity costs incurred by Lender because of the unavailability of the funds. If such interest payment is not received by Lender on or before the date when it becomes due, Borrower shall pay interest on the entire outstanding principal balance of the Note at the Default Rate from and after the date when the payment was due until paid.

**2.7.3.2.**  If any payment of principal required hereunder or under any other Loan Document (including, without limitation, the principal payment due on the Maturity Date) is not received by Lender on or before the date such payment becomes due, Borrower shall pay to Lender a late charge equal to five percent (5%) of the amount of such unpaid payment to defray part of the increased cost of collecting late payments and the opportunity costs incurred by Lender because of the unavailability of the funds. If any payment of principal required hereunder or under any other Loan Document (including, without limitation, the principal payment due on the Maturity Date) is not received by Lender on or before the date such payment becomes due, Borrower shall, in addition to the late charges described above also pay interest on the entire outstanding principal balance of the Note at the Default Rate from and after the date when the payment was due.

**2.7.3.3.**  Effective immediately upon the occurrence of, and during the continuance of, any Event of Default that remains uncured beyond any applicable notice and cure period, other than default in the payment of interest or principal as described in the preceding two paragraphs, the balance of this Note then outstanding shall bear interest at the Default Rate (based on a 360-day year and charged on the basis of actual days elapsed). In addition, all other amounts due Lender (whether directly or for reimbursement) under the Note, this DIP Loan Agreement or any of the other Loan Documents, if not paid when due or, in the event no time period is expressed, if not paid within five (5) days after written notice from Lender that the same has become due, shall also bear interest thereafter at the Default Rate until paid.

9

2.7.4.    **Computation of Interest**. Interest shall be computed on the basis of the actual number of days elapsed in the period during which interest accrues and a year of 360 days. In computing interest, the date of funding and the date of payment shall be included; provided, however, that if any funding is repaid on the same day on which it is made, one day's interest shall be paid thereon. Notwithstanding any of the terms and conditions contained in this Section, interest in respect of any amount of the DIP Loan shall not exceed the maximum rate permitted by applicable law.

2.8    **Payments**.

2.8.1.    **Voluntary Prepayments**.  Provided that Lender has received aggregate interest payments in an amount equal to or greater than the Guaranteed Interest Amount, Borrower may, at any time, prepay the DIP Loan in whole but not in part (a "**Prepayment**").

2.8.2.    **Intentionally Omitted**.

2.8.3.    **Manner and Time of Payment**. All payments of principal, interest and fees hereunder payable to Lender shall be made, without condition or reservation of right and free of set-off or counterclaim, in U.S. dollars and by ACH or wire transfer (pursuant to Lender's written wire transfer instructions) of immediately available funds delivered to Lender not later than 1:00 P.M. prevailing Central Time) on the date due. Funds received by Lender after that time and date shall be deemed to have been paid on the next succeeding Business Day.

2.8.4.    **Payments on Non-Business Days**. Whenever any payment to be made by Borrower hereunder shall be stated to be due on a day which is not a Business Day, payments shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

2.8.5.    **Application of Payments**. At Lender's sole discretion, all payments received by Lender on account of Borrower's liabilities under the Loan Documents shall be applied as follows, subject to all applicable laws: (a) first, to payment of all unpaid fees and expenses owing under the Loan Documents, (b) second, to the payment of all accrued and unpaid interest owing under the Loan Documents and (c) third, to the payment of the outstanding principal amount of the DIP Loan. Upon the occurrence and during the continuance of an Event of Default that remains uncured beyond any applicable notice and cure period, Lender shall have the right to apply any such payments in such order and manner as Lender may determine in its sole discretion.

3.    **DISBURSEMENT.**

3.1    **Loan Opening and Disbursements of Loan Proceeds**. At such time as all of the terms and conditions set forth in **Section 2.4** have been satisfied by Borrowers and Borrowers have executed and delivered or caused to be executed and delivered to Lender each of the Loan Documents in form and substance satisfactory to Lender, in its reasonable discretion, Lender shall disburse to or for the benefit of Borrowers an amount equal to $1,485,506 (the "**Opening Disbursement**"), the proceeds of which Opening Disbursement shall be used solely in accordance with the Budget. and Lender's other costs and expenses (including consultants' fees and attorneys' fees and costs) in connection with the DIP Loan. The date upon which the Opening Disbursement is made will be referred to as the "**First Funding Date**." At such time as all of the terms and

10

conditions set forth in **Section 3.3** have been satisfied by Borrowers, Lender shall allow bi-weekly draws (each a "**Draw**") with payment of interest due under the DIP Loan. In the event Borrowers fail to satisfy such disbursement conditions, Borrowers nevertheless shall pay all costs and expenses incurred by Lender in connection with the transactions contemplated herein promptly upon receipt of an invoice therefor from Lender (and, if appropriate, any Affiliate of Lender).

   **3.1.1.  Subsequent Draws**.  For each Draw occurring after the Opening Disbursement ("**Subsequent Draws**"), Borrowers must provide two days prior written notice and a variance report to budget versus actual expenditures and must be in compliance with the DIP Budget.

   **3.1.2.  DIP Loan Agreement**. Borrowers and Lender shall have executed (to the extent applicable) and/or delivered, or caused to be delivered, to Lender, within two (2) Business Days of the DIP Approval Date, (i) this DIP Loan Agreement, (ii) each Loan Document, (iii) any other documents reasonably required by Lender to evidence the liens on the Collateral  or other customary closing deliverables and (iv) a notice of pendency of the Chapter 11 Cases in a form appropriate for recordation in Cook County, State of Illinois, and in the case of (i) through (iv), each in form acceptable to Lender in its sole and absolute discretion.

   **3.1.3.  Approvals**. Lender shall have received satisfactory evidence that Borrowers have obtained all required consents and approvals of all persons in connection with the filing of the Chapter 11 Cases, the execution, delivery and performance of the Loan Documents, and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the transactions contemplated hereby.

   **3.1.4.  DIP Motion**.  Lender shall have approved the DIP Motion filed in the Chapter 11 Cases.

   **3.1.5.  Financing Order**. The Financing Order, in form and substance satisfactory to Lender in its sole and absolute discretion, shall have been entered by the Bankruptcy Court and shall not have been vacated, reversed or stayed, or modified or amended, without the prior written consent of Lender. The Financing Order shall provide, among other things, that: (i) notice of the DIP Motion has been provided as required under applicable Bankruptcy Laws; (ii) the Loan Documents are approved by the Bankruptcy Court in their present from without revision (except as may be consented to by Lender prior to such approval but without any obligation to do so); (iii) the execution, delivery and performance of this Loan Agreement by the Borrowers is authorized; (iv) the Bankruptcy Court shall have found that the Loan Documents constitute valid and enforceable obligations of Borrowers and that the payment and performance of the obligations of Borrowers under the Loan Documents shall constitute (x) an unsecured credit obtained pursuant to Section 364(c)(1) of the Bankruptcy Code, allowable under Section 503(b)(1) of the Bankruptcy Code and having priority over any and all administrative expenses of the kind specified in, or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 726 or any other provisions of the Bankruptcy Code, but not collectible from Avoidance Actions or the proceeds thereof, and (y) a senior secured, super priority loan as set forth herein pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code,; (v) that Borrowers shall not be entitled to seek other or further financing under Sections 364(b), (c), or (d) of the Bankruptcy Code, whether

182749781.2

having priority, subordinated, unsecured or secured, unless either (A) the payment and performance of obligations to Lender under the Loan Documents have been paid and performed in full or (B) Lender has consented thereto in writing (but without any obligation to do so); (vi) the validity, enforceability and priority of the payment and performance obligations to Lender by Borrowers with respect to the DIP Loan and the Loan Documents shall not be impaired or otherwise adversely affected in any manner; (vii) the Bankruptcy Court's finding that Lender is entitled to the protections of Section 364(e) of the Bankruptcy Code as Lender has negotiated in good faith with Borrowers and has entered into the Loan Documents and has extended credit hereunder in good faith; and (viii) the Loan Fee and other fees and closing expenses are approved.

**3.1.6.** **Automatic Stay**. The automatic stay of Section 362 of the Bankruptcy Code shall have been modified, amended, annulled and terminated: (i) to permit the creation and perfection of Lender's Liens and security interests, as more fully set forth in the Financing Order and (ii) to permit Lender's enforcement of all rights and remedies granted to Lender under the Loan Documents, the Financing Order and applicable state and federal law, including without limitation the exercise of any prejudgment remedies by Lender and foreclosure by Lender under the Loan Documents upon an Event of Default under the Loan Documents, all without further order of the Bankruptcy Court.

**3.1.7.** **Insurance**. Evidence of the insurance described in **Section 4**.

**3.1.8.** **Property Specific**.

**3.1.8.1.** **Survey**. A survey for all the Property indicating no condition that Lender reasonably determines could interfere with or impair the operation of the Property.

**3.1.8.2.** **Environmental Assessments**. The Environmental Report.

**3.1.9.** **Organization, Authorization and Good Standing**. Such evidence of the due authorization, good standing and qualification to do business, of the Borrowers as Lender may reasonably request, and certified copies of the Organizational Documents of each Borrower.

**3.2** **Disbursements Evidenced by the Note**. All amounts disbursed by Lender hereunder, together with interest thereon, shall be evidenced by the Note and secured by the Collateral Documents.

**3.3** **Additional Conditions**. Notwithstanding anything to the contrary contained herein, the continued performance, observance and compliance by Borrowers in all material respects of and with all of the covenants, conditions and agreements of Borrowers contained herein (whether or not non-performance constitutes an Event of Default) and in the other Loan Documents shall be further conditions precedent to any disbursements of the proceeds of the DIP Loan. In addition, Lender shall not be required to disburse proceeds of the DIP Loan at any time that (i) there exists an Event of Default or Potential Event of Default that remains uncured beyond any applicable notice and cure period, (ii) any proceedings have been commenced or Borrower (or either of them) has received written notice of the commencement of proceedings by any public or quasi-public body to acquire any Property or any interest in any Property or any part thereof (other than a part which, in Lender's sole and absolute judgment, is immaterial) by eminent domain or by condemnation proceedings, (iii) any legislation has been passed or any suit or other proceeding

12

has been instituted the effect of which is to prohibit, enjoin (or to declare unlawful or improper) or otherwise adversely affect, in Lender's sole and absolute judgment, Borrowers' performance of their respective obligations under the Loan Documents, or (iv) Lender has reasonable cause to believe that any portion of the Property might be subject to forfeiture under any RICO Related Law. Lender's refusal to disburse any proceeds of the DIP Loan on account of the provisions of this Section shall not alter or diminish any of Borrowers' other obligations hereunder or otherwise prevent any breach or default of Borrowers hereunder from becoming an Event of Default.

**4.     INSURANCE.**[1]

**4.1     Types of Policies**. Borrowers, at their sole cost and expense, shall insure or cause to be insured and keep insured the Property against such perils and hazards, and in such amounts and with such limits, as Lender may from time to time require, and, in any event, including, without limitation, the following coverages with respect to the Property.  Borrowers shall add DIP Lender as an additional insured on all insurance policies and provide evidence of same at closing

**4.1.1.     All Risk**. Insurance against loss to the Property which, during any construction, shall be on an "All Risk" perils "Builders' Risk," monthly reporting or non-reporting "Completed Value" form and, after completion of construction, shall be on an "All Risk" policy form covering, in each case, insurance risks of all physical loss "Causes of Loss - Special Form," including theft, terrorism, and insurance against such other risks as Lender may reasonably require. Such policies shall be in amounts equal to the full replacement cost of the Property (including the related Improvements, and specifically, Borrowers' interest in any leasehold improvements).

**4.1.2.     Intentionally Omitted**.

**4.1.3.     Public Liability**. Commercial general public liability insurance against death, bodily injury and property damage arising in connection with the Property with limits of not less than $1,000,000 per occurrence. Such policy shall be written on an occurrence form and shall list Borrowers as the named insured, shall designate thereon the location of the Property and shall have such limits as Lender may reasonably require.

**4.1.4.     Other Insurance**. Such other insurance relating to the Property and the use and operation thereof as Lender may, from time to time, require.

**4.2     Policy Requirements**. All insurance shall be carried in companies reasonably acceptable to Lender and all policies shall name Lender as an additional insured, and loss payee. Furthermore, all insurance shall be in form and content reasonably acceptable to Lender, provide 10 days' advance written notice to Lender before any cancellation, adverse material modification or notice of non-payment and, to the extent limits are not otherwise specified herein, contain deductibles which are in amounts acceptable to Lender. Lender shall be specifically named in all policies as an additional insured. All physical damage policies and renewals shall contain a standard mortgage clause naming Lender, which clause shall expressly state that any breach of any condition or warranty by Borrowers shall not prejudice the rights of Lender under such insurance, as well as a loss payable clause in favor of Lender for personal property, contents, inventory and equipment. No additional parties shall appear in the mortgage or loss payable clause with respect

to the Property without Lender's prior written consent except for such policies existing as of the date of this DIP Loan Agreement with respect to personal property, including, without limitation equipment. All evidence of insurance shall reference the specific projects being covered by name and address and shall otherwise be in form and substance acceptable to Lender. All deductibles shall be in amounts acceptable to Lender.

