UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | | |
|---|---|---|
| In Re: | ) | Case Number:   26-03505 |
| | ) | (Jointly Administered) |
| Hawthorne Race Course, Inc., et al., | ) | Chapter:   11 |
| | ) | |
| Debtors. | ) | Honorable Timothy A. Barnes |
| | ) | |
| Debtor(s) | ) | |
| | ) | |

**ORDER (I) APPROVING
THE SALE OF ACQUIRED PROPERTY
FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS,
INTERESTS, AND ENCUMBRANCES, (II) AUTHORIZING
THE DEBTORS TO PERFORM THEIR OBLIGATIONS UNDER
THE PURCHASE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") [Docket No. 222], of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Sale Order") (a) authorizing and approving the entry into and performance under the terms and conditions of that certain Real Estate Agreement of Sale, substantially in the form attached hereto as **Exhibit 1** (as may be amended, supplemented, restated, or otherwise modified from time to time, the "Purchase Agreement"),[1] by and among certain of the Debtors (the "Sellers") and ALLIMAC 2023, LLC, a limited liability company organized under the laws of the State of Delaware (the "Purchaser"), and all other transaction documents, (b) authorizing and approving the sale (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Purchase Agreement, the "Sale") of the property set forth in Section 1 of the Purchase Agreement (the "Acquired Property"), on an "as is, where is" basis, free and clear of all liens, claims, encumbrances, and other interests, except to the extent set

---

[1]   Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Purchase Agreement and the Bid Procedures Order, as applicable.

1

forth in the Purchase Agreement and this Sale Order, pursuant to the Purchase Agreement upon the closing of the Sale (the "Closing"), and (c) granting related relief, all as more fully set forth in the Motion; and this Court having entered the *Order: (I) Approving Bid Procedures in Connection with the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances; (II) Scheduling a Sale Hearing and, If Necessary, an Auction; and (III) Granting Related Relief* [Docket No. 262] (the "Bid Procedures Order"); and this Court having entered the *Order Granting Debtors' Motion for Entry of an Order (I) Approving Designation of Stalking Horse Purchaser of Real Estate Assets, (II) Approving the Bid Protections, and (III) Granting Related Relief* [Docket No. 387]; and this Court having entered the *Order Rescheduling Sale Hearing and Modifying Related Bid Procedure Dates* [Docket No. 400]; and this Court having entered the *Order Authorizing Debtors in Possession to Employ and Retain Hilco Real Estate, LLC as Real Estate Broker* [Docket No. 255]; and this Court having entered the *Order Authorizing the Supplemental Retention and Employment of Province, LLC as Sale Process Advisor to the Official Committee of Unsecured Creditors* [Docket No. 250]; and the Debtors having determined that the Purchaser has submitted the highest or otherwise best bid for the Acquired Property and determined that the Purchaser is the Successful Bidder; and the Court having held a hearing on [July 20], 2026 (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the Purchase Agreement, and any and all objections to the Sale, the Purchase Agreement and the other transaction documents filed in accordance with the Bid Procedures Order; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and upon the *Declaration of Timothy Sean Carey in Support of Chapter 11 Petitions and First Day Relief* [Docket No. 17] (the "Carey

2

Declaration") and the *Declaration of Billy Condon in Support of Chapter 11 Petitions and First Day Relief* [Docket No. 19] (together with the Carey Declaration, the "First Day Declarations"), and the testimony proffered at the Sale Hearing; and due and sufficient notice of the Motion, the Sale Hearing, the Purchase Agreement, and the Sale having been provided; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders, and all other parties in interest; and the Court having jurisdiction over this matter; and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby

**FOUND, CONCLUDED, AND DETERMINED THAT:**

**Jurisdiction, Venue, and Final Order**

A.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute

3

conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice of the Motion, Auction,**
**Sale Hearing, Purchase Agreement and Sale**

D.      As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Purchase Agreement, and the Sale has been provided in accordance with sections 102(1), 105, and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007 and 9014.  The Debtors have complied with all obligations to provide notice of the Motion, the Sale Hearing, the Purchase Agreement, and the Sale as required by the Bid Procedures Order.  The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Sale Hearing, the Purchase Agreement, or the Sale is required.

E.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

**Highest and Best Offer**

F.      As demonstrated by the evidence proffered or adduced at the Sale Hearing, and the representations of counsel made on the record at the Sale Hearing, the Debtors conducted a sale process in accordance with, and have, along with the Purchaser, complied in all respects with, the Bid Procedures Order and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Acquired Property.

G.      (i) The Debtors and their advisors engaged in a robust and extensive marketing and sale process, both prior to the commencement of these chapter 11 cases and through the postpetition sale process in accordance with the Bid Procedures Order and the sound exercise of

4

the Debtors' business judgment, as more fully detailed in the First Day Declarations and the evidence proffered or adduced at the Sale Hearing; (ii) the Debtors conducted a fair and open sale process; (iii) the sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Acquired Property, or who the Debtors believed may have had an interest in acquiring the Acquired Property, to make an offer to purchase the Debtors' assets, including, without limitation the Acquired Property; (iv) the Debtors and the Purchaser have negotiated and undertaken their roles leading to the entry into the Purchase Agreement in a diligent, non-collusive, fair, reasonable, and good faith manner; and (v) the sale process conducted by the Debtors pursuant to the Bid Procedures Order and the Bid Procedures resulted in the highest or otherwise best value for the Acquired Property for the Debtors and their estates, was in the best interest of the Debtors, their estates, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result. There is no legal or equitable reason to delay entry into the transactions contemplated by the Purchase Agreement.

H. No other entity or group of entities has submitted or otherwise presented a higher or otherwise better offer to the Debtors to purchase the Acquired Property than the Purchaser.

I. Approval of the Purchase Agreement, and the consummation of the Sale contemplated thereby, is in the best interests of the Debtors, their respective creditors, estates, and other parties in interest. The Debtors have demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of their obligations under the Purchase Agreement.

J. The consummation of the Sale outside a plan of reorganization pursuant to the Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor

5

impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The

Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without

the protections that a disclosure statement would afford.

K.    Entry of an order approving the Purchase Agreement and all the provisions thereof

is a necessary condition precedent to Purchaser's consummation of the Sale, as set forth in the

Purchase Agreement.

## Good Faith of Purchaser

L.    The consideration to be paid by the Purchaser under the Purchase Agreement was

negotiated at arm's-length, in good faith and without collusion pursuant to section 363(m) of the

Bankruptcy Code and constitutes reasonably equivalent value and fair and adequate consideration

for the Acquired Property.  Specifically:  (i) the Purchaser recognized that the Debtors were free

to deal with any other party interested in purchasing the Acquired Property; (ii) the Purchaser

complied in all respects with the provisions in the Bid Procedures Order in negotiating and

entering into the Purchase Agreement and the other transaction documents, and the Purchase

Agreement, the other transaction documents, and the transactions described therein comply with

the Bid Procedures Order; (iii) the Purchaser agreed to subject any bid to the competitive bid

procedures set forth in the Bid Procedures Order; (iv) all payments made by the Purchaser in

connection with the Sale have been disclosed in the Purchase Agreement; (v) no common identity

of directors, officers, or controlling stockholders exists among the Purchaser and the Debtors; (vi)

the negotiation and execution of the Purchase Agreement and the other transaction documents

were at arm's-length and in good faith, and at all times each of the Purchaser and the Debtors

were represented by competent counsel of their choosing; (vii) the Purchaser did not in any way

induce or cause the chapter 11 filing of the Debtors; and (viii) the Purchaser has not acted in a

collusive manner.   The Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Purchase Agreement and the other transaction documents.   The terms and conditions set forth in the Purchase Agreement are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws.   The findings of Purchaser's good faith under section 363(m) shall not inure to the benefit of any third party.

M.      The Purchaser, its equityholders, and the subsidiaries of each of its equityholders, and with respect to each of the foregoing, its management, boards of directors, members (excluding limited partners and other minority equityholders, but solely in their capacity as limited partners and other minority equityholders), officers, directors, managers, employees, attorneys, brokers, agents, and representatives (collectively, the "Purchaser Parties"), have acted in good faith.  The Purchase Agreement and the other transaction documents, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtors and the Purchaser Parties in good faith, without collusion or fraud, and from arm's-length bargaining positions.  The Purchaser Parties are a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.

### No Fraudulent Transfer

N.      The consideration provided by the Purchaser pursuant to the Purchase Agreement for its purchase of the Acquired Property constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

O.     Neither the Purchaser nor its past, present and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, brokers, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies or partners (collectively, the "Purchaser Stakeholders") is a continuation of the Debtors or their respective estates and no Purchaser Stakeholder is holding itself out to the public as a continuation of the Debtors or their respective estates and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser (or any other Purchaser Stakeholder) and the Debtors.

**Validity of Transfer**

P.     The Debtors' boards of directors have authorized the execution and delivery of the Purchase Agreement and the Sale of the Acquired Property to the Purchaser (or its designee).  The Debtors (i) have full corporate power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Sale, and (iii) have taken all action necessary to authorize and approve the Purchase Agreement and to consummate the Sale, and no further consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the transactions contemplated by the Purchase Agreement, except as otherwise set forth in the Purchase Agreement.  The Acquired Property constitutes property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtors' estates.

**<u>Section 363(f) Is Satisfied</u>**

Q. The Sale of the Acquired Property to the Purchaser (or its designee) under the terms of the Purchase Agreement meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the Sale of the Acquired Property will be free and clear of any and all liens, claims, interests, and encumbrances, and will not subject any Purchaser Stakeholder to any liability for any liens, claims, interests, and encumbrances whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability). All holders of liens, claims, interests, and encumbrances who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of liens, claims, interests, and encumbrances are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their liens, claims, interests, and encumbrances, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert liens, claims, interests, and encumbrances, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable. Those holders of claims who did object and that have an interest in the Acquired Property falls within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

R. In order for the Debtors to deliver the Acquired Property free and clear of all liens, claims, interests, and encumbrances under section 363(f) of the Bankruptcy Code, no persons or horses, including the Backstretch Community (as defined in the *Limited Objection and Reservation of Rights to Approval of Proposed Sale of Hawthorne Race Course to ALLIMAC 2023, LLC*

[Docket No. 428]), may be on, living on, or stabled or housed on, the Acquired Property as of the Closing.

S.       Derby DIP LLC, in its capacity as DIP Lender (as defined in the *Final Order Authorizing Debtor in Possession Postpetition Financing* [Docket No. 232] (the "Final DIP Order")), has consented to the sale of the Acquired Property to the Purchaser pursuant to the Purchase Agreement.  Subject to receipt of the applicable Sale Proceeds set forth in paragraph 20 below and full satisfaction of the DIP Obligations (as defined in the Final DIP Order, as supplemented by the Supplemental DIP Order), the sale of Acquired Property to the Purchaser shall be deemed to be free and clear of the DIP Liens (as defined in the Final DIP Order).