**4.3** **Notice; Evidence of Renewal**. Any notice pertaining to insurance and required pursuant to this Section shall be given in the manner provided in **Section 10.8** and at any additional address of which Lender gives Borrowers prior written notice. Borrowers shall use its best efforts to deliver to Lender evidence of renewal satisfactory to Lender at least five (5) Business Days before the expiration of existing policies or any prior renewal thereof. If Lender has not received satisfactory evidence of such renewal or substitute insurance in the time frame herein specified, Lender shall have the right, but not the obligation, to purchase such insurance without prior notice to Borrowers. Any amounts so disbursed by Lender pursuant to this Section shall be a part of the DIP Loan and shall bear interest at the Default Rate. Nothing contained in this Section shall require Lender to incur any expense or take any action hereunder, and inaction by Lender shall never be considered a waiver of any right accruing to Lender on account of this **Section 4**.

**4.4** **Separate Insurance**. Borrowers shall not carry any separate insurance on the Property concurrent in kind or form with any insurance required hereunder or contributing in the event of loss without Lender's prior written consent and, in the event Lender grants its consent, any such policy shall nevertheless have attached thereto a standard clause, with loss payable to Lender, and shall otherwise meet all other requirements set forth in this **Section 4**.

**4.5** **Standard Insurance Requirements**. Without limitation of the terms and provisions of this **Section 4**, Borrowers agree that it shall comply with the insurance requirements set forth on **Exhibit D** attached hereto. In the event of any conflict between any terms or provisions of **Section 4** above and **Exhibit D**, the terms of **Exhibit D** shall control.

**5.** **GENERAL REPRESENTATIONS AND WARRANTIES**. Borrowers hereby covenant, represent, and warrant to Lender as follows:

**5.1** **Authority**. Subject to the entry of the Financing Order by the Bankruptcy Court, each of the Borrowers has full right, power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party and any other documents and instruments to be executed and delivered by such Borrowers pursuant to this DIP Loan Agreement. The Loan Documents and any other documents and instruments to be executed and delivered by the Borrowers pursuant to this DIP Loan Agreement, when executed and delivered pursuant hereto, will constitute the duly authorized, valid, and legally binding obligations of such parties and will be enforceable strictly in accordance with their respective terms, subject to the effect of bankruptcy and other laws affecting the rights of creditors generally.

**5.2** **Formation**. Each Borrower that is not an individual or general partnership is a corporation, limited liability company, trust, or limited partnership (as the case may be, as identified in this DIP Loan Agreement), and is duly formed, validly existing, and in good standing under the laws of the state under the laws of which it was formed.

14

**5.3**     **No Default**. Except as set forth in **Schedule 6**, none of the Borrowers are in default under any contract, agreement, or commitment to which it is a party, the effect of which is reasonably likely to adversely affect Borrowers' performance of its respective obligations pursuant to and as contemplated by the terms and provisions of this DIP Loan Agreement or any of the other Loan Documents. The execution and delivery of the Loan Documents and any other documents or instruments to be executed and delivered by the Borrower Parties pursuant hereto, the consummation of the transactions herein or therein contemplated, and compliance with the terms and provisions hereof or thereof, will not (i) violate any presently existing provisions of law or any presently existing applicable regulation, order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality, (ii) subject to the entry of the Financing Order by the Bankruptcy Court, require any governmental or third-party consent or approval or any consent or approval not heretofore obtained under any partnership agreement, operating agreement, articles of incorporation, bylaws or other document, or (iii) conflict or be inconsistent with, or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in any acceleration of any obligations under, any indenture, deed of trust, instrument, documents, agreement or contract of any kind to which any of the Borrowers is a party or by which any Collateral any of the Borrowers may be bound, in the case of each of clauses (i), (ii), and (iii) immediately above, the effect of which is reasonably likely to adversely affect Borrowers' performance of their respective obligations pursuant to and as contemplated by the terms and provisions of this DIP Loan Agreement or any of the other Loan Documents.

**5.4**     **No Litigation**. Except as set forth in **Schedule 6** and the Chapter 11 Cases, there are no petitions, actions, suits or proceedings pending or, to the best of Borrowers' knowledge, threatened against or affecting any Collateral before any court or governmental, administrative, regulatory, adjudicatory or arbitrational body or agency of any kind which is reasonably likely to materially adversely affect the performance by Borrowers, of their respective obligations pursuant to and as contemplated by the terms and conditions of this DIP Loan Agreement or the other Loan Documents.

**5.5**     **True and Complete Information**. Neither this DIP Loan Agreement, nor any other Loan Document, nor any document, financial statement, credit information, certificate, or other statement required herein furnished to Lender by any Borrower contains any untrue statement of a material fact or omits to state a material fact relating to the Collateral or any matter covered by this DIP Loan Agreement. To the best of Borrowers' knowledge, no document, financial statement, credit information, certificate, or other statement prepared by any party other than Borrowers and furnished to Lender contains any untrue statement of a material fact or omits to state a material fact relating to this DIP Loan Agreement. To the best of Borrowers' knowledge, there is no fact that Borrowers have not disclosed to Lender in writing that could materially adversely affect the assets, business, or financial condition of any Borrower.

**5.6**     **Usury**. The DIP Loan constitutes a lawful transaction within the meaning of 815 Illinois Compiled Statutes, 205 Section 4(1), and neither the amounts to be received by Lender as interest under the Note nor the loan fees (including the Loan Fee) is usurious or illegal under any applicable law.

182749781.2

**5.7** **Non-Foreign Status**. No Borrower is a nonresident alien for purposes of U.S. income taxation and is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as said terms are defined in the Internal Revenue Code and Income Tax Regulations).

**5.8** **ERISA**. Borrowers are not and, for so long as any obligation of Borrowers hereunder remains outstanding, shall not be an "employee benefit plan" within the meaning of section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and Borrowers' assets do not constitute assets of any such plan.

**5.9** **RICO**. There are no suits, actions or proceedings pending or threatened against any Borrower or any of the principals thereof under a RICO Related Law.

**5.10** **Financial Statements**. Borrowers have heretofore furnished Lender a copy of the most recent financial statements of Borrowers. Such financial statements were prepared in a manner consistent with such person's or entity's preparation method for the prior fiscal year and present fairly the financial condition of such person or entity as of the respective dates thereof and the results of operations for the period then ended and otherwise comply with **Section 8.1**. Since the date of such financial statements, there has been no material adverse change in any such person's or entity's business or financial condition not disclosed in writing to Lender. Borrowers do not have any contingent liabilities not provided for or disclosed in said financial statements. Borrowers have the financial capacity to perform and discharge each and every one of their respective obligations and liabilities under this DIP Loan Agreement and any of the other Loan Documents as it becomes due.

**5.11** **Property Specific**.

**5.11.1.** **Title**. Borrowers have good, marketable and indefeasible title in fee simple to the Property, subject to no liens, claims, encumbrances, rights of others, conditions, or exceptions other than the Permitted Exceptions and as set forth in the Chapter 11 Cases and any additional matters specifically approved by Lender in writing.

**5.11.2.** **Intentionally Omitted**.

**5.11.3.** **Real Estate Taxes**. The Property is and shall remain taxed separately for real estate tax purposes without regard to any other real property. Except as disclosed in writing to Lender, there is no pending reassessment of real estate taxes or pending appeal of any such reassessment.

**5.11.4.** **Annexation**. The Property is located in its respective Municipality and has been properly annexed thereto.

**5.11.5.** **Condemnation**. No Borrower has received any notice from any governmental or quasi-governmental body or agency or from any person or entity with respect to and there is no actual or threatened taking of the Property, or any portion thereof, for any public or quasi-public purpose by the exercise of the right of condemnation or eminent domain.

**5.11.6.** **Compliance With Laws**. Except as set forth on **Schedule 6**, the use of the Property, does not violate any presently existing applicable statute, law, regulation, rule,

16

182749781.2

ordinance, or order of any kind whatsoever, or any building permit issued with respect to the Property or any condition, easement, right-of-way, covenant, or restriction of record affecting the Property, which violation could, in Lender's reasonable opinion, impair Borrowers' ability to keep or perform any of its agreements, undertakings, obligations, covenants or conditions under this DIP Loan Agreement.

### 5.11.7. **Intentionally Omitted**.

### 5.11.8. **Intentionally Omitted**.

**5.12** **Agreements Affecting the Property**. Except as set forth on **Schedule 6**, there are no leases, licenses, occupancy agreements, or other agreements relating to possession of the Property. No Borrower has entered into and there are no, contracts or agreements (either oral or written) affecting any part of the Property, including, without limitation, leases, tenancies, property management agreements, leasing agreements, or other contracts or agreements relating to the possession, maintenance, development, or management thereof, other than contracts and agreements of which Borrowers have heretofore furnished Lender true, complete, and correct copies. No Borrower shall enter into any contract or agreement relating to the management of the Property without the prior written consent of Lender and, if required by Lender, the applicable Borrower shall execute a collateral assignment to Lender of such Borrower's right, title and interest in and to any such property management agreement, and the manager thereunder shall execute a consent and subordination with respect thereto in form and substance satisfactory to Lender.

**5.13** **Loan Purposes**. The Loan is not being made for the purpose of purchasing or carrying margin stocks, and Borrowers agree to execute, or cause to be executed, all instruments necessary to comply with all of the requirements of Regulation U of the Federal Reserve System. The DIP Loan is an exempt transaction under the Truth-in-Lending Act.

**5.14** **Ownership Interests**. There are no existing pledges of any direct or indirect ownership interests in Borrowers. The shareholders and members of Borrowers directly own 100% of the ownership interests in Borrowers, in each case, to the best knowledge of Borrowers, free and clear of any security interest, restriction, third-party rights, and other encumbrances.

**5.15** **Representations and Warranties Generally**. The representations and warranties set forth in this DIP Loan Agreement and/or in any other Loan Document will be true and correct on the date of this DIP Loan Agreement. All representations, warranties, covenants and agreements made in this DIP Loan Agreement or in any certificate or other document delivered to Lender by or on behalf of Borrowers pursuant to or in connection with this DIP Loan Agreement shall be deemed to have been relied upon by Lender notwithstanding Lender's review of any documents or materials delivered by Borrowers to Lender pursuant to the terms hereof and notwithstanding any investigation heretofore or hereafter made by Lender or on their behalf (and Borrowers hereby acknowledges such reliance by Lender in making the DIP Loan and all disbursements thereunder) and, furthermore, shall survive the making of any or all of the disbursements of proceeds of the DIP Loan and continue in full force and effect as long as there remains unperformed any obligations to Lender hereunder or under any of the other Loan Documents.

**6.** **HAZARDOUS MATERIALS.**

**6.1**   **Special Representations and Warranties**. Without in any way limiting the other representations and warranties set forth in this DIP Loan Agreement, and after reasonable investigation and inquiry, Borrowers hereby represent and warrant to the best of Borrowers' knowledge as of the date of this DIP Loan Agreement as follows:

**6.1.1.**   **Hazardous Materials**. Except as disclosed in the Environmental Report, the Property is not and has not been a site for the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of any oil, flammable explosives, asbestos, urea formaldehyde insulation, polychlorinated biphenyls, radioactive materials, hazardous wastes, toxic or contaminated substances or similar materials, including, without limitation, any substances which are "**hazardous substances**," "**hazardous wastes**," "**hazardous materials**," or "**toxic substances**" under the Hazardous Materials Laws, as described below, and/or other applicable environmental laws, ordinances, or regulations (collectively, the "**Hazardous Materials**") in material violation of all applicable Hazardous Materials Laws.

**6.1.2.**   **Hazardous Materials Laws**. Except as may be set forth in the Environmental Report, the Property is in compliance with all laws, ordinances, and regulations relating to Hazardous Materials and with any permit, license, or requirement pertaining to the protection, preservation, conservation, or regulation of the environment which relates to the Property ("**Hazardous Materials Laws**"), including, without limitation: the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986), 42 U.S.C. Section 9601 et seq.; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; and all comparable state and local laws, laws of other jurisdictions or orders and regulations.

**6.1.3.**   **Hazardous Materials Claims**. There are no claims or actions ("**Hazardous Materials Claims**") pending or, to the knowledge of Borrowers, threatened, nor have there been any such claims or actions in the past, against Borrowers or the Property by any governmental entity or agency or by any other person or entity relating to Hazardous Materials or pursuant to the Hazardous Materials Laws.