T.       The transfer of the Acquired Property to the Purchaser (or its designee) under the Purchase Agreement will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Acquired Property free and clear of all liens, claims, interests, and encumbrances.  Subject to receipt of the applicable Sale Proceeds set forth in paragraph 20 below, the Debtors may sell their interests in the Acquired Property free and clear of all liens, claims, interests, and encumbrances because, in each case, one or more of the standards set forth in section 363(f) has been satisfied.  The Purchaser would not have entered into the transaction documents and would not consummate the transactions contemplated thereby (i) if the transfer of the Acquired Property was not free and clear of all interests of any kind or nature whatsoever, including, without limitation, the presence or habitation of any persons or horses, including the Backstretch Community, any licenses (whether implied or express), any leases (whether implied or express), and any rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise or (ii) if the Purchaser or any of its affiliates or designees would, or in the future could,

be liable for any interests, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise or for the presence or habitation of any persons or horses, including the Backstretch Community, on the Acquired Property.  Not transferring the Acquired Property free and clear of all interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, would adversely impact the Debtors' efforts to maximize the value of their estates.

### Secured Creditors

U.      Based on the Final DIP Order, as well as the Debtors' business records, the Debtors' schedules, and claims filed in the Debtors' bankruptcy cases, the following creditors have asserted liens on all or a portion of the Acquired Property in the following amounts (currently estimated as of August 31, 2026):

| Secured Creditor | Amount | General Description of Collateral (*see* Proofs of Claim for actual description of collateral) | Support |
|---|---|---|---|
| Cook County Treasurer | $4,434,444 | CHP Premises; Hawthorne Premises | Claim Nos. 1 and 15 and Debtor's business records |
| Derby DIP LLC | $21,651,194.44 | DIP Collateral including Acquired Property | Dkt. No. 232 |

| Secured Creditor | Amount | General Description of Collateral (*see* Proofs of Claim for actual description of collateral) | Support |
|---|---|---|---|
| 180 Hawthorne Holdings, LLC, as successor-in-interest to Signature Bank ("**180 Hawthorne**") | $53,163,940 | Acquired Property | Dkt. No. 232 (Final DIP Order); Claim No. 109 against Debtor HRC; Claim No. Claim No. 14 against Debtor CHP; Claim No. 13 against SDI; and Dkt No. 344 |
| Aria Group Architects, Inc. ("**Aria**") | $7,082,509, which includes 10% statutory interest per annum and legal fees recoverable under the Illinois Mechanics' Lien Act. | CHP Premises | Claim No. 3 against Debtor CHP, and Claim Nos. 8 and 120 against Debtor HRC, pertaining to mechanics' liens originating on August 7, 2024 (recorded on August 7, 2024 in the Office of the Recorder of Deeds of Cook County, Illinois as Document No. 242208024). |
| W.E. O'Neil Construction Company ("**W.E. O'Neil**") and any and all related claims of W.E. O'Neil's subcontractors (the "Subcontractors"). The Subcontractors include, but are not limited to, the | $7,771,211, which includes 10% statutory interest per annum and legal fees recoverable under the Illinois Mechanics' Lien Act. | CHP Premises | Claim No. 3 against Debtor PTC; Claim No. 6 against Debtor CHP; Claim No. 8 against Debtor SDI; and Claim No. 56 against HRC pertaining to mechanics' liens originating on October 12, 2022 (recorded on |

| Secured Creditor | Amount | General Description of Collateral (*see* Proofs of Claim for actual description of collateral) | Support |
|---|---|---|---|
| following: Milburn, LLC and Gurtz Electric Co., Waukegan Steel, SG Metal & Glass, Warren Thomas, USAFP, Mechanical Inc., Prime Scaffolding, Helm Mechanical, and National Rent-a-Fence. | | | October 12, 2022 in the Office of the Recorder of Deeds of Cook County, Illinois as Document No. 2228557045). See also 9019 Motion dated July 19, 2026; subcontractor Milburn LLC's ("Milburn") Claim No. 4 against Debtor CHP; Milburn's Claim No. 2 against Debtor SDI; and Milburn LLC's Claim No. 24 against Debtor HRC pertaining to sub-contractor's claim for lien originating on November 10, 2022 (recorded on November 10, 2022 in the Office of the Cook County Clerk as Document No. 2231449119). |
| Latto Capital LLC ("**Latto**") | $7,500,000 (subject to Committee challenge) | CHP Premises | Docket No. 232 at Findings of Fact h(iii) |
| Churchill Downs, Inc. | $851,443.78 | Hawthorne Premises | Claim 70 |

| Secured Creditor | Amount | General Description of Collateral (*see* Proofs of Claim for actual description of collateral) | Support |
|---|---|---|---|
| Monarch Content Management, LLC | $7,565,167.27 | Hawthorne Premises | Claim 92 |

**W.E. O'Neil Settlement**

V.    In resolution of the limited objection to the Sale and reservation of rights filed by W.E. O'Neil [Docket No. 432] (the "WEO Sale Objection") and all disputes concerning W.E. O'Neil's asserted secured claim and mechanics' lien against the Acquired Property, and pursuant to the settlement of such matters as set forth in the Debtors' and WEO's Joint Motion for Entry of An Order Approving Settlement with W.E. O'Neil Construction Company, Inc. Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure [Docket No. 435], and as approved by this Court on July 20, 2026 (the "WEO Settlement"), W.E. O'Neil has agreed to: (a) the allowance of its proofs of claim (Claim No. 56 against Hawthorne Race Course, Inc.; Claim No. 6 against Carey Heirs Properties, LLC; Claim No. 8 against Suburban Downs, Inc.; and Claim No. 3 against Post Time Catering, Inc.) as a single allowed secured claim in the reduced amount of $4,950,000 (the "WEO Allowed Secured Claim"), with the remaining unpaid portion of W.E. O'Neil's claims to be allowed as general unsecured claims, subject to future liquidation and allocation among the Debtors' Estates based upon the ongoing accrual of interest, fees, and other costs; (b) in full and final satisfaction of the WEO Allowed Secured Claim and any and all secured claims of W.E. O'Neil's Subcontractors, (i) receive payment at Closing of $4,500,000 (the "WEO Claim Payment"), to be paid in cash on a dollar-for-dollar basis from the Sale Proceeds, and (ii) as a

14

condition to its receipt of payment, WEO shall permit payment at Closing of $450,000, as a gift by W.E. O'Neil on account of the WEO Allowed Secured Claim, to the Illinois Thoroughbred Horsemen's Association ("ITHA") and its charitable foundations, the Illinois Backstretch Charitable Foundation, Inc. and Galloping Out, Inc., both Illinois 501(c)(3) corporations, not for lobbying fees or in relation to political gain, but for the expressed purposes of assisting the Backstretch Community (as defined in the ITHA's objection) and horses, and in partial resolution of the ITHA's objection to the Sale and in satisfaction of the ITHA's claim against the Sale Proceeds; and (c) the remainder of W.E. O'Neil's claims against the Debtors' Estates and the remainder of any and all related claims of W.E. O'Neil's Subcontractors shall be deemed allowed general unsecured claims. The Debtors and W.E. O'Neil shall work cooperatively to dismiss the Appeal and all related litigation following W.E. O'Neil's receipt of the WEO Claim Payment. Notwithstanding anything to the contrary in this Sale Order, in the event that the Closing does not occur and/or the WEO Claim Payment is not paid to W.E. O'Neil in full, the WEO Settlement shall be deemed void and of no force or effect, and W.E. O'Neil's asserted secured claim, mechanics' lien against the Acquired Property, the WEO Sale Objection, Milburn LLC's asserted secured claim, the pending motion for relief from the automatic stay, and the Appeal shall be automatically reinstated and preserved in full, without prejudice and with the same validity, extent, and priority as existed immediately prior to entry of this Sale Order, and nothing in this Sale Order shall constitute a waiver, release, satisfaction, or impairment of any of W.E. O'Neil or the Subcontractors' claims, liens, rights, defenses, or remedies, or any other party in interest's rights, objections, or defenses thereto.

W. In resolution of the Aria Objection (the "Aria Settlement"), Aria has agreed to: (a) an allowed secured claim of $4,950,000, with the remaining unpaid portion of Aria's claims to be

15

allowed as general unsecured claims, subject to future liquidation and allocation among the Debtor's Estates based upon the ongoing accrual of interest, fees, and other costs; (b) in full and final satisfaction of its secured claims against the Debtor's Estates, and any of its subcontractors: (i) receive payment at Closing of $4,500,000 (the "Aria Claim Payment"), to be paid in cash on a dollar-for-dollar basis from the Sale Proceeds and (ii) as a condition to its receipt of payment, Aria shall permit payment at Closing of $450,000, as a gift by Aria to the ITHA and its charitable foundations in the following amounts, the Illinois Backstretch Charitable Foundation, Inc. ($350,000) and Galloping Out, Inc. ($100,000), both Illinois 501(c)(3) corporations, not for lobbying fees or in relation to political gain, but for the expressed purposes of assisting the Backstretch Community (as defined in the ITHA's objection) and horses, (c) the remainder of Aria's claims against the Debtors' Estates shall be deemed allowed general unsecured claims, and (d) subject to its receipt of payment from the proceeds of sale, Aria shall cause its Adversary Complaint to be dismissed with prejudice.  Notwithstanding anything to the contrary in this Sale Order, in the event that the Closing does not occur and/or the Aria Claim Payment is not paid to Aria in full, the Aria Settlement shall be deemed void and of no force or effect, and Aria's asserted secured claim, mechanics' lien against the Acquired Property, Aria's objection, and the Adversary Complaint shall be automatically reinstated and preserved in full, without prejudice and with the same validity, extent, and priority as existed immediately prior to entry of this Sale Order, and nothing in this Sale Order shall constitute a waiver, release, satisfaction, or impairment of any of Aria or its subcontractors' claims, liens, rights, defenses, or remedies, or any other party in interest's rights, objections, or defenses thereto.

X.     Solely to the extent that no persons or horses, including the horsemen and the Backstretch Community, are on, living on, or housed or stabled on, the Acquired Property by

August 31, 2026 at 4:00 p.m., prevailing Central Time (as determined by the Debtor and the Purchaser), and solely to the extent Closing has occurred, the Purchaser shall contribute $1,000,000 of additional funds to be paid at Closing to the ITHA (the "Purchaser/ITHA Funds"), for the sole purpose of assisting the effective transition and vacating of the horsemen and the Backstretch Community (as defined in the ITHA's objection) and horses, off of the Acquired Property. At Closing, ITHA shall pay to the Debtors, solely from the Purchaser/ITHA Funds, the amount needed to reimburse the Debtors' estates for the Additional DIP Financing (as defined below) in full in cash. For the avoidance of doubt, if and when payable pursuant to this Order, the Purchaser/ITHA Funds are in addition to the Purchase Price (as defined in the Purchase Agreement).