**6.1.4.**   **Waters of the United States**. No part of the Property contains "waters of the United States," as defined in 33 CFR 328. No Borrower shall discharge dredged or fill material into waters of the United States as such activity is described and regulated by Section 404 of the Clean Water Act, 33 U.S.C. 1344.

**6.2**   **Covenants**. Borrowers agree as follows:

**6.2.1.**   **No Hazardous Activities**. Except in its ordinary course of business and in compliance with all Hazardous Materials Laws, Borrowers shall not cause or permit the Property

18

182749781.2

or any Improvements to be used as a site for the use, generation, manufacture, storage, treatment, release, discharge, disposal, transportation, or presence of any Hazardous Materials in quantities and in a manner that complies with Hazardous Materials Laws ("**Common Materials**").

> 6.2.2.  <u>Compliance</u>. Borrowers shall comply and cause the Property and the Improvements to comply with all Hazardous Materials Laws.

> 6.2.3.  <u>Notices</u>. Borrowers shall immediately notify Lender in writing of: (i) the discovery of any Hazardous Materials on, under, or about the Property or Improvements, other than Common Materials; (ii) any knowledge by Borrowers that the Property or Improvements do not <u>comply</u> with any Hazardous Materials Laws; and (iii) any Hazardous Materials Claims. Borrowers shall promptly cure and have dismissed with prejudice all Hazardous Materials Claims pursuant to applicable law, and Borrowers shall keep the Property free of any encumbrance arising from any judgment, liability, or lien imposed pursuant to any Hazardous Materials Claims. Notwithstanding the foregoing sentence, Borrowers may, diligently, in good faith and by appropriate legal proceedings, contest any such Hazardous Materials Claims provided (i) Borrowers first furnish to Lender such deposits or other collateral as Lender, in its sole discretion, deems sufficient to fully protect Lender's interests, (ii) such contest shall have the effect of preventing any threatened or pending sale or forfeiture of all or any portion of the Property or the loss or impairment of Lender's lien and security interests in and to the Property, and (iii) such contest will not cause Lender to incur any liability, in Lender's sole judgment. Borrowers shall permit Lender, at Lender's option, to appear in and to be represented in any such contest and shall pay upon demand all expenses incurred by Lender in so doing, including, without limitation, attorneys' fees and expenses.

> 6.2.4.  <u>Remedial Action</u>. In response to the presence of any Hazardous Materials on, under, or about the Property or Improvements, Borrowers shall immediately take, at Borrowers' sole <u>expense</u>, all remedial action required by any Hazardous Materials Laws or any judgment, consent decree, settlement, or compromise in respect to any Hazardous Materials Claims.

> 6.2.5.  <u>Exceptions</u>. The obligations of Borrowers set forth in this Section shall not be applicable to any noncompliance with the terms and conditions hereof to the extent resulting directly from the actions of <u>Lender</u> after Lender acquires title or actual possession to the Property pursuant to a foreclosure under the Mortgage.

6.3  <u>Inspection By Lender</u>. Borrowers shall provide such information and certifications as Lender may reasonably request from time to time (whether before or after the commencement of a nonjudicial or judicial foreclosure proceeding) to monitor Borrowers' compliance with this Section for the sole purpose of protecting Lender's interest in the Property and Improvements. To protect its interest in the Property and Improvements, Lender shall have the right, but not the obligation, at any time upon reasonable prior notice to Borrowers, to enter upon the Property, take samples, review Borrowers' books and records, interview Borrowers' employees and officers, and conduct such other activities as Lender, in its sole and absolute discretion, deems appropriate, provided that Lender shall take reasonable actions to minimize disruption of Borrowers' business at the Property. Borrowers shall cooperate fully in the conduct of such an audit. If Lender decides to conduct such an audit because of (i) a Hazardous Material

19

Claim, (ii) the possibility that Lender may take possession of or title to the Property (or any part thereof) after an Event of Default, (iii) a material change in the use of the Property which, in Lender's sole and absolute judgment, increases the risk to its interest in the Property and Improvements, or, (iv) the introduction of Hazardous Material to the Property, then Borrowers shall pay upon demand all reasonable costs and expenses connected with such audit, as determined by Lender in its sole and absolute discretion, which, until paid, shall become additional indebtedness under the Note secured by the Loan Documents. Nothing in this **Section 6** shall give or be construed as giving Lender the right to direct or control Borrowers' actions in complying with Hazardous Materials Laws.

6.4    **Lender's Right to Rely**. Lender is entitled to rely upon Borrowers' representations, covenants, agreements and warranties contained in this **Section 6** despite any independent investigations by Lender or its consultants or other representatives. Borrowers shall take all necessary actions to determine for themselves, and to remain aware of, the environmental condition of the Property. Borrowers shall have no right to rely upon any independent environmental investigations or findings made by Lender or its consultants or other representatives unless otherwise stated in writing therein and agreed to in writing by Lender.

7.    **GENERAL COVENANTS, CONDITIONS AND AGREEMENTS**. Borrowers hereby further covenant and agree with Lender as follows:

7.1    **Compliance with Loan Documents**. Borrowers shall comply with, observe and timely perform each and every one of the covenants, agreements and obligations under each and every one of the Loan Documents and any other loan documents to which they are a party.

7.2    **Use of the Property**. Borrowers shall not make, suffer or permit any use of the Property for any purpose other than as exists on the date hereof except as contemplated by Borrowers in connection with the development of the Property as disclosed to Lender.

7.3    **Leases and Other Transfers**. Borrowers shall not, without the prior written consent of Lender (to be granted or withheld in Lender's reasonable discretion), enter into any Lease, modify, surrender, terminate, extend or renew, either orally or in writing, any Lease now existing or hereafter created upon the Property or any part thereof, or permit an assignment or sublease thereof without the prior written consent of Lender (to be granted or withheld in Lender's discretion). Borrowers shall not, without the prior written consent of Lender, assign or further encumber or convey or dispose (or permit or consent or agree to the conveyance, encumbrance or disposal) of any interest in the Property (including the Licenses), and any assignment or encumbrance, or purported assignment or encumbrance, conveyance, or disposal of any of the foregoing shall be void and of no effect for any purpose whatsoever; provided, however, that Lender shall be deemed to consent to a sale of Borrowers' assets pursuant to that certain *Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Certain of Debtors' Real Property Assets* (Docket No. XXX, the "**Bidding Procedures Order**").

7.4    **Covenants, Conditions and Restrictions**. Borrowers shall not record (or cause to be recorded) any covenants, conditions, restrictions, declarations, or any other agreement or instrument with respect to any portion of the Property (including the Licenses), without the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed. If

applicable, Lender may, in the reasonable exercise of its discretion, require that Borrowers execute and deliver to Lender an assignment of the declarants' rights together with such other security agreements, financing statements and instruments as Lender may require which have the effect of creating a collateral assignment of Borrowers' interest as declarants, all in a form acceptable to Lender.

**7.5** **Other Agreements Affecting the Property**. No Borrower shall either enter into any written agreement or amend or modify, in any material respect, any REA or any other easements, covenants, or conditions affecting all or any portion of the Property without Lender's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

**7.6** **Inspection of Books and Records**. Borrowers shall keep and maintain, at the Property or at Borrowers' main office, proper and accurate books, records and accounts reflecting all items of income and expense incurred by Borrowers in connection with the operation of the Property or in connection with any services, equipment or furnishings provided in the operation of the Property. Borrowers shall allow Lender and any of Lender's representatives, at any reasonable time during normal business hours, access to the records and books of account, including, without limitation, any supporting or related vouchers or papers kept at the Property or at Borrowers' main office, by or on behalf of Borrowers or any of their representatives in connection with the Property, such access to include the right to make abstracts or copies thereof.

**7.7** **Expenses**. Borrowers shall be responsible for payment of all of Lender's costs and expenses associated with the underwriting, documenting, funding, monitoring and enforcing of the DIP Loan, without regard to whether the DIP Loan closes. Such expenses shall include, but not be limited to, legal fees and expenses, search fees, appraisal fees, travel expenses, consultant fees and other due diligence costs.

**7.8** **Litigation**. During the term of the Loan, Borrowers shall, upon receiving notice of same, promptly furnish Lender a written notice of any material litigation in which any Borrower is named as defendant or affecting or relating to the Property or a portion thereof, or any other Collateral, other than personal injury or workers compensation claims that are covered by insurance and minor construction contract disputes.

**7.9** **Appraisal**. Borrowers acknowledge that, while the DIP Loan or any portion thereof remains outstanding, Lender has the right to obtain a new Appraisal (or an update of an existing Appraisal) for the Property (or any portion thereof) once per year or more often than once per year either (i) if, in Lender's reasonable judgment, such an Appraisal is warranted as a result of Lender's internal evaluation of the DIP Loan, or (ii) in order to comply with any statutes, rules, regulations or directives of governmental agencies having jurisdiction over Lender. Borrowers agree to pay from Borrowers' Funds, on demand by Lender, all expenses, charges, costs and fees of any such re-Appraisal.

**7.10** **Intentionally Omitted**.

**7.11** **No Lien Rights**. If any Borrower or any person or entity controlled by or affiliated with any of the foregoing acts as a general contractor, architect, engineer, subcontractor, property manager, or supplier of materials, or otherwise performs lienable work or services with respect to

21

any part of the Property, such Borrower hereby irrevocably waives and relinquishes, or Borrowers shall cause such Borrower or its Affiliate to waive and relinquish, as appropriate, any and all lien rights it may obtain as a result of such work or services.

**7.12** **No Transfers or Other Financing**. Borrowers shall not permit a Transfer of all or any portion of any direct or indirect ownership interest in any Borrower. In addition to the foregoing, Borrowers shall not permit a Transfer of the Property (or any portion thereof or any direct or indirect interest therein), other than the encumbrance of the Property with the liens of the Loan Documents, or pursuant to the Bidding Procedures Order. Other than any assignments or encumbrances evidenced by the DIP Loan Documents, no Borrower shall, without the prior written consent of Lender, assign or further encumber or convey or dispose, or consent or agree, to the conveyance, encumbrance, exchange, or disposal of any other interest in the Property, and any assignment or encumbrance, or purported assignment or encumbrance, conveyance, exchange, or disposal of any of the foregoing shall be void and of no effect for any purpose whatsoever. Furthermore, Borrowers shall not, without the prior written consent of Lender, enter into any financing arrangement or loan transaction or consent to or agree to any such financing arrangement or loan transaction (except with respect to a time when this Loan has been repaid in full) other than the DIP Loan, and any such financing arrangement or loan transaction shall be void and of no effect for any purpose whatsoever.

**7.13** **No Related Party Payments**. Other than as provided in the Bankruptcy Plan, no distributions or other payments shall be made directly or indirectly by Borrowers or their partners, members, or managers to any other person or entity or affiliate thereof owning a direct or indirect interest in Borrowers or their partners, members, or managers.

**7.14** **Mechanic's Liens**. If a claim of a mechanics or materialman's lien is recorded and affects the Property, Borrowers shall, within thirty (30) days after Borrowers become aware of such recording or service or within five (5) Business Days of Lender's demand, whichever occurs first: (a) pay and discharge the claim of lien; (b) effect the release thereof by recording or delivering to Lender a surety bond in sufficient form and amount; or (c) provide Lender with other assurance which Lender deems, in its sole discretion, to be satisfactory for the payment of such claim of lien and for the full and continuous protection of Lender from the effect of such lien.

**7.15** **Inspections**. Borrowers shall permit, and shall cooperate with Lender in arranging for, inspections of the Property from time to time by any representatives of Lender. In the event that such representative furnishes Lender with reports covering such inspections, Lender may, but is not under any obligation whatsoever, to furnish Borrowers with copies of any of said reports. Borrowers acknowledge and agree that (i) all of such inspections and reports shall be made for the sole benefit of Lender and not for the benefit of Borrowers or any third party, and none of Lender, nor any of Lender's representatives assume any responsibility or liability (except to Lender) by reason of such inspections, reports or the furnishing of any of such reports to Borrowers, (ii) Borrowers shall not rely upon any of such inspections or reports for any purpose whatsoever, and (iii) such inspections and the furnishing of any of such reports to Borrowers shall not constitute a waiver of any of the provisions of this DIP Loan Agreement or any of the obligations of Borrowers hereunder.

     **7.16**   **Construction**. Borrowers shall not perform any construction or other improvement or repair to the Property except with the prior written consent of Lender, to be granted or withheld by Lender in its sole discretion.