Y.      The Debtors have filed a motion seeking authority to obtain additional debtor in possession financing from Derby DIP LLC in an amount up to $1,000,000 (the "Additional DIP Financing"). The Additional DIP Financing will only be used in the manner permitted in the Additional DIP Financing motion to cover the costs of the continued use of the Acquired Property by the horsemen and the Backstretch Community through August 31, 2026. Contemporaneously herewith, the Court entered a final order approving the additional DIP financing (the "Supplemental DIP Order"). At Closing, the ITHA shall cause a portion of the Purchaser/ITHA Funds to be paid to the Debtors in an amount equal to the Additional DIP Financing and not to exceed the Purchaser/ITHA Funds (the "ITHA Debtors Payment").

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED to the extent set forth herein. **General Provisions**

2.      All objections to or reservation of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved are overruled with prejudice.

17

All persons and entities who did not object or withdraw their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.    The Purchase Agreement and the other transaction documents, and all terms and conditions thereof, are hereby approved in all respects.  The failure to specifically include any particular provision of the Purchase Agreement or the transaction documents in this Sale Order shall not diminish or impair the effectiveness of such provision.

**Transfer of the Acquired Property as set forth in the Purchase Agreement**

4.    The Debtors are authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale in accordance with the terms and conditions set forth in the transaction documents and this Sale Order, and (b) take all further actions and execute and deliver the transaction documents and any and all additional instruments and documents that may be necessary or appropriate to implement the Purchase Agreement and the other transaction documents and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

5.    All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Acquired Property to the Purchaser (or its designee) in accordance with the Purchase Agreement, the other transaction document and this Sale Order.

6.    The ITHA shall communicate to its membership and communicate to them that no persons or horses, including the Backstretch Community are on, living on, or housed or stabled on, the Acquired Property at the Closing.  The ITHA shall use best efforts to cause the Backstretch Community to vacate the Acquired Property by August 31, 2026.  Notwithstanding anything to the contrary herein, Purchaser shall not be required to proceed to Closing in the event that

18

individuals or horses, including the Backstretch Community, continue to live on, or are otherwise housed or stabled on, the Acquired Property.

7.      On or before August 1, 2026, the ITHA shall  promptly give notice that all persons (including the Backstretch Community) that are on, living on, or housed on the Acquired Property must vacate the Acquired Property as soon as possible, but no later than 4:00 p.m. (Central Daylight Time) on August 31, 2026 (hereinafter, the "Eviction Deadline"), which notice, at a minimum, shall include this Sale Order signed by this Court and a summary of the terms contained here, by posting this Sale Order and summary in multiple high traffic locations in the Backstretch that are visible to all persons (including the Backstretch Community) that are on, living on, or housed on the Acquired Property.  On August 7, 14 and 21, 2026, the ITHA shall provide to the Debtors, Purchaser and 180 Hawthorne Holdings, and shall file with this Court, reports related to the move out status of the Backstretch Community including, but not limited to, a contemporaneous report related to the total persons and horses then on, living on, or housed on, the Acquired Property and such other reasonable requests for information.

8.      Upon Closing and payment of the $1,000,000 to the ITHA, the ITHA, on behalf of itself and each of its members, including each individual of the Backstretch Community, (i) fully and forever release the Purchaser Stakeholders from any and all claims, causes of action, counterclaims, crossclaims, interests, damages, remedies, third-party claims, demands, rights, actions, controversies, offsets, licenses, liens, indemnities, and guaranties of any kind whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, directly or derivatively, in contract, tort, law, equity or otherwise and (ii) hereby provide all requisite consent to the vacating

of the Acquired Property no later than August 31, 2026, notwithstanding any rights arising under applicable state or local laws or regulations.

9.      At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Acquired Property shall be immediately vested in the Purchaser (or its designee) pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code.  Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Acquired Property.  All persons or entities, presently or at or after the Closing, in possession of some or all of the Acquired Property, are directed to surrender possession of any and all portions of the Acquired Property to the Purchaser (or its designee) or its respective designees on the Closing or at such time thereafter as the Purchaser (or its designee) may request.  For the avoidance of doubt, any licenses, tenancy rights and/or related agreements (express or implied, and whether written or oral) with respect to any person (including the Backstretch Community) then on, living on (or housed on) the Acquired Property are deemed rejected as of Closing.

10.      This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) no claims will be assertable against any Purchaser Party or any of its respective assets, (ii) the Acquired Property shall have been transferred to the Purchaser (or its designee) free and clear of all liens, claims, interests, and encumbrances, including any licenses (whether implied or express), any leases (whether implied or express), and the presence or habitation of any persons or horses, including the Backstretch Community, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of

their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement and the other transaction documents.  The Acquired Property are sold free and clear of any reclamation rights.  All liens, claims, interests, and encumbrances on the Acquired Property shall attach to the proceeds of the Sale ultimately attributable to the property against which such liens, claims, interests, and encumbrances applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such liens, claims, interests, and encumbrances applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

11.     Except as otherwise provided in the Purchase Agreement, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Property, and the ownership, sale, or operation of the Acquired Property prior to Closing or the transfer of the Acquired Property to the Purchaser (or its designee), are hereby forever barred, estopped, and permanently enjoined from asserting such claims against any Purchaser Party and its property (including, without limitation, the Acquired Property).  Following the Closing, no holder of any claim or interest shall interfere with the Purchaser's (or its designee's) title to or use and enjoyment of the Acquired Property based on or related to any such claim or interest, or based on any action the Debtor may take in their Chapter 11 cases.

12.     If any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against the Debtors or in the Acquired Property shall not have delivered to the Debtors prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all liens, claims, interests, and encumbrances that the person or entity has with respect to the Debtors or the Acquired Property or otherwise, then only with regard to the Acquired Property that are purchased by the Purchaser (or its designee) pursuant to the Purchase Agreement and this Sale Order, (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Property, (b) the Purchaser (or its designee) is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, interests, and encumbrances against the Purchaser Stakeholders and the Acquired Property, and (c) upon consummation of the Sale, the Purchaser (or its designee) may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all liens, claims, interests, and encumbrances that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Acquired Property.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.  Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Acquired Property free and clear of liens, claims, interests, and encumbrances shall be self-executing and neither the Debtors nor the Purchaser (or its designee) shall be required to execute or file releases,

termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

**No Successor or Transferee Liability**

13.      No Purchaser Stakeholder shall be deemed, as a result of any action taken in connection with the Purchase Agreement, the consummation of the Sale contemplated by the Purchase Agreement, or the transfer, operation, or use of the Acquired Property to (a) be a legal successor, or otherwise be deemed a successor to the Debtors, (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("ERISA"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation.

14.      Immediately prior to the Closing, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or controlling stockholders existed between the Purchaser and the Debtors.

15.      Other than as expressly set forth in the Purchase Agreement, no Purchaser Stakeholder shall have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Property or (b) any claims against the Debtors or any of their predecessors or affiliates.  Except as expressly provided in the Purchase Agreement with respect to the Purchaser, no Purchaser Stakeholder shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the

23

Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Acquired Property prior to the Closing or in respect of pre-Closing periods or (b) any plan, agreement, practice, policy, or program, whether written or unwritten, providing for pension, retirement, health, welfare, compensation or other employee benefits which is or has been sponsored, maintained or contributed to by any Debtor or with respect to which any Debtor has any liability, whether or not contingent, including, without limitation, any "multiemployer plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA) to which any Debtor has at any time contributed, or had any obligation to contribute. No Purchaser Stakeholder shall have any liability or obligation under any applicable law, including, without limitation, (a) the WARN Act (29 U.S.C. §§ 2101 et seq.), (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the "NLRA"), or (f) any foreign, federal, state, or local labor, employment or environmental law, by virtue of the Purchaser's purchase of the Acquired Property pursuant to the terms of the Purchase Agreement. Without limiting the foregoing, no Purchaser Stakeholder shall have any liability or obligation

24

with respect to any environmental liabilities of the Debtors or any environmental liabilities associated with the Acquired Property.

16. Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against any Purchaser Party or their respective assets (including, without limitation, the Acquired Property), with respect to any (a) claim in these Chapter 11 cases or in connection with or related to the Sale or the Debtors or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Acquired Property or conduct any of the businesses operated with respect to such assets.

**Good Faith of Purchaser**

17. The Sale contemplated by the Purchase Agreement is undertaken by the Purchaser Parties, without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization

provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

18.     Neither the Debtors nor the Purchaser Parties have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Acquired Property under the Purchase Agreement is fair and reasonable and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

19.     The findings herein concerning Purchaser Parties, including findings of good faith under section 363(m), shall not inure to the benefit of any third party.

### Distribution of Proceeds

20.     At Closing, the Debtors are authorized and directed to distribute sale proceeds (the "Sale Proceeds") and the ITHA Debtors Payment to the following parties in the amounts set forth below:

A)  All amounts due the Cook County Treasurer that are secured by the CHP Premises and the Hawthorne Premises;

B)  All amounts due to Derby DIP LLC under the Final DIP Order and the Supplemental DIP Order, which are estimated to be $21,651,194.44 as of August 31, 2026;

C)  On account of its success fee, the Debtors shall distribute $787,500 to Province, LLC representing 0.875% of the purchase price;

D)  On account of its success fee, the Debtors shall distribute $787,500 to Hilco Real Estate, LLC representing 0.875% of the purchase price;

E)  In full satisfaction of all claims held by 180 Hawthorne against the Debtors' estates, the Debtors shall distribute $52,963,940 to 180 Hawthorne;

F)  In full satisfaction of all secured claims held by Aria, and any subcontractor of Aria, against the Debtors' estates, the Debtors shall distribute (i) $4.5 million

to Aria and (ii) as a condition to its receipt of payment, direct the payment of an additional $450,000 (as a gift designated by Aria on account of its secured claim) to the ITHA's charitable foundations in the following amounts, the Illinois Backstretch Charitable Foundation, Inc. ($350,000) and Galloping Out, Inc. ($100,000), both Illinois 501(c)(3) corporations, not for lobbying fees or political gain, but expressly for purposes of assisting the Backstretch Community (as defined in the ITHA's objection) and horses.  The remainder of Aria's claims against the Debtors' estates shall be deemed allowed general unsecured claims and subject to its receipt of payment from the proceeds of sale, Aria shall cause its Adversary Complaint to be dismissed with prejudice;

G) In satisfaction of the WEO Allowed Secured Claim, and the secured claim of any Subcontractor of W.E. O'Neil, against the Debtors' estates, the Debtors shall distribute (i) $4.5 million to W.E. O'Neil, to be allocated pro rata between W.E. O'Neil and the Subcontractors, and (ii) as a condition to its receipt of payment, direct payment of an additional $450,000 (as a gift designated by W.E. O'Neil on account of its secured claim) to the ITHA and its charitable foundations, the Illinois Backstretch Charitable Foundation, Inc. and Galloping Out, Inc., both Illinois 501(c)(3) corporations, not for lobbying fees or political gain, but expressly for purposes of assisting the Backstretch Community (as defined in the ITHA's objection) and horses. The remainder of W.E. O'Neil and the Subcontractors' claims against the Debtors' estates shall be deemed allowed general unsecured claims;

H) The remainder of any sale proceeds, if any, shall be distributed to Latto in full satisfaction of its secured claims against the Debtors' estates.  The remainder of Latto's claims against the Debtors' estates shall be deemed general unsecured claims.