     **7.17**   **Taxes Contest**. Except for the current tax contests, which has been disclosed to Lender, in the event Borrowers desire to contest the validity of any Taxes, Borrowers shall (i) prior to the due date thereof, notify Lender in writing that Borrowers intend to so contest the same, (ii) if requested by Lender, pay the entire amounts of such Taxes when due or, if a contest is permitted by law without such payment on or before the due date thereof, deposit with Lender security in form and content and amounts satisfactory to Lender for the payment of 125% of such Taxes, or provide to Lender such other indemnity or assurance of timely payment as may be acceptable to Lender, and (iii) if requested by Lender, deposit additional security or indemnity, from time to time, so that, at all times, adequate security or indemnity will be available for the payment of the full amount of the Taxes together with all interest, penalties, costs and charges accrued or accumulated thereon. If the foregoing deposits are made and Borrowers continue, in good faith, to contest the validity of such Taxes by appropriate legal proceedings which shall operate to prevent the collection thereof and the sale of the Property, or any part thereof, to satisfy the same, Borrowers shall be under no obligation to pay such Taxes until such time as the same has been decreed, by court order, to be a valid lien on the Property. Lender shall have full power and authority to reduce any such security or indemnity to cash and apply the amount so received to the payment of any unpaid Taxes to prevent the sale or forfeiture of the Property, without any liability on Lender's part for any failure to apply the security or indemnity so deposited, unless Borrowers request, in writing, the application thereof to the payment of the particular Taxes for which such deposit was made. Any surplus deposit retained by Lender, after the payment of the Taxes for which the same was made, shall be repaid to Borrowers, unless an Event of Default (as hereinafter defined) exists, or an event has occurred or condition exists which, with the giving of notice or the passage of time, or both, could give rise to an Event of Default, in which event such surplus shall be applied by Lender to amounts due under the DIP Loan in such order and manner as Lender may determine.

     **7.18**   **Compliance with Loan Documents**.  Borrowers shall comply with, observe and timely perform each and every one of the covenants, agreements and obligations under each and every one of the Loan Documents and any other loan documents to which they are a party. Borrowers shall use diligent good faith efforts to achieve the Milestones within the time period applicable to each such Milestone.

**8.**    **FINANCIAL STATEMENTS.**

     **8.1**   **Monthly Operating Reports**. Within twenty (20) days after the end of each calendar month, beginning with the calendar month in which the initial disbursement of Loan proceeds occurs, Borrowers shall deliver to Lender true and complete copies of Monthly Operating Reports filed with the Bankruptcy Court in compliance with the forms and guidelines set forth by the United State Trustee's office, Region 11 pursuant to 28 C.F.R. § 58.8.

     **8.2**   **Income Tax Returns**. On or prior to the date that is thirty (30) days following the earlier of the due date or actual submission of any federal income tax return for Borrowers,

Borrowers shall cause a complete and accurate certified copy of such income tax return to be furnished to Lender.

## 9. BORROWERS' DEFAULT.

### 9.1 Borrowers' Defaults and Lender's Remedies.

**9.1.1.** **Events of Default**. Each of the following shall constitute an "**Event of Default**" under this DIP Loan Agreement:

**9.1.1.1.** Borrowers, (i) fail to pay, when due, any principal of or installment of interest on the Note, or (ii) fail to pay monthly deposits of taxes or insurance escrows required under this DIP Loan Agreement, or (iii) fail to contribute or deposit any Borrowers' Funds as and when required under this DIP Loan Agreement, and with respect to any failure under this clause (ii) only, such failure continues for a period of five (5) Business Days after notice thereof from Lender to Borrowers; or

**9.1.1.2.** Borrowers fail to pay, when due, any part of the Loan Fee or any other amount payable under this DIP Loan Agreement (other than principal or interest or taxes and insurance deposits), and such failure continues for a period of three (3) Business Days after notice thereof from Lender to Borrowers; or

**9.1.1.3.** Borrowers fail to keep or perform any of its agreements, undertakings, obligations, covenants or conditions under this DIP Loan Agreement not expressly referred to in another clause of this Section and such failure continues for a period of 5 days after notice thereof from Lender to Borrowers; or

**9.1.1.4.** Any "**Event of Default**" occurs, as defined under any of the Loan Documents, including, without limitation, any Collateral Document; or

**9.1.1.5.** Any Borrower other than Borrowers fail to keep or perform any of their agreements, undertakings, obligations, covenants or conditions under the Loan Documents to which they are a party, and such failure continues beyond any applicable cure period (and if no cure period is specified, such failure continues for a period of 30 days after notice thereof from Lender to such Borrower); or

**9.1.1.6.** Any representation, warranty or certification made in this DIP Loan Agreement by Borrowers or otherwise made in writing in connection with or as contemplated by this DIP Loan Agreement or any of the other Loan Documents by Borrowers shall be or become materially incorrect or false, or any material representation to Lender by Borrowers as to the financial condition or credit standing of any Borrower is or proves to be false or misleading; or

**9.1.1.7.** The recording of any claim of lien against the Property or any Improvements and the continuance of such claim of lien for 30 days without discharge, satisfaction or provision for payment being made by Borrowers in a manner satisfactory to Lender; or the condemnation, seizure or appropriation of, or occurrence of an uninsured casualty with respect to any material portion of the Property or any Improvements; or the sequestration or attachment of, or any levy or execution upon any Property or any Improvements, any other Collateral, or any

24

substantial portion of the other assets of Borrowers, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of thirty (30) days or the sale of the assets affected thereby; or

9.1.1.8.    The dissolution of or the occurrence of any material management or organizational change in Borrowers, which Lender determines, in its sole and absolute discretion, has or is reasonably likely to have a material adverse effect on the DIP Loan, the Property, or any Improvements, or on the ability of any Borrower to perform its respective obligations under the Loan Documents to which it is a party; or

9.1.1.9. The Property or any part thereof or any interest therein is sold, conveyed, refinanced, transferred, leased, assigned, exchanged, disposed of, or is further encumbered, or an agreement for any of the foregoing is entered into, without the prior written consent of Lender; or

9.1.1.10. Any Borrower enters into any secondary or additional financing agreements or arrangements of any kind whatsoever secured, in whole or in part, by all or any part of or interest in any Collateral; or

9.1.1.11. There occurs, in the reasonable opinion of Lender, a material adverse change in the financial condition of Borrowers; or

9.1.1.12. Any order or decree is entered by any court of competent jurisdiction directly or indirectly enjoining or prohibiting Lender or any Borrower from performing any of their obligations under this DIP Loan Agreement or any of the Loan Documents, and such order or decree is not vacated, and the proceedings out of which such order or decree arose are not dismissed, within 60 days after the granting of such decree or order; or

9.1.1.13. The filing of formal charges by any governmental or quasi-governmental entity, including, without limitation, the issuance of an indictment, under a RICO Related Law against any Borrower or any property manager for the Property; or

9.1.1.14. Final judgment or judgments for the payment of money aggregating in excess of $100,000.00 is or are outstanding against Borrowers or against any of their property or assets, and any one of such judgments has remained unpaid, unvacated, unbonded, or unstayed by appeal or otherwise for a period of 45 days from the date of its entry; or

9.1.1.15. The Property is rezoned (except for such rezoning as may be specifically approved in advance by Lender), either voluntarily or involuntarily, or any agreement for the foregoing is entered into, without the prior written consent of Lender; or

9.1.1.16. Borrowers fail to commence compliance with or to cause commencement of compliance with (or to bond or indemnify Lender to its satisfaction with regard to) any requirement (including, without limitation, compliance with all applicable zoning, building, health, fire, and environmental laws, rules, regulations, and ordinances) of any governmental authority having jurisdiction within 15 days after Borrowers have notice of such requirement, or Borrowers fail to diligently prosecute such compliance; or

25

**9.1.1.17.** Any order or decree is entered by any court of competent jurisdiction directly or indirectly enjoining the operation of any Property or prohibiting Lender or Borrowers from performing any of their obligations under any of the Loan Documents and such order or decree is not vacated, and the proceedings out of which such decree or order arose are not dismissed, within 30 days after the granting of such decree or order.

**9.1.1.18. Bankruptcy Specific Defaults**. The occurrence of any of the following in either of the Chapter 11 Cases:

(i)       the Financing Order shall not have been entered by the Bankruptcy Court in accordance with the Milestones, or such later date as consented to in writing by Lender in its sole and absolute discretion (or, if so entered, shall be subject to stay pending appeal of such date) or at any time ceases to be in full force and effect;

(ii)       the entry of an order amending, supplementing, staying, vacating, reversing or otherwise modifying this DIP Loan Agreement, the other Loan Documents, or the Financing Order without the written consent of Lender;

(iii)       the appointment in any of the Chapter 11 Cases of an interim or permanent trustee or the appointment of a responsible person or an examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Borrower (powers beyond those expressly set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code);

(iv)       the dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(v)       the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral with respect to assets of any Borrower exceeding One Hundred Thousand and No/100 Dollars ($100,000.00) in value; or (y) to permit the perfection of any Lien on the Collateral;

(vi)       the entry of an order avoiding or requiring repayment of any portion of the payments made on account of the Existing Loan or the Obligations owing under the Loan Documents;

(vii)       the entry of an order granting any administrative claim or Lien (including adequate protection Liens) which are equal or superior to that provided to Lender;

(viii)       the filing of any pleading by any Debtor seeking or otherwise consenting to or supporting any of the matters set forth in clauses (iii), (iv), (v), (vi), or (vii) of this Section 10.1.1.21;

(ix)       any violation of the Financing Order;

(x)       Borrower, the Creditors Committee or any other creditor or party

26

in interest proposes a plan of reorganization that seeks to vary, amend, modify or change in any respect the terms, covenants and conditions of this DIP Loan Agreement, the other Loan Documents, or the Financing Order without the prior written consent of Lender, which consent may be given or withheld in Lender's sole and absolute discretion

(xi)      the filing by any Borrower of any motion or proceeding, or the entry of an order by the Bankruptcy Court, which could reasonably be expected to result in material impairment of Lender's Collateral or Lender's rights under the Loan Documents or the Financing Order;

(xii)     any Borrower seeks to sell any of its assets outside of the ordinary course of business without the written consent of Lender;

(xiii)    any Borrower (A) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the Loan Documents or the Liens on or security interests in the assets of Borrower securing the obligations of Borrower under the Loan Documents or (B) commences any actions or proceedings against Lender;

(xiv)    Debtors file or commence any proceeding to surcharge Lender pursuant to Sections 105, 364 or 506(c) of the Bankruptcy Code;

(xv)     the allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral;

(xvi)    the Creditors Committee commences any actions or proceedings against Lender;

(xvii)   any Borrower or the Creditors Committee moves the Bankruptcy Court to enter, modify or amend any Financing Order without the prior written consent of Lender to the form and substance of the proposed order;

(xviii)  the entry by the Bankruptcy Court of a debtor-in-possession financing order or amendment thereto that does not fully repay the obligations of Borrower under the Loan Documents, the form and substance of which is not consented to in writing by Lender; or

(xix)    the Bankruptcy Court enters an order granting relief from the automatic stay to any Person asserting a claim or other right against the Collateral unless otherwise consented to in writing by Lender.

**9.1.1.19. Lender's Remedies**. Upon the happening of any Event of Default, Lender shall have the right, in addition to all the remedies conferred upon Lender by law or equity or the terms of any Loan Document, to do any or all of the following, concurrently or successively, without notice to any Borrower:

**9.1.1.19.1.**      Declare the Note to be, and it shall thereupon become, immediately due and payable without presentment, demand, protest or notice of any kind,

all of which are hereby expressly waived, anything contained herein or in the Note to the contrary notwithstanding; or

9.1.1.19.2.   Terminate Lender's obligations under this DIP Loan Agreement to extend credit of any kind or to make any disbursement, whereupon the commitment and obligation of Lender to extend credit or to make disbursements hereunder shall terminate; or

9.1.1.19.3.   Apply all other amounts received by Lender, in such order and manner as Lender may determine in its sole discretion; or

9.1.1.19.4.   Appropriate and apply to any amounts due under the Loan Documents any and all balances, credits, deposits (general or special, time or demand, provisional or final), accounts or monies of Borrowers with Lender; or

9.1.1.19.5.   Exercise all of its rights and remedies at law, in equity and/or pursuant to any or all Collateral Documents, including foreclosing on the Collateral.

Borrowers shall pay to Lender, upon demand, all expenses (including, without limitation, attorneys' fees and expenses) of obtaining such judgment or decree or of otherwise seeking to enforce its rights under this DIP Loan Agreement or any of the other Loan Documents; and all such expenses, as determined by Lender in its sole and absolute discretion, shall, until paid, be secured by the Loan Documents and shall bear interest at the Default Rate.

**9.2**   **Protective Advances**. If an Event of Default occurs or if Lender determines, in its sole discretion, that advances are required in order to protect or preserve the Property or any other Collateral or Lender's interest therein, Lender may (but shall in no event be required to) cure any such Event of Default and/or make any such advances and any amounts expended by Lender in so doing, as determined by Lender in its sole and absolute discretion, shall (i) be deemed advanced by Lender under an obligation to do so regardless of the identity of the person or persons to whom such funds are furnished, (ii) constitute additional advances hereunder, the payment of which is additional indebtedness evidenced by the Note, and (iii) become due and owing, at Lender's demand, with interest accruing from the date of disbursement thereof until fully paid at the Default Rate.