21.     Solely to the extent that no persons or horses, including the horsemen and the Backstretch Community, are on, living on, or housed or stabled on, the Acquired Property by August 31, 2026, at 4:00 p.m., prevailing Central Time (as determined by the Debtor and the Purchaser), and solely to the extent Closing has occurred, the Purchaser shall contribute $1,000,000 of funds to be paid at Closing to the ITHA, for the sole purpose of assisting the effective transition and vacating of the horsemen and the Backstretch Community and horses, off of the Acquired Property.   At Closing, ITHA shall pay to the Debtors, solely from the Purchaser/ITHA Funds, the amount needed to reimburse the Debtors' estates for the Additional DIP Financing in full in cash.  For the avoidance of doubt, if and when payable pursuant to this

27

Order, the Purchaser/ITHA Funds are in addition to the Purchase Price (as defined in the Purchase Agreement).

22. The distribution of Sale Proceeds as provided herein shall not be (either directly or indirectly): (a) subject to any challenge, objection, reduction, counterclaim, disallowance, recoupment, recharacterization, subordination (equitable, contractual or otherwise), or offset for any reason, and (b) subject to any objection, avoidance, or recovery actions under the Bankruptcy Code or applicable law, including, without limitation, sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, any provisions of the Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar state or common law.

**Contingent Eviction Procedures**

23. For the avoidance of doubt, any person (including the Backstretch Community) on, living on or housed on the Acquired Property shall vacate and surrender exclusive possession of the Acquired Property to the Debtors by the Eviction Deadline and shall remove all personal property from the Acquired Property (including any and all horses) by the Eviction Deadline.

24. At the continued status hearings set for July 29, August 5, August 12, August 19, and August 26, 2026, each at 2 p.m., prevailing Central Time, the Court will consider arguments for additional relief including, but not limited to, authorizing and directing the Clerk to issue a writ of assistance pursuant to Bankruptcy Rule 7070 and 11 U.S.C. § 105(a) for any person (including the Backstretch Community) or any other occupant, licensee or other person that fails to vacate or surrender possession of the Acquired Property on the Eviction Deadline.

**Other Provisions**

25.     Any amounts that become payable by the Debtors to the Purchaser pursuant to the Purchase Agreement and any related agreements executed in connection therewith shall (a) constitute allowed superpriority administrative expense claims under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, (b) not be subordinate to any other administrative expense claim against the Debtors' or Debtors' affiliates except for the DIP Obligations and the Carve Out (each as defined in the Final DIP Order, as supplemented by the Supplemental DIP Order), and (c) shall not be altered, amended, discharged or affected without the prior written consent of the Purchaser, and (d) be paid by the Debtors in the time and manner provided for in the Purchase Agreement without any further order of this Court.

26.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court, (a) to allow the Purchaser to give the Debtors any notice provided for in the Purchase Agreement, (b) to allow the Purchaser to take any and all actions permitted by the Purchase Agreement in accordance with the terms and conditions thereof, including, without limitation, effectuating the Sale and the other transactions contemplated by the Purchase Agreement and (c) to otherwise implement the terms and provisions of the Purchase Agreement and this Sale Order.

27.     The terms and provisions of the Purchase Agreement, the other transaction documents and this Sale Order shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Acquired Property, the Purchaser, and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s), examiner(s), or receiver(s) appointed in any of the Debtors' chapter 11 cases

29

or upon conversion to Chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. The Purchase Agreement shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders, or any trustee(s), examiner(s), or receiver(s).

28. The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any of these chapter 11 cases; (b) converting any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the chapter 11 cases; or (d) pursuant to which this Court abstains from hearing any of the chapter 11 cases. The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in (a)–(d) above, shall continue in these chapter 11 cases, or following dismissal of these chapter 11 cases. This Sale Order (including the obligations herein) shall be enforceable against each of the Debtors, their estates, and any successors thereto, including, without limitation, against any trustee or any other estate representative elected or appointed in these chapter 11 cases, upon the conversion of any of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing. Upon any order from this Court granting relief to any party, including the Office of United States Trustee, seeking to (i) convert these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code or (ii) appoint a trustee, examiner, or receiver in any of the Debtors' chapter 11 cases, the Purchaser may seek immediate termination of the Purchase Agreement and pursue any and all rights and remedies afforded the Purchaser on account of such termination, including the refunding of the Deposit in accordance with Section 3.A.(iii) of the Purchase Agreement.

29.     If the Closing does not occur by September 2, 2026, then (i) 180 Hawthorne's conditional consent to the Sale ("180's Consent") as set forth herein shall immediately terminate, be deemed void and of no force and effect; *provided*, *however*, that 180 Hawthorne may extend its conditional consent to the Sale in its sole and absolute discretion in writing, which writing may be delivered by counsel to 180 Hawthorne to counsel for the Debtors, and to counsel for the Purchaser (including by email); and (ii) any conditional forbearance by 180 Hawthorne related to the Debtors' alleged default under the Final DIP Order (including, but not limited to, the Milestones and adequate protection payments) shall immediately terminate, be deemed void and of no force and effect; *provided*, *however*, that 180 Hawthorne may extend its conditional forbearance in its sole and absolute discretion in writing, which writing may be delivered by counsel to 180 Hawthorne to counsel for the Debtors, and to counsel for the Purchaser (including by email), and 180 Hawthorne shall retain all of its rights and remedies set forth in the Final DIP Order, including but not limited to as set forth in Paragraph 47 therein.  For the avoidance of doubt, in the event that (i) the Debtor terminates the Purchase Agreement because Closing has not occurred solely due to any individuals or horses, including the Backstretch Community, continuing to live on, or otherwise being housed or stabled on, the Acquired Property, (ii) this Court grants relief to any party, including the Office of the United States Trustee, seeking to (a) convert these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code or (b) appoints a trustee, examiner, or receiver in any of the Debtors' chapter 11 cases, (iii) a sale of the Acquired Property is consummated with a party other than the Purchaser, or (iv) the closing does not occur by October 31, 2026, unless otherwise waived by the Purchaser, the Escrow Agent is directed to, and the Debtors shall cause the Escrow Agent to, return the Deposit (each as defined in the Purchase Agreement) to the Purchaser immediately and no later than one business day following any such

termination or occurrence set forth in (i)–(iv); *provided*, *however*, that the foregoing shall in no way prejudice or otherwise limit Purchaser's right, claim, or entitlement to the Deposit or Bid Protections pursuant to the terms of this Order, the Stalking Horse Order, and the Purchaser Agreement.

30.     180 Hawthorne Holdings, LLC is hereby designated as the Back-Up Bidder and its bid is selected as the Back-Up Bid for the Acquired Property.  If a sale to the Back-Up Bidder closes, the Back-Up Bidder shall release any liens it holds against the Debtors' real and personal property interests at 13148 Rivercrest Drive, Crestwood, Illinois.  Notwithstanding anything to the contrary in this Order, the Bidding Procedures Order, or otherwise, approval of any sale of the Acquired Property to any party other than the Purchaser, including to the Back-Up Bidder, shall require further order of the Bankruptcy Court, which shall include an adjudication as to whether any Bid Protections are due and owing to the Purchaser in connection with any such sale.

31.     Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

32.     The Purchase Agreement and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

33.     The Purchase Agreement may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or their creditors.  For the avoidance of doubt, all other modifications, amendments, or supplements that have a material adverse effect on the Debtors' estates or their creditors shall require Court approval.

34.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

35.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, and 9014 or otherwise, the terms and conditions of this Sale Order shall be effective immediately upon entry and the Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.

36.     To the extent there is any conflict between the terms of this Sale Order and the Purchase Agreement, the terms of this Sale Order shall control.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the Purchase Agreement or any other transaction document or the terms of this Sale Order, unless otherwise agreed by the Debtors and the Purchaser (or, with respect to applicable Sales Proceeds, the affected creditors).

37.     The Debtors are authorized to take any actions reasonably required or desirable to give effect to the transactions, provisions, and powers contemplated hereunder.

38.     The Court shall retain exclusive jurisdiction with respect to the terms and provisions of this Sale Order and the Purchase Agreement.

Dated:  July 27, 2026                                      ENTERED:

 

_____
Judge Timothy A. Barnes
United States Bankruptcy Court

## REAL ESTATE AGREEMENT OF SALE

THIS REAL ESTATE AGREEMENT OF SALE (the "**Agreement**") is made this 29th day of June, 2026 (the "**Effective Date**"), by and between **CAREY HEIRS PROPERTIES LLC**, an Illinois limited liability company ("**CHP**"), and **HAWTHORNE RACE COURSE, INC.**, an Illinois corporation **("Hawthorne"**, and together with CHP, **"Seller")** and **ALLIMAC 2023, LLC**, a Delaware limited liability company ("**Buyer**").

## BACKGROUND

A.       On February 27, 2026 (the "**Petition Date**"), Seller and two affiliates (collectively, the "**Debtors**") filed voluntary petitions (the "**Bankruptcy Petitions**") for relief under chapter 11 of title 11, United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "**Bankruptcy Court**") thereby commencing cases that are jointly administered as case no. 26-03505 (the "**Bankruptcy Case**").

B.       WHEREAS, CHP owns the real estate and related improvements located in the Town of Cicero and the Town of Stickney, Cook County, Illinois (APN/Parcel ID(s): 16-33-322-010-0000, 16-33-400-001-0000, 16-33-400-005-0000 and 16-33-400-040-0000), being more particularly described on Exhibit A-1 attached hereto and incorporated hereby (the "**CHP Premises**").

C.       WHEREAS, Hawthorne owns the real estate and related improvements located in the Town of Cicero, Cook County, Illinois (APN/Parcel ID: 16-33-314-046-0000), being more particularly described on Exhibit A-2 attached hereto and incorporated hereby (the "**Hawthorne Premises**").