**9.3**   **Other Remedies**. If any Event of Default shall occur and be continuing, Lender may, in addition to any other rights and remedies hereunder, exercise any and all remedies provided in any of the other Loan Documents.

**9.4**   **RICO Related Law Concerns**. Notwithstanding anything to the contrary contained in this DIP Loan Agreement, if Lender has reasonable cause to believe that any material portion of any Property or of any collateral securing the DIP Loan or of any other funds, property or other assets of Borrowers might be subject to forfeiture under any RICO Related Law, Lender may, in its sole and absolute discretion, refuse to make any further disbursements, hereunder or under any of the other Loan Documents, of any kind whatsoever until Lender has no reasonable belief that any portion of any Property or any of such assets are subject to forfeiture under any RICO Related Law.

28

**9.5**    **No Lender Liability**. To the extent permitted by law, Lender shall have no liability for any loss, damage, injury, cost, or expense resulting from any action or omission by it, or any of its representatives, which was taken, omitted or made in good faith.

**9.6**    **Lender's Fees and Expenses**. In case of any Event of Default hereunder, Borrowers shall pay Lender's fees and expenses including, without limitation, attorneys' fees and expenses, in connection with the enforcement of this DIP Loan Agreement or any of the other Loan Documents.

**10.    MISCELLANEOUS.**

**10.1**    **Indemnification**. Borrowers shall indemnify, defend, and hold Lender and its Affiliates harmless from and against any and all losses, liabilities, obligations, penalties, claims, fines, demands, litigation, defenses, costs, judgments, suits, proceedings, actual damages, disbursements, or expenses of any kind or nature whatsoever (including, without limitation, attorneys' fees and expenses), which may at any time be either directly or indirectly imposed upon, incurred by, or asserted or awarded against Lender or any of Lender's Affiliates in connection with, arising from, or relating to Lender's entering into or carrying out the terms of this DIP Loan Agreement or being the holder of the Note, or the use, operation, or maintenance of the Property, including, without limitation, any injury or damage to person or property, or both, occurring on or about the Property, other than any loss, liability, damage, suit, claim, expense, fees, or costs arising solely by reason of Lender's or any of Lender's Affiliates' willful misconduct or gross negligence.

**10.2**    **Assignment and Participation**. Lender may pledge or otherwise hypothecate all or any portion of this DIP Loan Agreement or grant participations herein, or in any of its rights and security hereunder, including, without limitation, the Note. Lender may also assign all or any part of the DIP Loan and the Lender's obligations in connection therewith to one or more banks or financial institutions or investors (each an "**Assignee Lender**"). Upon delivery to Borrowers of an executed copy of the Assignee Lender's assignment and acceptance (i) each such Assignee Lender shall be deemed to be a party hereto and, to the extent that rights and obligations hereunder have been assigned and delegated to such Assignee Lender, such Assignee Lender shall have the rights and obligations of Lender hereunder and under the other Loan Documents (ii) Lender, to the extent that rights and obligations hereunder have been assigned and delegated by it, shall be released from its obligations hereunder and under the other Loan Documents (including, without limitation, the obligation to fund the Assignee Lender's share of the DIP Loan). Within five (5) Business Days after receipt of a copy of the executed assignment and acceptance document, Borrowers shall execute and deliver to Lender a new Note or Notes, as applicable (for delivery to the relevant Assignee Lender), evidencing such Assignee Lender's assigned portion of the DIP Loan and a replacement Note or Notes, as applicable, in the principal amount of the DIP Loan retained by Lender (such Note to be in exchange for, but not in payment of, the Note then held by Lender), provided, however, in no event shall the aggregate obligations of Borrowers under such new or replacement notes exceed Borrowers' obligations under the Note before issuance of such new or replacement notes. Such Note shall be dated the date of the predecessor Note. Lender shall mark the predecessor Note "exchanged" and deliver it to Borrowers. Accrued interest on that part of the predecessor Note evidenced by the new Note, and accrued fees, shall be paid as provided in the assignment agreement between Lender and to the Assignee Lender. Accrued interest on that part of the predecessor Note evidenced by the replacement Note shall be paid to Lender. Accrued

29

interest and accrued fees shall be so apportioned between the Note and the predecessor Note, and paid at the same time or times provided in the predecessor Note and in this DIP Loan Agreement. Borrowers authorize Lender to disclose to any prospective Assignee Lender any financial or other information pertaining to the Borrower Parties, the DIP Loan, the Property, or Improvements, and in connection therewith, Lender shall direct any prospective Assignee Lender to maintain the confidentiality of all such information and use it only in connection with its acquisition or potential acquisition of the DIP Loan or interests therein. In addition, Borrowers agree that, if so requested by Lender, Borrowers will cause all insurance policies, binders, and commitments (including, without limitation, casualty insurance) required by the Loan Documents to be delivered to Lender to name the Assignee Lender as an additional insured or obligee, as Lender may request, at no increased cost or expense to Borrowers. Anything in this DIP Loan Agreement to the contrary notwithstanding, and without the need to comply with any of the formal or procedural requirements of this DIP Loan Agreement, including, without limitation, this **Section 10.2**, Lender may at any time and from time-to-time pledge and assign all or any portion of its rights under all or any of the Loan Documents.

10.3    **Prohibition on Assignment**. Borrowers shall not assign or attempt to assign their rights under this DIP Loan Agreement, either voluntarily or by operation of law.

10.4    **Time of the Essence**. Time is of the essence of this DIP Loan Agreement.

10.5    **No Waiver**. No waiver of any term, provision, condition, covenant or agreement herein contained shall be effective unless set forth in a writing signed by Lender, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising, by Lender or any holder of the Note, of any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof, or the exercise of any other right or remedy provided by law. The rights and remedies provided in this DIP Loan Agreement are cumulative and not exclusive of any right or remedy provided by law or equity. No notice or demand on Borrowers in any case shall, in itself, entitle Borrowers to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, expressed or implied, by Lender to or of any breach or default by Borrowers in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Borrowers hereunder. Failure on the part of Lender to complain of any acts or failure to act or to declare an Event of Default, irrespective of how long such failure continues, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers or remedies on account of any breach or default by Borrowers.

10.6    **Severability**. Any provision of this DIP Loan Agreement which is unenforceable or invalid or contrary to law, or the inclusion of which would adversely affect the validity, legality, or enforcement of this DIP Loan Agreement, shall be of no effect and, in such case, all the remaining terms and provisions of this DIP Loan Agreement shall subsist and be fully effective according to the tenor of this DIP Loan Agreement the same as though any such invalid portion had never been included herein. Notwithstanding any of the foregoing to the contrary, if any provisions of this DIP Loan Agreement or the application thereof are held invalid or unenforceable only as to particular persons or situations, the remainder of this DIP Loan Agreement, and the

application of such provision to persons or situations other than those to which it shall have been held invalid or unenforceable, shall not be affected thereby, but shall continue valid and enforceable to the fullest extent permitted by law.

**10.7 Use of Proceeds.** All agreements between Borrowers and Lender (including, without limitation, this DIP Loan Agreement and any other Loan Documents) are expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to Lender exceed the highest lawful rate of interest permissible under the laws of the State of Illinois. If, from any circumstances whatsoever, fulfillment of any provision hereof or of any other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then ipso facto, the obligation to be fulfilled shall be reduced to the highest lawful rate of interest permissible under the laws of the State of Illinois, and if for any reason whatsoever, Lender shall ever receive as interest an amount which would be deemed unlawful, such interest shall be applied to the payment of the last maturing installment or installments of the indebtedness secured by the Collateral (whether or not then due and payable) and not to the payment of interest.

**10.8 Notices.** Any notice which either party hereto may be required or may desire to give hereunder shall be deemed to have been given if in writing and if delivered personally, or if delivered by a responsible overnight courier, addressed:

If to Borrowers:

Hawthorne Race Course, Inc.
Post Time Catering, Inc.
Suburban Downs, Inc.
Carey Heirs Properties, LLC
3501 S. Laramie Ave.
Stickney, IL 60804
Attention: Tim Carey
Telephone: 708-780-3700

With a copy to:

Carey White Boland
Murnighan & Murray, LLC
33 W, Jackson Blvd., Suite 500
Chicago, IL 60604
Attn: Kevin Murnighan
Telephone: 312-939-4300
Fax: 312-939-4285

And:

Saul Ewing LLP
161 North Clark Street, Suite 4200
Chicago, IL 60601
Attn: Barry Chatz
Telephone: 312-876-7100 ____

31

182749781.2

Fax:  312-876-0288

If to Lender:

          Derby DIP LLC
          c/o JDI Loans LLC
          853 N. Elston
          Chicago, Illinois 60642
          Attn: Bennet Schwartz
          Telephone:  312-433-0500
          Fax:  312-433-0555

And to:

          Derby DIP LLC
          c/o JDI Loans LLC
          c/o JDI Loans LLC
          853 N. Elston
          Chicago, Illinois 60642
          Attn: Bennet Schwartz
          Telephone: 312-433-0500
          Fax: 312-433-0500

and a copy to:

          Fox Rothschild, LLP
          1980 Festival Plaza Drive, Suite 700
          Las Vegas Nevada, 891356
          Attn: Brett A Axelrod
          Telephone:  702-262-6899
          Fax:  702-597-5503

or to such other address or addresses as the party to be given notice may have furnished in writing to the party seeking or desiring to give notice, as a place for the giving of notice, provided that no change in address shall be effective until seven (7) days after being given to the other party in the manner provided for above. Any notice given in accordance with the foregoing shall be deemed given when delivered personally or, if sent by overnight courier, the Business Day following the date of delivery to such courier. Any facsimile telephone numbers given above are for convenience only and are not for the purpose of completing any required notice under this DIP Loan Agreement. Except as otherwise specifically required herein, no notice of the exercise of any right or option granted to Lender herein is required to be given.

      **10.9**   **Joint and Several; Successors and Assigns**. The obligations and liabilities of Borrowers under this DIP Loan Agreement and the other Loan Documents shall be joint and several. This DIP Loan Agreement shall inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns except that, unless Lender consents in writing, no assignment made by Borrowers in violation of this DIP Loan Agreement shall confer any rights on any assignee of Borrowers.

182749781.2

**10.10** **No Joint Venture**. Nothing contained herein or in any document executed pursuant hereto and no action or inaction whatsoever on the part of Lender, shall be deemed to make Lender a partner or joint venturer with Borrowers.

**10.11** **Publicity**. Borrowers shall not publicize this Loan without the prior written consent of Lender.

**10.12** **Documentation**. All documents and other matters required by any of the provisions of this DIP Loan Agreement to be submitted or furnished to Lender shall be in form and substance satisfactory to Lender.

**10.13** **Additional Assurances**. Borrowers agree that, at any time or from time to time, upon the written request of Lender, it will execute all such further documents and do all such other acts and things as Lender may reasonably request to effectuate the transaction herein contemplated.

**10.14** **Entire Agreement**. This DIP Loan Agreement and the Exhibits hereto constitute the entire agreement between the parties hereto with respect to the subject matter hereof and may not be modified or amended in any manner other than by supplemental written agreement executed by the parties hereto.

**10.15** **Choice of Law**. This DIP Loan Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois. Nothing herein shall be deemed to limit any rights, powers or privileges which Lender may have pursuant to any law of the United States of America or any rule, regulation or order of any department or agency thereof and nothing herein shall be deemed to make unlawful any transaction or conduct by Lender which is lawful pursuant to, or which is permitted by, any of the foregoing. Borrowers acknowledge that Lender's principal office is located in Chicago, Illinois and that Lender may be harmed if required to institute or defend any action in any jurisdiction other than the Northern District of Illinois or Cook County, Illinois. Therefore, Borrower irrevocably (i) agrees that any suit, action or other legal proceeding relating to this DIP Loan Agreement or any of the other Loan Documents may be brought, at Lender's sole option, only in the Circuit Court of Cook County or in the Northern District of Illinois, (ii) consents to the jurisdiction of each such court in any such suit, action or proceeding, (iii) waives any objection which Borrowers may have to the laying of venue in any such suit, action or proceeding in any such court, and (iv) waives personal service of any and all process (in any court or jurisdiction whatsoever) and consents that all such services of process may be made by certified mail return receipt requested directed to Borrowers at the address indicated in **Section 10.8** herein, and services so made shall be complete five (5) days after the same has been deposited in the U.S. Mail as aforesaid. Notwithstanding the foregoing, the Bankruptcy Court shall have exclusive jurisdiction over the DIP Loan and any proceedings relating to this DIP Loan Agreement through the effective date of the Bankruptcy Plan.