D.       On May 1, 2026, the Bankruptcy Court entered an order (the "**Bid Procedures Order**") approving the procedures (the "**Bid Procedures**") by which the Debtors, including Seller, may market, solicit bids, and sell their assets, including the CHP Premises and the Hawthorne Premises (collectively, the "**Premises**").  The Bid Procedures Order provides, *inter alia*, that Seller may enter into a stalking horse asset purchase agreement which provides for a break-up fee and other bidder protections, subject to Bankruptcy Court approval. Any terms not defined herein shall have the meanings ascribed in the Bid Procedures Order or the Bid Procedures.

E.       Seller desires to sell the Premises to Buyer, and Buyer desires to purchase the Premises from Seller, upon the terms and conditions set forth herein.

F.       Seller and Buyer each acknowledge and agree that this Agreement and the transactions contemplated by this Agreement (the "**Transactions**") are subject to the Bankruptcy Court's approval.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties hereto, intending to be legally bound hereby, agree as follows:

57927531.5 06/25/2026

1.      **SALE OF PROPERTY**.

Subject to the terms and conditions set forth herein this Agreement, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller: (a) the Premises, including all the buildings and other improvements located thereon, together with all of Seller's right, title, and interest in and to (i) any land lying in the bed of any street, road or alley, open or proposed, in front, abutting or adjoining the subject property, (iii) any easement, privilege, license or right-of-way inuring to the benefit of the subject property (iv) the appurtenances and hereditament belonging or otherwise pertaining to the subject property, and (v) any and all fixtures situate at the Premises (collectively, the "**Real Property**"); and (b) all tangible personal property owned by Seller and located at or used in connection with the Premises (the "**Personal Property,**" and together with the Real Property, the "**Property**").

2.      **PURCHASE PRICE**. The total purchase price to be paid by Buyer to Seller for the Property (the "**Purchase Price**") shall be NINETY MILLION DOLLARS ($90,000,000), subject to adjustments and prorations as set forth in this Agreement, payable as follows:

A.      Within two (2) business days after the Effective Date, the sum of FOUR MILLION FIVE HUNDRED THOUSAND DOLLARS ($4,500,000) (the "**Deposit**") 5% of the Purchase Price, to be deposited with Commonwealth Land Title Insurance Company, 2390 E. Camelback Rd, Suite 230, Phoenix, AZ 85016 (Attn: Michael Zotika, MZotika@cltic.com) (the "**Escrow Agent**"). Escrow Agent shall hold the Deposit, in trust, in an interest-bearing account, with all interest thereon accruing to the benefit of Buyer and credited against the Purchase Price at Closing, pursuant to the terms of this Agreement. The Deposit shall be fully refundable to Buyer if any of Buyer's conditions precedent to Closing are not satisfied.

B.      The balance of the Purchase Price in the sum of EIGHTY-FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($85,500,000), plus or minus any net cash adjustments made pursuant to the terms of this Agreement, is to be paid by Buyer to Seller at the Closing (hereinafter defined), in immediately available federal funds, subject to adjustments, prorations and credits as herein provided.

3.      **COVENANTS PRIOR TO CLOSING**. Between the Effective Date and the date of Closing:

A.      Bankruptcy Issues.

(i)      The purchase and sale of the Property will be subject to competitive bidding in accordance with the terms of the Bid Procedures Order and the Bid Procedures.

(ii)      Stalking Horse Designation.  Seller confirms that it is critical to the process of arranging a sale of the Property to proceed by selecting Buyer as its stalking horse to enter into this Agreement in order to present the Bankruptcy Court with arrangements for obtaining the highest realizable price for the Property.  In recognition of the foregoing, Seller acknowledges that Buyer would not have invested the effort in negotiating and documenting the transaction provided for herein and incurring the obligations to pay its outside advisors and legal counsel if Buyer were not allowed the Bid Protection set forth below.

2

57927531.5 06/25/2026

(iii)     Bid Protections.   Subject to Bankruptcy Court approval, Seller hereby grants to Buyer the following bid protections (the "**Bid Protections**"): (i) in the event that Buyer is not the prevailing purchaser of the Property, then Buyer shall be entitled to a Break-up Fee in the amount of two percent (2%) of the Purchase Price plus an Expense Reimbursement for Buyer's actual, reasonable and documented out-of-pocket costs and expenses (including legal and advisor fees) in an amount up to $250,000; (ii) an Initial Overbid must equal or exceed the sum of: (A) the Purchase Price plus (B) the Break-up Fee and Expense Reimbursement; plus (C) $500,000; and (iii) any subsequent bids, after the Initial Overbid, must exceed the prior bid by at least $500,000. No later than two (2) Business Days following entry into this Agreement, Seller shall file, or cause to be filed, any motion or pleading seeking approval from the Bankruptcy Court of the Bid Protections as set forth in this Agreement (the "Bid Protections Order").   The Bid Protections Order shall be acceptable to the Buyer.   The Bankruptcy Court shall enter the Bid Protections Order no later than seven (7) Business Days following entry into this Agreement. In the event the Bid Protections Order is not entered within such seven (7) Business Day period, Buyer shall have the right to terminate this Agreement upon written notice to Seller, in which event the Deposit shall be refunded to Buyer and the parties shall be released from all liabilities and obligations under this Agreement, except those which expressly survive termination.   The obligations to pay the Break-Up Fee and Expense Reimbursement, collectively defined as the Bid Protections, (a) shall constitute allowed super-priority administrative expense claims against Seller and Seller's debtor-Affiliates under Sections 503(b) and 507 of the Bankruptcy Code, (b) shall not be subordinate to any other administrative claims against Seller or Seller's debtor-Affiliates, (c) and shall survive termination of this Agreement. At any auction, Buyer shall be entitled to credit bid the full amount of the Bid Protections, which credit shall apply to the Initial Overbid and to each subsequent bid by Buyer. If Closing does not occur due to a breach by Seller or failure of a closing condition, Buyer shall be entitled to the Break-up Fee and Expense Reimbursement on a priority basis, which amounts shall be paid to Buyer within five (5) Business Days of Buyer becoming entitled thereto.

(iv)     Seller and Buyer shall each use their reasonable efforts, and shall cooperate, assist and consult with each other to secure, the entry of an order (the "**Sale Order**") of the Bankruptcy Court in the Bankruptcy Case in form and substance acceptable to Seller and Buyer containing provisions, including without limitation: (i) approving this Agreement, (ii) authorizing the sale of the Property pursuant to Section 363 of the Bankruptcy Code, (iii) authorizing the Transactions, and (iv) providing that this Agreement and the Transactions are undertaken by Buyer and Seller at arm's length, without collusion, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, that Buyer and Seller are entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code are not applicable. The Sale Order shall be entered no later than thirty (30) days following the Effective Date.

(v)     This Agreement shall automatically terminate if Buyer is not the Successful Bidder or Backup Bidder.   In such event, Escrow Agent shall return the Deposit to Buyer promptly, without further consent or instruction from Seller, and upon the making of such refund this Agreement shall terminate and neither party shall thereafter have any rights hereunder against the other, excepting the provisions hereof that expressly survive termination of this Agreement. This Agreement shall also be subject to termination by Purchaser upon written notice to Seller if (a) Seller breaches in any material respect its covenants related to the Bid Procedures

3

Order, the Bid Protections Order or the Sale Order, (b) the Bankruptcy Case is dismissed or converted to a proceeding under Chapter 7 of the Bankruptcy Code, a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Bankruptcy Case, or an examiner is appointed with expanded powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code, or (c) the Sale Order has not been entered within thirty (30) days following the Effective Date. Upon any such termination, the Deposit shall be refunded to Buyer and the parties shall be released from all liabilities and obligations under this Agreement, except those which expressly survive termination; provided, however, that any termination pursuant to clause (c) above shall not entitle Purchaser to payment of the Bid Protections.

(vi)     Seller acknowledges and agrees that notwithstanding anything to the contrary herein, in the Bidding Procedures, the Bid Protections Order, or the Bidding Procedures Order, Seller shall not be permitted to solicit, encourage, or accept any bid from any party other than the Buyer following the closing of the Auction.

**4.     CLOSING; CLOSING DELIVERIES**.

A.     <u>Closing</u>. The closing ("**Closing**") shall occur on the later of: (a) July 30, 2026; and (b) the first business day following the date on which the Sale Order is entered by the Bankruptcy Court (or, at Buyer's election, the first business day following the date on which the Sale Order becomes a final order) (such date the "**Closing Date**").  Buyer acknowledges and agrees that it is an express condition precedent to Seller's and Buyer's obligations to complete Closing that the Bankruptcy Court has entered the Sale Order. Closing shall be held via escrow through the services of Commonwealth Land Title Insurance Company, 2390 E. Camelback Rd, Suite 230, Phoenix, AZ 85016 (Attn: Michael Zotika, MZotika@cltic.com) (the "**Title Company**") at which time all documents legally required to carry out the terms of this Agreement shall be executed and delivered upon satisfaction of applicable escrow conditions.

B.     <u>Seller's Closing Deliveries</u>. At Closing, Seller shall execute (or cause to be executed) and deliver (acknowledged where necessary) to Buyer or the Title Company, as applicable:

(i)     special warranty deeds (the "**Deeds**"), conveying title to the Premises to Buyer in the form attached hereto as Exhibit B;

(ii)     bills of sale (the "**Bills of Sale**") conveying the Personal Property to Buyer in the form attached hereto as Exhibit C;

(iii)     an affidavit which states that no Seller is a "foreign person" as set forth in Section 1445 of the Internal Revenue Code of 1986, as amended;

(iv)     the Closing Date Certificate (defined below);

(v)     any real property transfer declarations required by the jurisdiction(s) in which the Premises is located;

(vi)     transfer stamps required by the jurisdiction(s) in which the Premises is located;

4

(vii)    such other affidavits and documents as are reasonably required by Buyer's title insurance company to consummate the transaction contemplated by this Agreement; and

(viii)   a signed settlement statement.

C.    Buyer's Closing Deliveries. At Closing, Buyer shall execute and deliver (acknowledged where necessary) to Seller or Buyer's Title Company, as applicable:

(i)    the balance of the Purchase Price;

(ii)    a signed counterpart of the Assignment;

(iii)    such affidavits and other documents as are reasonably required by the Buyer's title insurance company to consummate the transaction contemplated by this Agreement; and

(iv)    a signed settlement statement.

5.    **APPORTIONMENTS**. At Closing, the following apportionments shall be made:

A.    Real Estate Taxes. Real estate taxes shall be apportioned on a per diem basis on the basis of the fiscal or calendar year of each taxing authority, with the date of Closing belonging to Buyer.

B.    Water, Sewer and Other Utility Charges. Any water, sewer or other utility charges assessed against or incurred with respect to the Premises, with the date of Closing belonging to Buyer.