**10.16** **No Third-Party Beneficiary**. This DIP Loan Agreement is made for the sole benefit of Borrowers and Lender, and no other person shall be deemed to have any privity of contract hereunder nor any right to rely hereon to any extent or for any purpose whatsoever, nor shall any other person have any right of action of any kind hereon or be deemed to be a third-party beneficiary hereunder.

182749781.2

    **10.17    Legal Tender of United States**. All payments hereunder shall be made in coin or currency which at the time of payment is legal tender in the United States of America for public and private debts.

    **10.18    Definitions; Captions**. With respect to any reference in this DIP Loan Agreement to any defined term, (i) if such defined term refers to a person, or a trust, corporation, partnership, or other entity, then it shall also mean all heirs, legal representatives, successors and assigns of such person or entity, and (ii) if such defined term refers to a document, instrument, or agreement, then it shall also include any replacement, extension or other modification thereof. Captions contained in this DIP Loan Agreement in no way define, limit or extend the scope or intent of their respective provisions.

    **10.19    Interpretation**. All references herein to a party's best knowledge shall be deemed to mean the best knowledge of such party based on commercially reasonable inquiry. All references herein to Borrowers' knowledge shall be deemed to refer to the knowledge of each Borrower. Unless specified to the contrary herein, all references herein to an exercise of discretion or judgment by Lender, to the making of a determination or designation by Lender, to the application of Lender's discretion or opinion, to the granting or withholding of Lender's consent or approval, to the consideration of whether a matter or thing is satisfactory or acceptable to Lender, or otherwise involving the decision making of Lender, shall be deemed to mean that Lender shall decide unilaterally using its sole and absolute discretion or judgment. The terms "**herein**," "**hereof**," "**hereunder**" and any other similar terms used herein shall be deemed to refer to this DIP Loan Agreement in its entirety. Any reference contained herein to attorneys' fees and expenses shall be deemed to be reasonable fees and expenses of Lender's outside counsel and of any other third-party experts or consultants engaged by Lender's outside counsel on Lender's behalf. All references to any Loan Document shall be deemed to be to such document as amended, modified or restated from time to time.

    **10.20    WAIVER OF RIGHT TO JURY TRIAL**. BORROWERS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THAT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION WITH THIS DIP LOAN AGREEMENT, THE NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY OTHER STATEMENTS OR ACTIONS OF BORROWERS OR LENDER. BORROWERS ACKNOWLEDGE THAT THEY HAS BEEN REPRESENTED IN THE SIGNING OF THIS DIP LOAN AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL SELECTED OF THEIR OWN FREE WILL, AND THAT THEY HAVE DISCUSSED THIS WAIVER WITH SUCH LEGAL COUNSEL. BORROWERS FURTHER ACKNOWLEDGE THAT (i) THEY HAVE READ AND UNDERSTAND THE MEANING AND RAMIFICATIONS OF THIS WAIVER, (ii) THIS WAIVER HAS BEEN REVIEWED BY BORROWERS AND BORROWERS' COUNSEL AND IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THE AGREEMENT AND THE OTHER LOAN DOCUMENTS and (iii) THIS WAIVER SHALL BE EFFECTIVE AS TO EACH OF SUCH OTHER LOAN DOCUMENTS AS IF FULLY INCORPORATED THEREIN.

    **10.21    Marshalling, Waiver of 506(c) Claims and Waiver of Equities**. Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the

182749781.2

Collateral, and all proceeds thereof shall be received and used in accordance with the Financing Order. Lender shall (i) be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) shall not apply to Lender with respect to proceeds, products, offspring, or profits of any of the Collateral, and (ii) not be subject to any surcharge claim under Sections 506(c) or 105(a) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by Lender upon the Collateral or and no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against Lender or any of its claims or liens, and Borrowers hereby irrevocably waive any such claims.

    **10.22  Counterparts**. This DIP Loan Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A facsimile, scanned, or photocopy signature on this DIP Loan Agreement, any amendment hereto, or any notice delivered hereunder shall have the same legal effect as an original signature.

                  **[THE REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

182749781.2

IN WITNESS WHEREOF, the parties hereto have caused this DIP Loan Agreement to be executed by their duly authorized representatives as of the date first above written.

**BORROWERS:**

**HAWTHORNE RACE COURSE, INC**., an Illinois corporation**:**


By:_____
Name: Timothy S. Carey
Its:      President


**POST TIME CATERING, INC**., an Illinois corporation:


By:_____
Name: Timothy S. Carey
Its:      President


**SUBURBAN DOWNS, INC.**, an Illinois corporation:


By:_____
Name: Timothy S. Carey
Its:      President


**CAREY HEIRS PROPERTIES, LLC**, an Illinois limited liability company:


By:_____
Name: Timothy S. Carey
Its:      Manager

182575938.3

182749781.2

IN WITNESS WHEREOF, the parties hereto have caused this DIP Loan Agreement to be executed by their duly authorized representatives as of the date first above written.

**LENDER:**

**DERBY DIP LLC**, an Illinois limited liability company

By:_____
Name: Bennet Schwartz
Its:     Manager

182575938.3

182749781.2

**EXHIBIT A**

**LEGAL DESCRIPTION**

**Common Address: 3501 S. LARAMIE, CICERO, IL 6080**

PARCEL 1:

ALL THAT PART OF THE SOUTHEAST 1/4 OF SECTION 33, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL (EXCEPT THE EAST 50.00 FEET, LYING NORTH OF THE SOUTH LINE OF OGDEN DITCH ALSO CALLED WEST FORK OF SOUTH BRANCH OF THE CHICAGO RIVER), LYING NORTH OF A LINE, DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING AT A POINT ON THE EAST LINE OF SOUTHEAST 1/4 OF SAID SECTION, A DISTANCE OF 1213.18 FEET NORTH OF THE SOUTHEAST CORNER THEREOF; THENCE WEST AT AN ANGLE OF 90 DEGREES SOUTH TO WEST, A DISTANCE OF 40.00 FEET; THENCE SOUTHWESTERLY ON A LINE WITH AN ANGLE OF 164 DEGREES, 24 MINUTES, MEASURED FROM EAST TO SOUTHWEST FROM LAST DESCRIBED LINE, A DISTANCE OF 259.98 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 36 MINUTES TO LEFT FROM LAST DESCRIBED LINE, A DISTANCE OF 849.63 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 17 MINUTES TO THE LEFT FROM LAST DESCRIBED LINE, A DISTANCE OF 234.76 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 04 DEGREES, 28 MINUTES, 15 SECONDS TO THE RIGHT, FROM LAST DESCRIBED LINE, A DISTANCE OF 210.14 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 02 DEGREES, 54 MINUTES, 30 SECONDS TO THE RIGHT FROM LAST DESCRIBED LINE, A DISTANCE OP 482.83 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 06 MINUTES, 52 SECONDS TO THE LEFT FROM THE LAST DESCRIBED LINE, A DISTANCE OF 411.74 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 03 DEGREES, 13 MINUTES, 30 SECONDS TO THE LEFT FROM THE LAST DESCRIBED LINE, A DISTANCE OF 259.35 FEET TO A POINT ON THE WEST LINE OF SAID SOUTHEAST 1/4, A DISTANCE OF 606.821 FEET NORTH OF THE SOUTHWEST CORNER OF SAID SOUTHEAST 1/4, IN COOK COUNTY, ILLINOIS.

PARCEL 2:

THAT PORTION OF THE SOUTHEAST 1/4 OF SECTION 33, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EAST LINE OF SAID SOUTHEAST 1/4 OF SECTION 33, WHICH IS 1174.48 FEET NORTH OF THE SOUTHEAST CORNER OF SAID SECTION AND RUNNING THENCE NORTH ALONG SAID EAST LINE OF THE SOUTHEAST 1/4, A DISTANCE OF 38.70 FEET TO A POINT 1213.18 FEET NORTH OF SAID SOUTHEAST CORNER; THENCE WEST PERPENDICULAR TO SAID EAST LINE OF SOUTHEAST 1/4,

A DISTANCE OF 40.00 FEET; THENCE SOUTHWESTERLY ON A LINE WITH AN ANGLE OF 164 DEGREES, 24 MINUTES, MEASURED FROM EAST TO SOUTHWEST FROM LAST DESCRIBED LINE, A DISTANCE OF 259.98 FEET TO A POINT WHICH IS 290.41 FEET (MEASURED PERPENDICULAR WEST OF SAID EAST

LINE OF THE SOUTHEAST ¼ AND THENCE EASTERLY, A DISTANCE OF 292.08 FEET TO THE POINT OF BEGINNING; EXCEPTING FROM THE ABOVE DESCRIBED LAND THE EAST 50.00 FEET THEREOF FALLING IN CICERO AVENUE, IN COOK COUNTY, ILLINOIS.

PARCEL 3: INTENTIONALLY DELETED

PARCEL 4:

THAT PART OF THE NORTH 1/2 OF THE SOUTH 1/2 OF BLOCK 'A' (EXCEPT THE EAST 80.00 FEET AND EXCEPT THE WEST 8.00 FEET) IN CALVIN F. TAYLOR'S SUBDIVISION OF THE EAST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 33, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING SOUTH OF THE SOUTH LINE OF WEST 37TH STREET AND NORTH OF THE NORTH LINE OF WEST 38TH STREET, IN COOK COUNTY, ILLINOIS.

Permanent Index Numbers:

16-33-322-010-0000
16-33-400-001-0000
l6-33-400-005-0000
l6-33-400-040-0000

**Common Address: 5065 CAL SAG ROAD a/k/a 13148 RIVERCREST DRIVE, CRESTWOOD, ILLINOIS**

LOT 24 IN RIVERCREST OF CRESTWOOD, A SUBDIVISION OF PART OF THE EAST 1/2 OF SECTION 33, TOWNSHIP 37 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 17, 1991 AS DOCUMENT NUMBER 91661848, IN COOK COUNTY, ILLINOIS.

PIN NO.: 24-33-408-007-0000

**EXHIBIT B**

**BUDGET**

**EXHIBIT C**

**LOAN DOCUMENTS**

A.    <u>Loan Documents</u>. The documents listed below, which are defined in this DIP Loan Agreement, and amendments, modifications and supplements thereto which have received the prior written consent of Lender and Borrowers, together with any documents executed in the future that are approved by Lender and Borrowers and that recite that they are "**Loan Documents**" for purposes of this DIP Loan Agreement are collectively referred to herein as the Loan Documents:

1.    This DIP Loan Agreement;

2.    Secured Note;

3.    Loan Disbursement Statement;

4.    Financing Order;

5.    Uniform Commercial Code – UCC Financing Statement (state level) showing Borrowers as Debtors and Lender as Secured Party; and

## EXHIBIT D

### BORROWER'S INSURANCE REQUIREMENTS

(a)     All insurance policies referred to herein shall be in form and substance acceptable to Lender.

(b)     Lender must receive evidence/certificates of insurance at least one (1) business days prior to the Opening Disbursement. Original policies must be provided to Lender as soon as they are available from insurers.

(c)     Proof of coverage must be on the following forms:

(d)     Commercial Property: ACORD 28 (2003/10) – Evidence of Property Insurance form. General Liability:   Must be written on ACORD 25 or its equivalent.

     (i)     Limits of liability coverage shall not be less than:

| | | |
|---|---|---|
| * | General Aggregate limit | $2,000,000 |
| * | Products/Completed Operations | $2,000,000 |
| * | Personal Injury Limit | $1,000,000 |
| * | Each Occurrence | $1,000,000 |
| * | Fire and Medical Expense Included | |

     (ii)     Lender named below must be named as Additional Insured and Certificate holder.

     (iii)     Provision giving Lender not less than thirty (30) days' notice of cancellation or material notification. Please remove "endeavor to" and "but failure to mail such notice shall impose…representatives" language as it relates to notices.

     (iv)     Insurance carrier must have a financial rating of A-IX or better in the most current Best's Key Rating Guide.

     (v)     The property should be identified as the location of operations.

     (vi)     The Borrower should be the named insured or additional insured, as applicable.

     (vii)     If the insured is a contractor or other than the Borrower, the Borrower should be named as an Additional Insured.

     (viii)     An original Certificate of Liability Insurance (Acord 25) may be accepted; a binder, or "TBA" or "TBD" policy number may be accepted for not more than thirty (30 days).

     (ix)     The type of insurance under General Liability should be "Occurrence."

Lender shall be shown as Certificate holder and Additional Insured.

(e)     All property policies shall contain a standard mortgagee clause in favor of Lender and shall provide for a thirty (30) days written notice to Lender of any material change or cancellation. Certificates with disclaimers will NOT be accepted.

(f)     The Borrowers must be the Named Insured.