C.    Real Estate Transfer Taxes. All real estate transfer taxes imposed by any governmental body or bodies shall be split equally between Buyer and Seller.

D.    Other Closing Costs. Buyer shall be responsible for the following fees and expenses in connection with the Closing: (i) the cost of issuance of the Title Policy, (ii) the cost of issuance of any lender's policy of title insurance, (iii) the cost of recording any mortgage granted by Buyer, and (iv) all of the escrow fees charged by the Title Company. Seller shall be responsible for the costs of recordation of the Deeds. Each party shall pay its own expenses incurred in connection with this Agreement and the Transactions contemplated hereby, including, without limitation, all accounting and legal fees.

6.    **REPRESENTATIONS AND WARRANTIES**.

A.    Representations and Warranties of Seller. In order to induce the Buyer to enter into this Agreement and purchase the Property, and with full knowledge that the Buyer is relying thereon, the Seller hereby warrants and represents to the Buyer as follows:

(i)    Authorization. Seller has been duly organized and is validly existing under the laws of the State of Illinois. Subject to the entry of the Sale Order by the Bankruptcy

57927531.5 06/25/2026

Court, Seller has full legal capacity, right, power and authority to enter into this Agreement. Subject to the entry of the Sale Order by the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions are within Seller's powers and have been duly authorized by all necessary actions on the part of Seller. Subject to entry of the Sale Order by the Bankruptcy Court, this Agreement constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms. The person signing this Agreement on behalf of Seller is authorized to do so.

(ii)     Condemnation/Eminent Domain. To the best of Seller's knowledge, there are no condemnation or eminent domain proceedings pending or contemplated against the Property or any part thereof, and Seller has received no notice of the desire or intention of any public authority to take or use the Property or any part thereof.

Any change of facts or circumstances not intentionally caused by Seller and arising or discovered after the date hereof that renders any of the representations and warranties of Seller set forth in this Agreement inaccurate, incomplete, incorrect or misleading in any material respect (each a "**Permitted Change**") shall not constitute a breach or default by Seller under this Agreement, but shall constitute a failure of the Conditions Precedent to Buyer's obligation to close.

B.     <u>Representations and Warranties of Buyer</u>. In order to induce the Seller to enter into this Agreement, the Buyer hereby warrants and represents to the Seller that:

(i)     <u>Due Authorization</u>. Buyer is a duly formed and validly existing limited liability company in good standing under the laws of the State of Delaware. Buyer has full power and authority to enter into this Agreement, to perform this Agreement and to consummate the Transactions contemplated hereby. The execution, delivery and performance of this Agreement and all documents contemplated hereby by Buyer have been duly and validly authorized by all necessary action on the part of Buyer, and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under any indenture, agreement and/or instrument to which Buyer is a party. This Agreement is a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting the rights of creditors generally.

(ii)     <u>OFAC</u>. Neither Buyer nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents is, nor will they become, a person or entity with whom United States persons or entities are restricted from doing business under regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including, without limitation, the September 24, 2001, Executive Order Blocking Premises and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities.

(iii)     <u>Consents</u>. No authorization, consent or approval of any governmental authority (including, without limitation, courts) is required for the execution and delivery by Buyer of this Agreement or the performance of its obligations hereunder.

6

57927531.5 06/25/2026

(iv)     <u>Bankruptcy Matters</u>. Buyer has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by its creditors, suffered the appointment of a receiver to take possession of substantially all of its assets, suffered the attachment or other judicial seizure of substantially all of its assets, admitted its inability to pay its debts as they come due, or made an offer of settlement, extension or composition to its creditors generally.

(v)     <u>Conflict</u>. Neither the execution, delivery or performance of this Agreement nor compliance herewith (A) conflicts or will conflict with or results or will result in a breach of or constitutes or will constitute a default under (x) the articles of incorporation and by-laws or other organization certificate and/or partnership or operating agreement of Buyer, or (y) to Buyer's knowledge, any law or any order, writ, injunction or decree of any court or governmental authority, or (B) results in the creation or imposition of any lien, charge or encumbrance upon its premises pursuant to any such agreement or instrument.

(vi)     <u>Sufficient Funds; Adequate Assurance</u>. Buyer has and will have at the Closing immediately available funds sufficient for the satisfaction of all of its obligations under this Agreement, including the payment of the Purchase Price, and all fees, expenses of and other amounts required to be paid by Buyer in connection with the Transactions contemplated hereby. Buyer's obligations under this Agreement are not contingent upon Buyer procuring financing for the Transactions contemplated hereby.

(vii)     <u>No Collusion</u>. Buyer represents and warrants that it has not engaged in any collusion with respect to its bid on the Property and the Transactions contemplated hereunder.

(viii)     <u>No Claims</u>. There are no material claims, actions, suits, proceedings, or investigations pending, or to the current actual knowledge of Buyer's officers, members and directors, without an obligation of independent inquiry, threatened against Buyer that could materially impair Buyer's ability to fulfill and perform Buyer's obligations under this Contract.

**7.     <u>AS-IS SALE</u>**. Buyer is a sophisticated investor and its decision to purchase the Property is based upon its own independent expert evaluations of such facts and materials deemed relevant to Buyer and its agents. Buyer has not relied in entering into this Agreement upon any oral or written information from the Seller or any of the Seller's agents, consultants, advisors or representatives except the Seller's Representations expressly set forth in this Agreement. Without limiting the generality of the foregoing, except as otherwise expressly provided herein, **BUYER ACKNOWLEDGES AND AGREES WITH SELLER THAT BUYER IS PURCHASING THE PROPERTY IN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION ON THE CLOSING DATE, INCLUDING ANY LATENT DEFECT OR NON-DISCOVERABLE DEFECT, SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER AND SELLER DISCLAIMS AND BUYER WAIVES ANY AND ALL WARRANTIES, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR AS TO ANY ENVIRONMENTAL MATTERS. SELLER IS NOT LIABLE OR BOUND IN ANY**

7

**MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS, REAL ESTATE BROKERS, "SET-UPS," OFFERING MEMORANDA OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, ADVISOR, CONSULTANT, AGENT, EMPLOYEE, REPRESENTATIVE OR OTHER PERSON. THE FOREGOING SHALL NOT RELEASE SELLER FROM ITS EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS AGREEMENT OR IN ANY DOCUMENT DELIVERED BY SELLER AT CLOSING.**

8. **CONDITIONS PRECEDENT TO CLOSING**.

A. <u>Conditions Precedent</u>. The obligation of the parties to close on the sale of the Property in accordance with this Agreement is subject to satisfaction of each of the following conditions (the "**Conditions Precedent**"), any of which, other than in Section 8.A (iii), may be waived in whole or in part by the applicable party on or prior to the Closing:

(i) <u>Certificate of Representations and Warranties</u>. Each party's representations set forth in this Agreement above shall be true and correct in all material respects on the Closing Date, as though made on such date (the "**Representation Condition**"). For purposes of determining whether the Representation Condition has been satisfied, each party will deliver to the other at Closing a certificate (the "**Closing Date Certificate**") certifying that all of the representations and warranties remain true and correct, as of the Closing Date and in all material respects, except for changes and qualifications specified in such Closing Date Certificate, such that the Closing Date Certificate is true and accurate in all material respects. If either party's representations are untrue in any material respect as indicated on the Closing Date Certificate (other than as a result of a Permitted Change), it shall be considered an event of default and the parties shall have the respective rights set forth in Section 11 below.

(ii) <u>Compliance with Covenants</u>. Each party shall have performed and complied, in all material respects, with all of the material terms, conditions and covenants required by this Agreement to be performed and complied with prior to or on the Closing Date.

(iii) <u>Entry of Sale Order</u>.

(a) The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case authorizing the Transactions and approving this Agreement under Sections 105(a), 363(b), 363(f) and 363(m) of the Bankruptcy Code, in form and substance acceptable to Seller and Buyer, providing that the Property is sold free and clear of all liens, claims, encumbrances and interests pursuant to Section 363(f) of the Bankruptcy Code, and the Sale Order shall contain findings that Buyer acquired the Property in good faith, for fair value, in an arm's length transaction, and as of the Closing Date the Sale Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed; provided that Buyer may, in its sole discretion, waive the requirement that the Sale Order not be stayed (and the requirement in Section 4.A that the Sale Order be a final order) and proceed to Closing without prejudice to Buyer's protections under Section 363(m) of the Bankruptcy Code;

8

(b)      the Bankruptcy Court shall have either (i) waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Sale Order or (ii) such stay shall have expired pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Sale Order; and

(c)      No injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

(iv)      <u>Title and Survey</u>. Buyer shall have received, at standard rates, an ALTA owner's policy of title insurance (or an irrevocable, unconditional commitment to issue the same) with extended coverage, in the amount of the Purchase Price, insuring good, clear, record and marketable fee simple title to the Premises in Buyer, free and clear of all liens, claims and encumbrances pursuant to the Sale Order. Seller shall deliver to Buyer copies of its existing surveys of the Premises and a customary owner's affidavit and gap undertaking sufficient for the Title Company to issue such policy without exception for the standard or "gap" exceptions or for any monetary or mechanics' liens.

B.      <u>Buyer's Rights If Conditions Precedent Are Not Satisfied</u>. Except as provided in Section 8.D below, if, on the Closing Date, any of the Conditions Precedent to the Buyer's obligation to consummate the purchase of the Property have not been satisfied, (except for the condition precedent set forth in Section 8.A (iii) above), and provided the Buyer is not in default of its obligations herein this Agreement, the Buyer shall elect to either (1) waive such of those conditions as are unsatisfied and proceed to Closing without abatement of the Purchase Price; or (2) terminate this Agreement, in which latter event, the Deposit shall be refunded to Buyer and the parties hereto shall be released from all liabilities and obligations under this Agreement, except those which expressly survive termination of this Agreement.  Except as provided in Section 8.D below, if, on the Closing Date, the condition precedent set forth in Section 8.A.(iii) above is not satisfied, and provided the Buyer is not in default of its obligations herein this Agreement, the Deposit shall be refunded to Buyer and the parties hereto shall be released from all liabilities and obligations under this Agreement, except those which expressly survive termination of this Agreement.  The foregoing shall not limit the Buyer's rights in the event the Conditions Precedent are not satisfied as a result of the Seller's default in accordance with Section 11.B below.