(g)    All required insurance certificates must show Lender as Mortgagee and or Lender's Loss Payee as follows:

> Derby DIP LLC and its successors and/or assigns
> 853 N. Elston Chicago, Illinois 60642

(h)    The property address must be identified as the insured property. No physical address.

(i)    The insurance documentation must be signed by an authorized representative.

*Specific Requirements*

(a)    If the property is in a blanket policy or limit, Lender must receive a schedule of the amount allocated to the Building or Rents or the amounts allocated must be indicated on the certificate.

(b)    Coverage must be on an "all risk" (Special Perils), 100% replacement cost basis without deduction for foundations and Footings, and WITHOUT co-insurance. The co-insurance must be waived or an Agreed Amount endorsement must be included and either "No Co-Insurance" or "Agreed Amount" must be indicated on the certificate.

(c)    Ordinance or Law coverage providing for demolition and increased cost of construction must be provided and indicated on the certificate.

(d)    Other coverages such as earthquake, boiler and machinery (which includes the mechanics of the building, such as elevators), and flood will be required when these risks are present.

(e)    Rent Loss or Business Income coverage shall be in an amount equal to 100% of the projected annual rents or revenue with a minimum period of indemnity of 12 months, or such greater period as Lender may require. This coverage needs to be written on a Gross Rental Income, Gross Profits or Extended Period of Indemnity form, not on an actual loss sustained basis which may terminate as soon as the premises are tenantable or operational.

**EXHIBIT E**

**PERMITTED EXCEPTIONS**

**3501 S. Laramie Ave., Stickney, IL**

The Mortgages and Exceptions set forth in that certain Chicago Title Insurance Company
Commitment for Title Insurance dated February 10, 2026

Real Estate Taxes for 2023, 2024 and 2025

Mechanics' Liens:

- **W.E. O'Neill Construction Co**, mechanic's lien claimant, against Carey Heirs Properties LLC
  (CHP), in the amount of $5,151,713.94, recorded on October 12, 2022

    - O'Neal's lien claim has been dismissed with prejudice subject to appeal
    - O'Neal's claim consists of its own alleged claim of $2,780,000 plus fees and costs, and
      subcontractor's claims, including the claims of Milburn, Gurtz, Warren Thomas,
      Mechanical and S&G (below)

- **Milburn, L.L.C**. d/b/a Milburn Demolition, mechanic's lien claimant against CHP, in the alleged
  amount of $429,848.00 plus fees and costs, recorded on November 10, 2022. Milburn is also a
  counterclaimant in the O'Neal case

- **Gurtz Electric Co**., mechanic's lien claimant, against CHP, in the amount of $1,111,161.00 plus
  fees and costs, recorded on May 17, 2023. Gurtz is also a counterclaimant in the O'Neal case

- **Warren Thomas Plumbing** is a counterclaimant in the O'Neal case seeking $355,298 plus fees
  and costs

- **Mechanical Incorporated** is a counterclaimant in the O'Neal case seeking $385,092 plus fees
  and costs

- **S & G Metal and Glass, LLC** is a counterclaimant in the O'Neal case seeking $89,500 plus fees
  and costs

- **Aria Group Architects, Inc**., mechanic's lien claimant, against CHP in the alleged amount of
  $5,696,398.56 plus fees and costs, recorded on August 7, 2024. To CHP knowledge, no lawsuit
  has been filed.

**5065 Cal Sag Road a/k/a 13148 Rivercrest Drive, Crestwood, IL**

The Mortgages and Exceptions set forth in that certain Chicago Title Insurance Company Title Insurance Policy dated on or about April 20, 2016

That certain Mortgage dated April 16, 2016, and recorded on April 25, 2016, with the Recorder of Deeds of Cook County, Illinois as Document Number 1611619112, as amended from time to time, in favor of Signature Bank

That certain Mortgage dated February 20, 2026, and recorded on February 24, 2026, with the Recorder of Deeds of Cook County, Illinois as Document Number 2605508011 in favor of the Marital trust of Robert F. Carey Jr. UAD 11/15/87.

Real Estate Taxes for 2023, 2024 and 2025

**SCHEDULE 6**

**EXCEPTIONS TO REPRESENTATIONS AND WARRANTIES**

5.12 <u>Agreements Affecting the Property</u>.

All Mortgages and Exceptions set forth in Exhibit E.

That certain Lease from Carey Heirs Properties Borrower to Hawthorne Race Course Borrower dated January 1, 2007, as amended from time to time.

That certain Lease from Carey Heirs Properties Borrower to Suburban Downs Borrower dated January 1, 2007, as amended from time to time.

# Exhibit B

Summary and Assumptions

**Hawthorne Race Course**
**Cash Flow Projection**
**Summary and Assumptions**

**Operating Collections**

Wagering Deposits — Cash receipts from live pari-mutuel wagering at the HRC facility and off-track betting facilities ("OTBs"). Driven by simulcasting, which allows HRC to accept wagers on races run at other tracks. Model assumes a ramp-up in simulcast availability, resulting in increased import wagering revenue.

Out of State Earnings — Wagering settlement receipts between race host tracks and signal-receiving tracks. Collections projected to increase when thoroughbred racing begins in WE 04/04/26. Model assumes a ramp-up in simulcast availability, driving increased export wagering revenue.
- Amounts received prior to start of thoroughbred season are prepetition revenue.

**Operating Disbursements**

**Payroll & Benefits**

Payroll — Bi-monthly payroll cycles: accrual for the 1st–15th paid on the 22nd; accrual for the 16th–end of month paid on the 7th of the following month. Payroll and related taxes are funded one day prior to each pay date. Model assumes an 8% reduction in payroll driven by a reduction in force ("RIF").
- $461k accrued balance, expected to be paid in full through the DIP facility in Week 1. Net amount per employee limited to statutory limit.

401(k) EE & ER Portion — Identical pay periods and payment timing as payroll.
- $60k accrued balance, expected to be paid in full through the DIP facility in Week 1.

Health Ins. Premium & Claims — Self-funded employee health insurance premiums and claims administered by Luminare Health.
- $52k accrued balance, expected to be paid in full through the DIP facility in Week 1.

Union Withholdings — Contractual union benefit obligations.
- Model assumes none of the accrued balance is paid during the DIP period. Actual payment amount subject to negotiated settlement.

**Due to Horsemen**

Horsemen Returned Checks — Purse obligations to Thoroughbred and Harness horsemen (owners, trainers, jockeys) for which checks were issued and subsequently returned.
- $1.4MM accrued balance, expected to be paid in full through the DIP facility in Week 2. Actual payment subject to negotiated settlement with the IRB.

Horsemen Purse Balance — Purse obligations to Thoroughbred and Harness horsemen that have accrued but have not yet been paid.
- $2.4MM accrued balance, expected to be paid in full through the DIP facility in Week 2. Actual payment subject to negotiated settlement with the IRB.

Purse Accrual — Thoroughbred racing season begins WE 04/04/26. Purse balance accrues at $110k per race day. Harness racing season ended in Dec 2025; no future purse accruals assumed.

**Tax & Regulatory**

ITHA Association Fees — Statutory payments to the Illinois Thoroughbred Horsemen's Association. Weekly fee accrual of $23k.
- Model assumes none of the accrued balance is paid during the DIP period. Actual payment amount subject to negotiated settlement.

IHHA Association Fees — Statutory payments to the Illinois Harness Horsemen's Association. Weekly fee accrual of $11k.
- Model assumes none of the accrued balance is paid during the DIP period. Actual payment amount subject to negotiated settlement.

Handle Tax — Taxes assessed on wagering handle, calculated as a percentage of total betting dollars.
- Model assumes none of the accrued balance is paid during the DIP period. Actual payment amount subject to negotiated settlement.

HISA — Regulatory assessments due to the Horseracing Integrity and Safety Authority ("HISA").
- Model assumes none of the accrued balance is paid during the DIP period. Actual payment amount subject to negotiated settlement.

**Signal Providers** — Reconciliation payments between host tracks and HRC related to simulcast wagering. Handle received by HRC is allocated to host tracks, purses, and regulatory fees.
- Model assumes $750k of critical vendor payments to maintain profitable signals. Actual amounts subject to negotiation and court approval.

**Facility-Related**

Property Taxes — Model assumes delinquent 2023 and 2024 tax balances paid in week 2. Tax year 2025 due on 04/01/26.

Rent — HRC operates 12 OTB locations, 11 of which are leased. HRC pays OTBs monthly rent to operate within OTB locations.
- Model assumes no pre-petition rent payments during the DIP period.

ComEd — Electricity service for HRC and certain OTB locations.
- Model assumes no pre-petition rent payments during the DIP period.

Waste Management — Horse manure removal and related waste services.
- Model assumes no pre-petition payments during the DIP period.

**Ordinary Course Professionals**

Auditor (FGMK) — Audit services required to complete the 2025 audit by 03/31/26, as required by the IRB. Audit work must commence by 02/01/26 to meet regulatory deadlines.
- $147k accrued balance; model assumes 1/3 of the accrued balance is paid during the DIP period. Actual payment amount subject to negotiated settlement.

**Hawthorne Race Course**
**Cash Flow Projection**
**Summary and Assumptions**

**Other Operating Disbursements**

Insurance
- Premiums for property insurance and accident & health coverage (jockeys and drivers).
- $64k payment in first week to bind workman's comp policy. Previous policy terminated for non-payment.

Daily Racing Form
- Paper forms for race and sportsbook wagering.
- Model assumes no pre-petition payments during the DIP period.

Incompass
- Central horse racing computer systems.
- Model assumes no pre-petition payments during the DIP period.

Esparza Trucking
- Freight and trucking services used to deliver backstretch supplies (feed, hay, track equipment).
- Model assumes no pre-petition payments during the DIP period.

**DIP Budget**

**Critical Vendor Payments**
- Payments for certain prepetition claims of vendors deemed critical to ongoing operations and value preservation.
- Budget assumes aggregate payments of $750k, distributed over the course of the case. Actual timing and amounts are subject to court approval and vendor negotiations.

**Professional Fee Carve Out**
- Funding of a segregated account for payment of court approved professional fees and expenses pursuant to fee application procedures.
- Weekly fee accrual by professional shown in the Professional Fee Budget.

**Chapter 11 Fees**

US Trustee Fees
- US Trustee fees calculated based on projected quarterly disbursements, pursuant to bankruptcy code.

Adequate Assurance Utilities
- Assumes deposits equal to approximately one half month of average utility service, pursuant to bankruptcy code.

**DIP Facility Related**

Secured Creditor Distributions
- Model assumes secured creditors are entitled to specified prepetition revenue collections.

Lender DIP Fees
- DIP lender entitled to an origination fee equal to 2% of the total loan commitment, net of any upfront fees previously paid.

Lender Legal Fees
- Assumes periodic payment of reasonable and documented legal fees and expenses of DIP lender professionals.

DIP Interest
- DIP loan bears interest at 13% per annum. Interest is calculated based on outstanding principal and paid bi-weekly.