C.      <u>Seller's Rights If Conditions Precedent Are Not Satisfied</u>. Except as provided in Section 8.D below, in the event the Sale Order to sell the Property to Buyer is not entered by August 31, 2026, this Agreement shall automatically terminate, the Deposit shall be returned to Buyer, and neither party shall have any other right, obligation, or liability hereunder (except for those which expressly survive). If, on the Closing Date, any of the other Conditions Precedent to Seller's obligation to consummate the purchase of the Property have not been satisfied (except for the condition precedent set forth in Section 8.A.(iii) above), Seller shall elect to either (1) waive such of those conditions as are unsatisfied and proceed to Closing without abatement of the Purchase Price; or (2) terminate this Agreement, in which latter event, the Deposit shall be refunded to Buyer and the parties hereto shall be released from all liabilities and obligations under this Agreement, except those which expressly survive termination of this Agreement. The foregoing shall not limit Seller's rights in the event the Conditions Precedent are not satisfied as a result of Buyer's default in accordance with Section 11.A below.

9

D.      Backup Bidder. If Buyer is determined to be the Backup Bidder for the Property, Buyer shall remain bound by the terms of this Agreement until the earlier of (1) closing of the sale to the Successful Bidder, or (2) forty-five (45) days after the conclusion of the Auction.

**9.      CONDEMNATION OR CASUALTY**.  If, prior to Closing, all or any material part of Premises is destroyed or damaged as a result of fire or any other casualty or is taken by eminent domain proceedings or a notice of any eminent domain proceeding with respect to the Premises or any part thereof is received by the Seller, the Seller shall immediately give notice thereof. In the event of a casualty or eminent domain taking which affects less than a material part of the Premises, Buyer shall remain obligated to proceed to Closing under the terms and conditions of this Agreement, without abatement or reduction of the Purchase Price; provided, however, Seller shall assign, transfer, and pay to Buyer any and all insurance proceeds or condemnation awards actually received by Seller at Closing. In the event of a casualty or eminent domain taking which affects a material part of the Premises, Buyer shall have the right, in its sole discretion, to terminate this Agreement by providing written notice to Seller within five (5) business days after Seller's written notice to Buyer of such casualty or eminent domain taking, in which event the Deposit shall be refunded to Buyer and the parties hereto shall be released from all liabilities and obligations under this Agreement, except those which expressly survive termination of this Agreement. For the purposes of this Agreement, a "material part" shall be deemed damage by casualty or condemnation of a portion of any portion of the Premises in an amount or having a value of equal to or greater than $250,000.00.

**10.      BUYER'S BROKERS**. Seller shall cause to be paid a broker's commission to Hilco Real Estate, LLC ("**Seller's Broker**") in accordance with its Real Estate Consulting, Advisory & Sales Services Agreement.  Buyer warrants to Seller that no finders, real estate brokers or other persons entitled to claim a fee or commission have interests in this Transaction, other than NAI Hiffman / Hiffman National ("**Buyer's Broker**"). Any fees and commissions owing to Buyer's Broker shall be paid by Buyer.  Buyer represents that it has not had any dealings with any other person which may entitle that person to a fee or commission. Buyer hereby agrees to indemnify and hold Seller harmless against any losses, costs or expenses (including attorney's fees) arising out of any claim of any broker or finder engaged by the party breaching the representation above. The terms of this Section 10 shall survive the Closing Date.

**11.      DEFAULT**.

A.      By Buyer. If the Buyer fails to fulfill or perform any material term or condition of the Agreement required to be performed by Buyer, and/or fails to complete Closing and such failure is not a result of Seller's default hereunder, and in either case such failure continues for ten (10) days after written notice from Seller, then as the Seller's sole and exclusive remedy, Seller may retain the Deposit as liquidated damages and not a penalty, such being agreed between Buyer and Seller to be a necessary condition to this Agreement to compensate the Seller for expenses and expenditures incurred and made in connection therewith, the damages sustained as a result of the Buyer's non-compliance with this Agreement. Thereupon, this Agreement shall become null and void and of no further force and both parties shall be released of further liability and obligations hereunder, except for those liabilities and obligations which expressly survive termination of this Agreement.

10

57927531.5 06/25/2026

B.  By Seller. If the Seller defaults in the performance of its obligations under this Agreement and such failure continues for ten (10) days after written demand from Buyer, or if Buyer determines that any of Seller's Representations were untrue in any material respect as of the Effective Date, Buyer, as Buyer's sole and exclusive remedy, shall either (a) exercise any right that Buyer may have to compel specific performance of Seller's obligations hereunder, which action for specific performance must be filed no later than thirty (30) days after the default, or (b) terminate this Agreement, in which latter event the Seller shall return the Deposit to Buyer, whereupon, this Agreement shall become null and void and of no further force and both parties shall be released of further liability and obligations hereunder, except for those liabilities and obligations which expressly survive termination of this Agreement.

C.  Prevailing Party. If Seller or Buyer commences any legal action involving this Agreement against one another, or Buyer makes Seller a party to any legal action involving this Agreement, the prevailing party shall be entitled to be reimbursed for all reasonable attorneys' fees and court costs in connection with any such action.

**12.  GENERAL PROVISIONS**.

A.  Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns. Buyer shall have the right to assign this Agreement, in whole or in part, to one or more entities that control, are controlled by, or are under common control with Buyer, and to direct that title to all or any portion of the Property be conveyed to any such affiliate or designee. In the event Buyer assigns this Agreement, then notwithstanding anything herein to the contrary, (i) Buyer shall not be released from any obligation hereunder; and (ii) no such assignment shall have the effect of delaying the Closing in any respect.

B.  Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior negotiations, understandings and agreements of any nature whatsoever with respect to the subject matter hereof. No amendment, waiver or discharge of any provision of this Agreement shall be effective against either party unless that party shall have consented thereto in writing.

C.  Governing Law. This Agreement shall be governed, interpreted, and construed in accordance with the internal laws of the State of Illinois without giving effect to principles of conflicts or choice of laws.

D.  Notices.  Any and all notices, demands, consents, approvals, offers, elections and other communications required or permitted under this Agreement shall be deemed adequately given if in writing and the same shall be delivered either (i) in hand, (ii) for next Business Day delivery by Federal Express or similar expedited commercial carrier, delivery charges prepaid, or (iii) via electronic mail. Notices by hand or federal express or email shall be deemed given when received, provided that a notice by hand or email which is received after 5:00 p.m. (Central Time) shall be deemed received the next day.  All such notices shall be addressed:

(a)  If to the Seller, addressed as follows:

11

57927531.5 06/25/2026

Carey Heirs Properties LLC
Hawthorne Race Course, Inc.
3501 South Laramie Ave.
Stickney, Illinois 60402
Attn:  Timothy S. Carey
Email:  timcarey@hawthorneracecourse.com

With a copy to:
Saul Ewing LLP
161 North Clark St., Suite 4200
Chicago, Illinois 60601
Attn:  Barry A. Chatz
          David A. Golin
Email:  barry.chatz@saul.com
          david.golin@saul.com

(b)      If to Buyer, addressed as follows:

ALLIMAC 2023, LLC
c/o NAI Hiffman | Hiffman National
One Oakbrook Terrace
Suite 400
Oakbrook Terrace, IL 60181
Attn: Adam Roth
Email: aroth@hiffman.com

With a copy to:
Kirkland & Ellis LLP
2049 Century Park East, 37th Floor
Los Angeles, CA 90067
Attn: Kevin M. Ehrhart, P.C.
Email: kevin.ehrhart@kirkland.com

By notice given as herein provided, the parties hereto shall have the right from time to time and at any time during the term of this Agreement to change their respective addresses effective upon receipt by the other parties of such notice and each shall have the right to specify as its address any other address within the United States of America. The attorneys of Buyer and Seller are authorized to give any notice specified in this Agreement on behalf of their respective clients.

E.      Captions. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

F.      Business Days. If the last day for performance of any act or exercise of any right falls on a Saturday, Sunday or legal holiday, such last day for performance or exercise of such right shall be extended to the next day that is not a Saturday, Sunday or legal holiday.

12

57927531.5 06/25/2026

G.      Counterparts. This Agreement may be executed in counterparts, including Docu-Sign or PDF signatures, which together shall constitute one agreement. The contract formation pursuant to this Agreement and record-keeping of this Agreement through electronic means shall have the same legal validity and enforceability as a manually executed or paper-based recordkeeping system to the fullest extent permitted by applicable Governmental Requirements, including without limitation, the Federal Electronic Signatures in Global and National Commerce Act, the Uniform Electronic Transactions Act or any similar state law, and the parties to this Agreement hereby waive any objection to the contrary.

H.      Waiver; Modification.  The failure by the Buyer or Seller to insist upon or enforce any of their rights shall not constitute a waiver thereof, and except to the extent conditions are waived by the express terms of this Agreement, nothing shall constitute a waiver of the Buyer's right to insist upon strict compliance with the terms of this Agreement.  Either party may waive the benefit of any provision or condition for its benefit which is contained in this Agreement.  No oral modification of this Agreement shall be binding upon the parties and any modification must be in writing and signed by the parties.  Time is of the essence for performance under this Agreement.

I.      Construction. Each party hereto hereby acknowledges that all parties hereto participated equally in the drafting of this Agreement and that, accordingly, no court construing this Agreement shall construe it more stringently against one party than the other.

J.      Confidentiality. Seller and Buyer will not, without the prior written consent of the other, make any public announcement about the purchase and sale transaction contemplated hereby or of any of the terms or conditions hereof, including without limitation, the Purchase Price, or the results of any inspection, test, survey, or study conducted by Buyer.  Neither party will transmit any of the information contained in this Agreement or any document obtained by Seller or Buyer in connection with this Agreement to any third party except for (i) disclosures to such party's counsel, consultants, lenders, and other advisors engaged to help such party in connection with the sale of the Property pursuant to this Agreement, (ii) disclosures to any parties providing Seller with DIP financing, and (iii) disclosures to any of Buyer's or Seller's members or board members, officers or employees (collectively, the "**Permitted Parties**"), on a need-to-know basis, provided such Permitted Parties are advised of the confidentiality and nondisclosure obligations of Seller and, to the extent permitted by law, agree to be bound thereby.  Such restrictions shall not apply to (i) disclosures that are required to be made pursuant to law or pursuant to any administrative or judicial action, including to the Bankruptcy Court or as may be required in connection with the Bankruptcy Case, or (ii) which is or becomes part of the public domain through no fault of the party against whom this enforcement of this provision is sought.  Each party agrees to indemnify and hold the other harmless from and against any loss, injury, damage, claim, lien, cost or expenses, including attorneys' fees, arising from a breach of the foregoing confidentiality agreement.  The covenants set forth in this Section will survive the termination of this Agreement or Closing.

**-SIGNATURES APPEAR ON FOLLOWING PAGE-**

13

Cicero/Stickney

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed the day and year first above written.

**SELLER:**

CAREY HEIRS PROPERTIES LLC

By: _____

Name: _Tim Carey_

Title: _Manager_

HAWTHORNE RACE COURSE, INC.