Cash Flow Projection

**Hawthorne Race Course**
**Cash Flow Projection**
*As of 03/04/26*

| | 1 03/07/26 | 2 03/14/26 | 3 03/21/26 | 4 03/28/26 | 5 04/04/26 | 6 04/11/26 | 7 04/18/26 | 8 04/25/26 | 9 05/02/26 | 10 05/09/26 | 11 05/16/26 | 12 05/23/26 | 13 05/30/26 | 03/07/26 05/30/26 13-Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING COLLECTIONS** | | | | | | | | | | | | | | |
| Wagering Deposits | 230,000 | 405,000 | 580,000 | 755,000 | 805,000 | 855,000 | 905,000 | 892,603 | 1,186,393 | 940,804 | 1,225,459 | 1,129,638 | 1,251,535 | 11,161,432 |
| Out of State Earnings | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 75,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 840,000 |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL OPERATING COLLECTIONS** | 250,000 | 425,000 | 600,000 | 775,000 | 825,000 | 875,000 | 925,000 | 967,603 | 1,311,393 | 1,065,804 | 1,350,459 | 1,254,638 | 1,376,535 | 12,001,432 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | |
| Payroll | 864,409 | - | 438,368 | - | 438,368 | - | 438,368 | - | - | 438,368 | - | 438,368 | - | 3,056,249 |
| 401(k) EE & ER Portion | 84,425 | - | 24,261 | - | 24,261 | - | 24,261 | - | - | 24,261 | - | 24,261 | - | 205,728 |
| Health Insurance Premium | - | 81,999 | - | - | - | 81,999 | - | - | - | - | 81,999 | - | - | 245,997 |
| Health Insurance Claims | 52,307 | - | 50,000 | - | - | - | 50,000 | - | - | - | 50,000 | - | - | 202,307 |
| Union Withholdings | - | 198,000 | - | - | - | 198,000 | - | - | - | - | 198,000 | - | - | 594,000 |
| Other Payroll & Benefits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll & Benefits | 1,001,141 | 279,999 | 512,629 | - | 462,629 | 279,999 | 512,629 | - | - | 462,629 | 329,999 | 462,629 | - | 4,304,281 |
| Thoroughbred Returned Checks | - | 281,844 | - | - | - | - | - | - | - | - | - | - | - | 281,844 |
| Harness Returned Checks | - | 1,182,620 | - | - | - | - | - | - | - | - | - | - | - | 1,182,620 |
| Thoroughbred Purse Balance | - | 1,108,733 | - | - | - | - | - | - | - | - | - | - | - | 1,108,733 |
| Harness Purse Balance | - | 1,337,968 | - | - | - | - | - | - | - | - | - | - | - | 1,337,968 |
| Thoroughbred Purse Accrual | - | - | - | - | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 1,980,000 |
| Harness Purse Accrual | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Due to Horsemen | - | 3,911,165 | - | - | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 220,000 | 5,891,165 |
| ITHA Association Fees | 23,016 | 23,016 | 23,016 | 23,016 | 23,016 | 23,016 | 23,016 | 23,016 | 23,016 | 23,016 | 23,016 | 23,016 | 23,016 | 299,208 |
| IHHA Association Fees | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 11,900 | 154,700 |
| Handle Tax | - | 133,000 | - | - | - | 133,000 | - | - | - | - | 130,000 | - | - | 396,000 |
| HISA | - | 121,146 | - | - | - | 121,146 | - | - | - | - | 121,146 | - | - | 363,438 |
| Other Tax & Regulatory | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 130,000 |
| Tax & Regulatory | 44,916 | 299,062 | 44,916 | 44,916 | 44,916 | 299,062 | 44,916 | 44,916 | 44,916 | 44,916 | 296,062 | 44,916 | 44,916 | 1,343,346 |
| Signal Providers | - | 700,000 | - | - | - | 900,000 | - | - | - | - | 1,000,000 | - | - | 2,600,000 |
| Signal Providers | - | 700,000 | - | - | - | 900,000 | - | - | - | - | 1,000,000 | - | - | 2,600,000 |
| Property Taxes | - | 2,324,105 | - | - | 599,091 | - | - | - | - | - | - | - | - | 2,923,196 |
| Rent | - | 81,000 | - | - | - | 81,000 | - | - | - | - | 81,000 | - | - | 243,000 |
| ComEd | - | 65,000 | - | - | - | 65,000 | - | - | - | - | 65,000 | - | - | 195,000 |
| Waste Management | 25,000 | 25,000 | 25,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | - | 20,000 | 20,000 | 20,000 | 275,000 |
| Other Facility-Related | - | 100,000 | - | - | - | 100,000 | - | - | - | - | 100,000 | - | - | 300,000 |
| Facility-Related | 25,000 | 2,595,105 | 25,000 | 20,000 | 619,091 | 266,000 | 20,000 | 20,000 | 20,000 | 20,000 | 266,000 | 20,000 | 20,000 | 3,936,196 |
| Auditor (FGMK) | - | 48,967 | - | - | - | - | - | - | - | - | - | 25,850 | - | 74,817 |
| Other Professional Fees | - | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Ordinary Course Professionals | - | 53,967 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,850 | 5,000 | 134,817 |
| Insurance | 64,449 | 120,000 | - | - | - | 215,000 | - | - | - | - | 197,000 | - | - | 596,449 |
| Daily Racing Form | - | 30,000 | - | - | - | 30,000 | - | - | - | - | 30,000 | - | - | 90,000 |
| Incompass | - | 15,000 | - | - | - | 15,000 | - | - | - | - | 15,000 | - | - | 45,000 |
| Esparza Trucking | - | 25,000 | - | - | - | 25,000 | - | - | - | - | 25,000 | - | - | 75,000 |
| Other Operating Disbursements | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 845,000 |
| Other Operating Disbursements | 129,449 | 255,000 | 65,000 | 65,000 | 65,000 | 350,000 | 65,000 | 65,000 | 65,000 | 65,000 | 332,000 | 65,000 | 65,000 | 1,651,449 |
| **TOTAL OPERATING DISBURSEMENTS** | 1,200,506 | 8,094,298 | 652,545 | 134,916 | 1,416,636 | 2,320,061 | 867,545 | 354,916 | 354,916 | 817,545 | 2,449,061 | 843,395 | 354,916 | 19,861,255 |
| Starting Cash | - | 250,000 | 500,000 | 500,000 | 967,789 | 500,000 | 500,000 | 500,000 | 1,112,687 | 1,304,173 | 1,552,432 | 500,000 | 911,243 | - |
| Change in Cash from Operations | (950,506) | (7,669,298) | (52,545) | 640,084 | (591,636) | (1,445,061) | 57,455 | 612,687 | 956,477 | 248,259 | (1,098,603) | 411,243 | 1,021,619 | (7,859,823) |
| Ch. 11 Disbursements | (285,000) | (315,000) | (1,878,325) | (172,236) | (713,901) | (250,000) | (707,421) | - | (764,991) | - | (994,991) | - | (1,171,505) | (7,253,428) |
| DIP Term Note Funding | 1,485,506 | 8,234,298 | 1,930,869 | - | 837,747 | 1,695,061 | 649,965 | - | - | - | 1,041,162 | - | - | 15,874,609 |
| **ENDING CASH** | 250,000 | 500,000 | 500,000 | 967,789 | 500,000 | 500,000 | 500,000 | 1,112,687 | 1,304,173 | 1,552,432 | 500,000 | 911,243 | 761,358 | 761,358 |

DIP Budget

Hawthorne Race Course
DIP Budget
*As of 03/04/26*

| | 1 03/07/26 | 2 03/14/26 | 3 03/21/26 | 4 03/28/26 | 5 04/04/26 | 6 04/11/26 | 7 04/18/26 | 8 04/25/26 | 9 05/02/26 | 10 05/09/26 | 11 05/16/26 | 12 05/23/26 | 13 05/30/26 | 03/07/26 05/30/26 13-Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Critical Vendor Payments | - | - | 250,000 | - | - | 250,000 | - | - | - | - | 250,000 | - | - | 750,000 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Critical Vendor Payments** | - | - | 250,000 | - | - | 250,000 | - | - | - | - | 250,000 | - | - | 750,000 |
| Prof. Fee Carve Out Funding | - | - | 1,580,000 | - | 655,000 | - | 640,000 | - | 640,000 | - | 670,000 | - | 790,000 | 4,975,000 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Professional Fee Carve Out Funding** | - | - | 1,580,000 | - | 655,000 | - | 640,000 | - | 640,000 | - | 670,000 | - | 790,000 | 4,975,000 |
| US Trustee Fees | - | - | - | 102,295 | - | - | - | - | - | - | - | - | 251,250 | 353,545 |
| Adequate Assurance Utilities | - | 250,000 | - | - | - | - | - | - | - | - | - | - | - | 250,000 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Chapter 11 Fees** | - | 250,000 | - | 102,295 | - | - | - | - | - | - | - | - | 251,250 | 603,545 |
| Secured Creditor Disbursements | - | 40,000 | 20,000 | 20,000 | - | - | - | - | - | - | - | - | - | 80,000 |
| Lender DIP Fees | 260,000 | - | - | - | - | - | - | - | - | - | - | - | - | 260,000 |
| Lender Legal Fees | 25,000 | 25,000 | - | 50,000 | - | - | - | - | 50,000 | - | - | - | 50,000 | 200,000 |
| DIP Interest | - | - | 28,325 | - | 58,901 | - | 67,421 | - | 74,991 | - | 74,991 | - | 80,255 | 384,883 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **DIP Facility Related** | 285,000 | 65,000 | 48,325 | 70,000 | 58,901 | - | 67,421 | - | 124,991 | - | 74,991 | - | 130,255 | 924,883 |
| **Total Chapter 11 Disbursements** | 285,000 | 315,000 | 1,878,325 | 172,295 | 713,901 | 250,000 | 707,421 | - | 764,991 | - | 994,991 | - | 1,171,505 | 7,253,428 |

Professional Fee Budget

**Hawthorne Race Course**
**Professional Fee Budget**
*As of 03/04/26*

| | 1<br>03/07/26 | 2<br>03/14/26 | 3<br>03/21/26 | 4<br>03/28/26 | 5<br>04/04/26 | 6<br>04/11/26 | 7<br>04/18/26 | 8<br>04/25/26 | 9<br>05/02/26 | 10<br>05/09/26 | 11<br>05/16/26 | 12<br>05/23/26 | 13<br>05/30/26 | 03/07/26<br>05/30/26<br>13-Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Accrual** | | | | | | | | | | | | | | |
| Debtor FA (Getzler Henrich) | 200,000 | 200,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,500,000 |
| Debtor Legal (Saul Ewing) | 200,000 | 200,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,500,000 |
| In-House Counsel (Carey White) | 50,000 | 50,000 | 50,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 500,000 |
| Regulatory Counsel (Greenberg Traurig) | 80,000 | 80,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 80,000 | 80,000 | 500,000 |
| Claims Agent (Omni) | 25,000 | 25,000 | 25,000 | 25,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| UCC Legal | 25,000 | 25,000 | 25,000 | 25,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| UCC FA | 25,000 | 25,000 | 25,000 | 25,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| Conflicts Counsel | - | - | 25,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 75,000 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Accrual** | 605,000 | 605,000 | 370,000 | 335,000 | 320,000 | 320,000 | 320,000 | 320,000 | 320,000 | 335,000 | 335,000 | 395,000 | 395,000 | 4,975,000 |
| | | | | | | | | | | | | | | |
| **Carve Out Funding** | | | | | | | | | | | | | | |
| Debtor FA (Getzler Henrich) | - | - | 500,000 | - | 200,000 | - | 200,000 | - | 200,000 | - | 200,000 | - | 200,000 | 1,500,000 |
| Debtor Legal (Saul Ewing) | - | - | 500,000 | - | 200,000 | - | 200,000 | - | 200,000 | - | 200,000 | - | 200,000 | 1,500,000 |
| In-House Counsel (Carey White) | - | - | 150,000 | - | 70,000 | - | 70,000 | - | 70,000 | - | 70,000 | - | 70,000 | 500,000 |
| Regulatory Counsel (Greenberg Traurig) | - | - | 180,000 | - | 40,000 | - | 40,000 | - | 40,000 | - | 40,000 | - | 160,000 | 500,000 |
| Claims Agent (Omni) | - | - | 75,000 | - | 45,000 | - | 40,000 | - | 40,000 | - | 50,000 | - | 50,000 | 300,000 |
| UCC Legal | - | - | 75,000 | - | 45,000 | - | 40,000 | - | 40,000 | - | 50,000 | - | 50,000 | 300,000 |
| UCC FA | - | - | 75,000 | - | 45,000 | - | 40,000 | - | 40,000 | - | 50,000 | - | 50,000 | 300,000 |
| Conflicts Counsel | - | - | 25,000 | - | 10,000 | - | 10,000 | - | 10,000 | - | 10,000 | - | 10,000 | 75,000 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Carve Out Funding** | - | - | 1,580,000 | - | 655,000 | - | 640,000 | - | 640,000 | - | 670,000 | - | 790,000 | 4,975,000 |
| | | | | | | | | | | | | | | |
| **Professional Fee Disbursements** | | | | | | | | | | | | | | |
| Debtor FA (Getzler Henrich) | - | - | - | - | 500,000 | - | 200,000 | - | 200,000 | - | 200,000 | - | 400,000 | 1,500,000 |
| Debtor Legal (Saul Ewing) | - | - | - | - | 500,000 | - | 200,000 | - | 200,000 | - | 200,000 | - | 400,000 | 1,500,000 |
| In-House Counsel (Carey White) | - | - | - | - | 150,000 | - | 70,000 | - | 70,000 | - | 70,000 | - | 140,000 | 500,000 |
| Regulatory Counsel (Greenberg Traurig) | - | - | - | - | 180,000 | - | 40,000 | - | 40,000 | - | 40,000 | - | 200,000 | 500,000 |
| Claims Agent (Omni) | - | - | - | - | 75,000 | - | 45,000 | - | 40,000 | - | 40,000 | - | 100,000 | 300,000 |
| UCC Legal | - | - | - | - | 75,000 | - | 45,000 | - | 40,000 | - | 40,000 | - | 100,000 | 300,000 |
| UCC FA | - | - | - | - | 75,000 | - | 45,000 | - | 40,000 | - | 40,000 | - | 100,000 | 300,000 |
| Conflicts Counsel | - | - | - | - | 25,000 | - | 10,000 | - | 10,000 | - | 10,000 | - | 20,000 | 75,000 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Professional Fee Disbursements** | - | - | - | - | 1,580,000 | - | 655,000 | - | 640,000 | - | 640,000 | - | 1,460,000 | 4,975,000 |