By: _____

Name: _Tim Carey_

Title: _President_

**BUYER:**

ALLIMAC 2023, LLC,
a Delaware limited liability company

By: _____

Name: _Carrie L. Tillman_

Title: _Director_

57927531.5 06/25/2026

## Exhibit A-1

### Legal Description – CHP Premises

PARCEL 1:

ALL THAT PART OF THE SOUTHEAST 1/4 OF SECTION 33, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, (EXCEPT THE EAST 50.00 FEET, LYING NORTH OF THE SOUTH LINE OF OGDEN DITCH ALSO CALLED WEST FORK OF SOUTH BRANCH OF THE CHICAGO RIVER), LYING NORTH OF A LINE, DESCRIBED AS FOLLOWS, TO WIT:
BEGINNING AT A POINT ON THE EAST LINE OF SOUTHEAST 1/4 OF SAID SECTION, A DISTANCE OF 1213.18 FEET NORTH OF THE SOUTHEAST CORNER THEREOF; THENCE WEST AT AN ANGLE OF 90 DEGREES SOUTH TO WEST, A DISTANCE OF 40.00 FEET; THENCE SOUTHWESTERLY ON A LINE WITH AN ANGLE OF 164 DEGREES, 24 MINUTES, MEASURED FROM EAST TO SOUTHWEST FROM LAST DESCRIBED LINE, A DISTANCE OF 259.98 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 36 MINUTES TO LEFT FROM LAST DESCRIBED LINE, A DISTANCE OF 849.63 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 17 MINUTES TO THE LEFT FROM LAST DESCRIBED LINE, A DISTANCE OF 234.76 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 04 DEGREES, 28 MINUTES, 15 SECONDS TO THE RIGHT, FROM LAST DESCRIBED LINE, A DISTANCE OF 210.14 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 02 DEGREES, 54 MINUTES, 30 SECONDS TO THE RIGHT FROM LAST DESCRIBED LINE, A DISTANCE OF 482.83 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 06 MINUTES, 52 SECONDS TO THE LEFT FROM THE LAST DESCRIBED LINE, A DISTANCE OF 411.74 FEET; THENCE SOUTHWESTERLY ON A LINE WITH A DEFLECTION OF 03 DEGREES, 13 MINUTES, 30 SECONDS TO THE LEFT FROM THE LAST DESCRIBED LINE, A DISTANCE OF 259.35 FEET TO A POINT ON THE WEST LINE OF SAID SOUTHEAST 1/4, A DISTANCE OF 606.821 FEET NORTH OF THE SOUTHWEST CORNER OF SAID SOUTHEAST 1/4, IN COOK COUNTY, ILLINOIS.

PARCEL 2:

THAT PORTION OF THE SOUTHEAST 1/4 OF SECTION 33, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE EAST LINE OF SAID SOUTHEAST 1/4 OF SECTION 33, WHICH IS 1174.48 FEET NORTH OF THE SOUTHEAST CORNER OF SAID SECTION AND RUNNING THENCE NORTH ALONG SAID EAST LINE OF THE SOUTHEAST 1/4, A DISTANCE OF 38.70 FEET TO A POINT 1213.18 FEET NORTH OF SAID SOUTHEAST CORNER; THENCE WEST PERPENDICULAR TO SAID EAST LINE OF SOUTHEAST 1/4, A DISTANCE OF 40.00 FEET; THENCE SOUTHWESTERLY ON A LINE WITH AN ANGLE OF 164 DEGREES, 24 MINUTES, MEASURED FROM EAST TO SOUTHWEST  FROM LAST DESCRIBED LINE, A DISTANCE OF 259.98 FEET TO A POINT WHICH IS 290.41 FEET MEASURED PERPENDICULAR WEST OF SAID EAST LINE OF THE SOUTHEAST 1/4 AND THENCE EASTERLY, A DISTANCE OF 292.08 FEET TO THE POINT OF

Exhibit A-1

BEGINNING; EXCEPTING FROM THE ABOVE DESCRIBED LAND THE EAST 50.00 FEET THEREOF FALLING IN CICERO AVENUE, IN COOK COUNTY, ILLINOIS.

PARCEL 3: INTENTIONALLY DELETED

PARCEL 4:

THAT PART OF THE NORTH 1/2 OF THE SOUTH 1/2 OF BLOCK 'A' (EXCEPT THE EAST 80.00 FEET AND EXCEPT THE WEST 8.00 FEET) IN CALVIN F. TAYLOR'S SUBDIVISION OF THE EAST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 33, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING SOUTH OF THE SOUTH LINE OF WEST 37TH STREET AND NORTH OF THE NORTH LINE OF WEST 38TH STREET, IN COOK COUNTY, ILLINOIS.

Exhibit A-2

57927531.5 06/25/2026

**Exhibit A-2**

**Legal Description – Hawthorne Premises**

PARCEL 5:
LOTS 45 AND 46 IN HAWTHORNE MANOR SUBDIVISION NUMBER 1 IN THE EAST
1/2 OF THE SOUTHWEST 1/4 OF SECTION 33, TOWNSHIP 39 NORTH, RANGE 13 EAST
OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Exhibit A-3

**Exhibit B**

**Form of Deed**

THIS INSTRUMENT PREPARED BY:

Saul Ewing LLP
161 N. Clark, Suite 4200
Chicago, IL 60601
Attn:  Thomas Goodwyn, Esq.

AFTER RECORDING RETURN TO:

_____
_____
_____
_____
.

MAIL TAX BILLS TO:

_____
_____
_____
_____

Above Space for Recorder's Use Only

**SPECIAL WARRANTY DEED**

This SPECIAL WARRANTY DEED, made as of _____, 2026 by _____, a(n) _____, having an address at _____ ("**Grantor**"), to and in favor of _____, a(n) _____, having an address at having an address at _____ ("**Grantee**").

WITNESSETH, that Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00), and other valuable consideration in hand paid by Grantee, the receipt and sufficiency whereof is hereby acknowledged, by these presents does REMISE, RELEASE, ALIEN AND CONVEY unto Grantee, and to its successors and assigns, FOREVER, all interest in and to the real estate situated in the County of Cook and State of Illinois known and described on Exhibit A attached hereto and by this reference made a part hereof, including all improvements located thereon (collectively, the "**Premises**") free and clear of all liens, claims, encumbrances and interests, pursuant to Section 363(f) of the United States Bankruptcy Code.

Together with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim or demand whatsoever, of the Grantor, either in law or equity, of, in and to the Premises, with the hereditaments and appurtenances:

Exhibit B-1

57927531.5 06/25/2026

TO HAVE AND TO HOLD the Premises as above described, with the appurtenances, unto the Grantee, its successors and assigns forever.

And the Grantor, for itself, and its successors and assigns, does covenant, promise and agree, to and with the Grantee, its successors and assigns, that during the period that Grantor has owned title to the Premises, it has not done or suffered to be done anything whereby the Premises hereby granted is, or may be, in any manner encumbered or charged, except for the Permitted Exceptions; and that the Grantor will WARRANT AND FOREVER DEFEND the Premises against all persons lawfully claiming by, through or under the Grantor, but not otherwise.

**[SIGNATURE PAGE FOLLOWS]**

Exhibit B-2

57927531.5 06/25/2026

**IN WITNESS WHEREOF**, Grantor has signed and sealed and delivered this instrument as of the day and year first above written.

**GRANTOR:**           _____, a(n)
                       _____

                                       By:      _____

                                       Name:  _____

                                       Its:      _____

STATE OF _____          )

                             ) ss
COUNTY OF _____         )

    I, the undersigned, a Notary Public in and for the State and County provided above, do hereby certify that _____, a _____ of _____, a(n) _____ , on behalf of such entity, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said company for the uses and purposes therein set forth.

    GIVEN under my hand and notarial seal this _____ day of _____, 20__.

                                       _____
                                       Notary Public

My commission expires on _____

Exhibit B-3

57927531.5 06/25/2026

## **Exhibit A**

## **Legal Description**

Tax Identification Number(s): _____

Common Address: _____

Exhibit B-4

**Exhibit C**

**Form of Bill of Sale**

**BILL OF SALE**

THIS BILL OF SALE (this "**Bill of Sale**") is made as of _____, 2026, from _____ ("**Seller**"), to [_____], a [_____ _____] ("**Buyer**").

**RECITALS**

A.      Concurrently with the execution and delivery of this Bill of Sale, Seller is conveying (or causing to be conveyed) to Buyer, by Special Warranty Deed, that certain property located _____, together with all of the improvements located thereon (collectively, the "**Premises**").

B.      Seller desires to sell, assign, transfer and convey to Buyer, and Buyer desires to accept and obtain, the Personal Property (as hereafter defined), subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the receipt of Ten and No/100 Dollars ($10.00) and other good and valuable consideration in hand paid by Buyer to Seller, the receipt and sufficiency of which are hereby acknowledged by Seller, Seller does hereby SELL, ASSIGN, CONVEY, TRANSFER, SET OVER, and DELIVER to Buyer, without recourse or warranty, expressed or implied, with respect to Seller's interest therein or condition, merchantability or fitness for any purpose thereof, all of Seller's right, title and interest in and to the following personal property (the "**Personal Property**"):

Buyer acknowledges that Seller makes no representation or warranty with respect to the Personal Property and that Seller's interest in the Personal Property is being transferred in its "AS IS" "WHERE IS" condition, with all faults, IT BEING THE INTENTION OF SELLER AND BUYER TO EXPRESSLY NEGATE AND EXCLUDE ALL WARRANTIES WHATSOEVER, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, ANY CLAIM BY BUYER FOR DAMAGES BECAUSE OF DEFECTS, WHETHER KNOWN OR UNKNOWN WITH RESPECT TO THE PERSONAL PROPERTY, AND ANY OTHER WARRANTIES CONTAINED IN OR CREATED BY THE UNIFORM COMMERCIAL CODE AS NOW OR HEREAFTER IN EFFECT IN THE STATE IN WHICH THE PERSONAL PROPERTY IS LOCATED, OR CONTAINED IN OR CREATED BY ANY OTHER LAW. Seller confirms that Buyer is relying solely upon its own investigation of the Personal Property.

This Bill of Sale is subject to all of the provisions in that certain Real Estate Agreement of Sale between Seller and Buyer, dated as of _____, 2026.

Exhibit C-1

57927531.5 06/25/2026

This Bill of Sale may be executed in two or more counterpart copies, all of which counterparts shall have the same force and effect as if all parties hereto had executed a single copy of this Bill of Sale.

*[Balance of Page Intentionally Left Blank; Signature Page Follows]*

Exhibit C-2

57927531.5 06/25/2026

EXECUTED to be effective as of date set forth above.

**SELLER:**

_____,

a _____

By:_____

Name:_____

Title:_____

**BUYER:**

_____,

a _____

By:_____

Name:_____

Title:_____

Exhibit C-3